IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DEB STORES HOLDING LLC, et al.,[1] | ) | Case No. 14-12676 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## DECLARATION OF DAWN ROBERTSON IN SUPPORT OF FIRST DAY MOTIONS

I, Dawn Robertson, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.      I am the Chief Executive Officer of each of the above-captioned debtors

and debtors in possession (collectively, these entities are referred to as the "Debtors" or the

"Company"). I am familiar with the day-to-day operations, business, and financial affairs of the

Debtors, having served as CEO of each of the Debtors since July 2013. Prior to serving as CEO

of the Debtors, I held executive management positions for 30 years as a global business leader of

major retailers and department stores such as President of Old Navy (2006 to 2008), Managing

Director of Myer Department Stores (2002-2006), President and CMO of Federated Direct

(2000-2002), Executive Vice President of Federated Merchandising, reporting to the Chairman

of the Board (1998-2000), President and CEO of McRaes, a division of Saks Inc group of

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: Deb Stores Holding LLC (4407), Deb Stores Holding II LLC (4455), Deb Shops SDP Inc. (4120), Deb Shops SDIH Inc. (4113), Deb Shops SD Inc. (8806), Deb Shops SDE LLC (4077), Deb Shops SDW LLC (4065), Deb Shops SDE-Commerce LLC (0926), and Deb Shops SDFMC LLC (8842). The location of the Debtors' headquarters and the service address for each of the Debtors is 9401 Blue Grass Road, Philadelphia, PA 19114.

Department Stores (1997 to 1998), and for a decade was Senior VP and Executive VP of

Kaufmanns in Pittsburgh, a division of May Department Stores (1983 to 1997). More recently, I

have held a number of positions other than with Department Stores including President of Sean

John, a private high growth company founded by Sean "Diddy" Combs (June 2008 to August

2010), President and CEO of Avenue, a Large Size Womens, 450- store chain which was a

division of French owned PPR (August 2010 to April 2012), and President of Nygard,

International, a privately owned Canadian women's fashion apparel wholesale and retail

company (April 2012 to June 2013). I have a Bachelor of Arts degree from Auburn University.

2.      I am authorized to make decisions with respect to all aspects of the

management and operation of the Debtors' businesses including, without limitation,

organization, human resources, marketing, sales, logistics, finance, administration, oversight, and

of the prosecution of these chapter 11 cases (the "Cases"). In my capacities with the Debtors, I

have general knowledge of the books and records of the Debtors, and am familiar with the

Debtors' financial and operational affairs.

3.      I submit this declaration (the "Declaration") in support of the Debtors'

petitions and "first day" motions and applications, described further below (collectively, the

"First Day Motions").[2] Except as otherwise indicated, all statements in this Declaration are

based upon my personal knowledge, my review of the Debtors' books and records, relevant

documents and other information prepared or collected by the Debtors' employees, or my

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

opinion based on my experience with the Debtors' operations and financial condition.  In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      Based on my personal knowledge, and through my review of the Debtors' books, records and other information, I believe that the relief sought by the Debtors in the First Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession during the course of their respective Cases and in particular, up through a sale of substantially all of the Debtors' assets, which such sale the Debtors seek to expeditiously effectuate, as discussed more fully herein.

5.      Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of these Cases.[3]

---

[3] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

DOCS_LA:283886.1 17794/001

## PART I

### A.    Overview and History of the Debtors

6.      Headquartered in Philadelphia, Pennsylvania, the Company is a mall-based retailer in the juniors "fast-fashion" specialty sector that operates under the name "DEB" and offers moderately priced, fashionable, coordinated women's sportswear, dresses, coats, lingerie, accessories and shoes for junior and plus sizes.  The fast fashion retail sector is where most recent fashion trends are designed and manufactured quickly and at a low cost, so that the mainstream consumer can take advantage of current clothing styles.  DEB merchandise consists of clothing and accessories appealing primarily to fashion-conscious junior and plus-sized female consumers between the ages of 13 and 25.  As of September 30, 2014, the Company operated a total of 295 retail store locations (primarily in the East and Midwest, especially Pennsylvania, Ohio and Michigan) as well as an e-commerce channel.

7.      The Company, founded by Philip Rounick and Emma Weiner, opened its first store under the name JOY Hosiery in Philadelphia, Pennsylvania in 1932.  JOY Hosiery initially sold reasonably priced hosiery, lingerie, and foundations in a wide variety of styles.  In 1939, it added nylon stockings to its inventory when those became available.  The Company expanded in the Philadelphia area in the 1950s.  Company co-founder Philip Rounick's son, Marvin Rounick, became more involved in the management of the company joining in 1961.  Co-founder Aaron Weiner's son, Warren Weiner, followed suit in 1965.  During this time, the company observed the new phenomenon of suburban growth and construction of shopping malls.

4

They responded by opening stores in several locations making them larger and offering more merchandise.  In the 1970s, Marvin Rounick and Warren Weiner closed most of the neighborhood stores and focused on opening larger stores in shopping malls. The chain was also renamed Deb Shops and re-focused on women's and girls' clothing.

8.      Deb Shops began the 1980s with 59 stores.  Within two years, it had 121 stores, sales were more than $70 million, and earnings were up to $5.5 million.  Throughout the decade, the Company continued to grow, opening between 30 and 40 new stores a year, with most in regional shopping centers in major metropolitan areas.  As these malls increased their rents, however, Deb began looking to mid-sized markets and secondary markets adjacent to a major town.  The Company also started opening stores in less expensive strip shopping centers. The Company determined that the reduced costs associated with operating in strip shopping centers more than offset the diminished sales at the strip store locations compared to mall operations.  By 1989 the company had stores in 67 strip centers. Stores ranged in size from 5,000 to 10,000 square feet, with the average store occupying 6,000 square feet.

9.      The Company continued to grow during the 90's and the 00's.  Also during this period, Deb acquired other companies in an attempt to expand its business and diversify its product lines.  In the early 90's, the Company acquired Tops 'N Bottoms, a New York chain selling name-brand clothing for young men and women at moderate prices.  In addition to the smaller (2,300 to 3,400 square feet) stand-alone stores in the Tops 'N Bottoms chain, the company opened Tops 'N Bottoms departments in several DEB stores.  On October

5

20, 1995, the company bought Atlantic Book Stores for $4.47 million.  At the time of the sale,

the Atlantic Books chain consisted of 14 stores.  Three were full-service warehouse stores,

between 12,000 and 26,000 square feet large.  These specialized in remainder books at greatly

discounted prices while also offering bestsellers, new titles, and magazines.  The other 11 stores

were located in resort towns along the coasts of New Jersey and Delaware. These units were

much smaller, between 1,000 and 2,000 square feet, and sold primarily remainder books and

some new titles.[4]

       10.    By the late 00's, the size of DEB's retail business had increased to

approximately 300 stores.  At the same time, however, DEB experienced a significant

deterioration in its operating performance due to the challenging retail environment brought on

by the banking and credit crisis, the high unemployment rate, increased home foreclosures and

the eventual recession.  DEB's poor operating performance led to a number of debt covenant

violations with its existing lenders, but DEB was able to reach a consensual debt restructuring

with each of its lenders and extend operations through 2010.  During this period, DEB also hired

new senior management to implement a turnaround strategy which included a proposed sale of

the DEB's assets to a willing buyer.

**B.**      **The Predecessor DEB's Prior Chapter 11 Case and the 2011 Sale**

       11.    After extensive marketing efforts conducted during late 2010 and early

2011, DEB entered into a stalking horse agreement with its then existing first lien lenders to

---

[4] Deb Shops decided to focus on its expanding core business and sold Atlantic Books back to its founder, Mark Simon, in the fall of 2001.

6

facilitate the sale of the company through chapter 11 of the Bankruptcy Code.  On June 26, 2011,

parent company DSI Holdings, Inc. and its subsidiaries ("Predecessor DEB") filed petitions for

relief before this Court (Case No. 11-11941 (KJC)).  To facilitate the sale of assets and provide

sufficient liquidity to operate during the chapter 11 cases, Predecessor DEB's first lien lenders

agreed to provide debtor in possession financing and act as the stalking horse bidder for the

purchase of substantially all of Predecessor DEB's assets pursuant to the terms of an asset

purchase agreement between Predecessor DEB and Ableco Finance LLC ("Ableco"), in its

capacity as agent on behalf of the first lien lenders, dated as of June 24, 2011 (the "2011 Asset

Purchase Agreement").  Contemporaneously with the chapter 11 petitions, Predecessor DEB

filed a motion to approve the 2011 Asset Purchase Agreement as the stalking horse bid under

section 363 of the Bankruptcy Code and to establish procedures for overbidding in connection

therewith.

       12.     Ultimately, no other party submitted a higher or better bid for Predecessor

DEB's assets.  On September 13, 2011, the Bankruptcy Court presiding over Predecessor DEB's

chapter 11 cases entered its order approving the 2011 Asset Purchase Agreement and the

transactions contemplated thereby [Docket No. 441].  In connection with the closing of the

transactions under the 2011 Asset Purchase Agreement and as specifically contemplated by the

terms of the agreement, Ableco assigned all of its rights and obligations under the 2011 Asset

Purchase Agreement to the Debtors, as designees, and on October 11, 2011 the Debtors  closed

the sale transaction, whereby the Debtors acquired substantially all of Predecessor DEB's assets

7

and assumed the liabilities as contemplated in the 2011 Asset Purchase Agreement, including the

assumption of $60 million of Predecessor DEB's debt pursuant to the Term Loan described

below.  In that transaction, substantially all of Predecessor DEB's assets were acquired free and

clear of all liens, claims, encumbrances and other interests pursuant to Sections 363 and 365 of

the Bankruptcy Code.

### Business Operations

13.    DEB stores offer moderately priced, fashionable, coordinated young

women's sportswear, dresses, coats, jewelry, accessories, and shoes for fashion-conscious junior

and plus size females, between the ages of 15 and 25.  The stores are located in regional malls,

outlet centers and strip shopping centers in 44 states, principally in the Eastern and Midwest

regions of the United States and average 7,441 square feet.  The real estate locations for the DEB

Stores are leased from approximately 106 different landlords.

14.    The Company also sells its products through its e-commerce channels.

The Company's website, www.debshops.com, enables customers to shop online and serves as a

marketing tool to drive additional store traffic by showing current fashions and providing a store

locator.  In the summer of 2014, the Company opened an online store on Amazon.com in order

to expand its customer reach.  The Company's new website www.SugarPair.com is geared to

capitalize on the growing market for its shoes, jewelry and accessories and to expand into

additional age segments outside of the teen / juniors space by targeting an audience in the 25 –

45 years old segment.  As of the second quarter of 2014, the Company's e-commerce sales

comprise approximately 9% of total sales with the remaining approximately 91% of total sales made through the retail stores.

15.     To service its stores and operate its business, the Company maintains a corporate office and distribution center located on approximately 20 acres in the northeast section of Philadelphia, Pennsylvania (the "DEB Facility").  The DEB Facility is approximately 282,848 square feet and is leased pursuant to a lease that expires on January 31, 2018.  All DEB locations, including the DEB Facility, are leased.

16.     The Debtors utilize, in the aggregate, approximately 4,059 employees in hourly, salaried, supervisory, management, sales, distribution center personnel, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' businesses (collectively, the "Employees").  Of that workforce, approximately 903 are full-time Employees, while approximately 3,156 are part-time Employees.  Approximately 93 full-time and 10 part-time Employees are members of the labor union – United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW) Local 10-286 (the "Union") – covering Employees at the Debtors' Philadelphia warehouse facility.

## Vendor Relations

17.     Retailers in the fast fashion specialty sector must be able to provide their customers with high-quality merchandise that reflects the current fashion trends.  To do so requires the use of vendors who are able to cost-effectively manufacture and deliver goods to the

9

Company's distribution center in eight to twelve weeks.  Over the years, the Company has

developed a network of vendors to supply its stores with the right mix of well-made but low-cost

apparel and accessories.  As is typical in the industry, the Company does not have long-term

contracts with any of its vendors; rather the Company places orders on an as-needed basis and is

invoiced by the vendor.  For the most part, the Company's vendors are small, thinly capitalized

companies whose own financial position is often precarious.

18.    The Company places orders directly with approximately 11,000 vendors.

These vendors accept orders from the Company on credit, pay for the cost of production and

delivery and invoice the Company for the cost of the merchandise.  Typical invoice terms

provide for payment within 30-days of delivery, however, payment terms with certain vendors

are up to 60-days following delivery.  Because many of these vendors supply the Company with

merchandise on credit, the Company's business relationships with these vendors are essential to

the Company's ongoing operations.  In many instances, the Company could not replace these

vendors because the company believes that there are no other vendors who could supply the

Company with the necessary product at the required price-point.

19.    A majority of the Company's vendors are either unwilling or unable to

produce and deliver merchandise to the Company on credit.  To place orders with these vendors,

the Company must deal with the vendor's factor.  In this relationship, the Company places orders

with the vendor through the applicable factor.  The factor will then purchase, at a discount, the

account receivable owed to the applicable vendor with respect to the Company's order.  The

Company will then pay the factor on the invoice, generally between 30 and 60 days of the invoice. However, in order to stay within the applicable credit limit of a particular factor, the Company may pay certain invoices faster than the typical 30 to 60 timeframe. The Company is not party to the factoring agreement between the vendor and the factor. This system provides the factored vendor with upfront cash to pay for the cost of production and the Company's credit-risk is assumed by the factor.

20.     There are a number of different factors (the "Factors") through which the Company orders products, however three factors - Rosenthal & Rosenthal, Inc. ("Rosenthal"), CIT Group Inc. ("CIT"), and Milberg Factors, Inc. ("Milberg") - currently account for a vast majority of the Company's factored merchandise. Historically, approximately 60% of the Company's merchandise has been ordered through Factors, with Rosenthal, CIT, and Milberg accounting for more than 80% of all factored merchandise orders. The services that the Factors provide are irreplaceable to the Company, and if the Factors ceased accepting orders, the Company would be unable to obtain sufficient merchandise to adequately stock its stores and thus, continue business operations.

### Recent Financial Information

21.     As of December 31, 2013, the Debtors' most recent audited consolidated financial statements reflected assets totaling approximately $90.5 million and liabilities totaling approximately $120.1 million. As of that date, the Debtors' assets included cash or cash

DOCS_LA:283886.1 17794/001

equivalents of approximately $1.5 million, inventory of $45.4 million and accounts receivable of approximately $2.6 million.

22.     The Debtors' unaudited year-to-date total revenues as of November 1, 2014 amounted to approximately $205 million, an approximately 10% decrease over total revenues for the same period in 2013.  The Debtors' total revenues for the twelve-month period ending December 31, 2013 amounted to approximately $296 million, an approximately 3% decrease over total revenues for the twelve-month period ending December 31, 2012.  The Debtors' EBITDA for the twelve-month period ending December 31, 2013 was approximately $2.7 million, a 58% decrease from reported EBITDA during the twelve-month period ending December 31, 2012.  The Debtors' unaudited year-to-date EBITDA as of November 1, 2014 is approximately $1.17 million.

## C.     The Debtors' Corporate Structure

23.     The Debtors are a privately held company.  The majority of the equity of ultimate parent, Deb Stores Holding LLC, is held by certain private equity funds affiliated with Cerberus Capital Management (approximately 69.7%), Guggenheim Partners (approximately 21%), Credit Suisse Securities USA LLC (approximately 6%), and Lee Equity Partners (approximately 3.4%), which entities acquired these interests in connection with the 2011 sale transaction, described above.  Deb Stores Holding LLC and Deb Stores Holding II LLC are the direct and indirect owners of all other debtors.  In addition, certain members of management own

12

profit shares in the ultimate parent.  Attached hereto as **Exhibit A** is a detailed chart that sets

forth the corporate structure and organization for each of the Debtors.

24.    In July 2013, I was hired as CEO.  Other members of senior management

include:  Brad Cunningham, SVP Chief Merchandising Officer; Melissa Latham, SVP of Stores;

Keith Sprigel, Chief Financial Officer; and Avril Bryant, VP Store Operations.  Prior to the

appointment of Stephen Marotta and Barry Kasoff in November 2014, representatives of

Cerberus Capital Management LP and Guggenheim Partners were members of the Board.  The

current members of the board of managers for Deb Stores Holding LLC are: Stephen Marotta

(independent); Barry Kasoff (independent); and Susan Riley (independent).

## D.    Significant Indebtedness

25.    In connection with the closing of 2011 sale transaction, the Debtors

entered into two secured credit facilities, which constitute the majority of the Debtors' secured

indebtedness.  The secured credit facilities are described in the *Declaration of Timothy D. Boates*

*in Support of: Debtors' Motion for Entry of Interim and Final Orders Authorizing Borrowing*

*and the Use of Cash Collateral, Granting Liens and Providing Super-Priority Administrative*

*Expense Status and Granting Adequate Protection Pursuant to Sections 363 and 364 of the*

*Bankruptcy Code*, filed concurrently herewith.

26.    In addition, as of October 31, 2014, the Company's trade payables

amounted to approximately $11.3 million.

13

**E.    Circumstances Leading to the Commencement
        of the Chapter 11 Cases and Goals of Chapter 11 Cases**

27.    Deb's recent performance has been strained due to a combination of factors, including historic lack of capital invested in business resulting in old tired stores with unfavorable mall traffic trends and general weakness in the competitive Juniors Space.  The Company has continued to find traction in its growing Plus segment, as well as through an expanded e-commerce platform, as described above.  The Company also has been selectively closing unprofitable stores at the end of their lease terms, implementing cost cuts across the Company and increasing merchandise margins to improve EBITDA.

28.    In October of 2013, the Company retained Alix Partners to perform a store operational and payroll analysis.  Based on recommendations emerging from that study, store payroll was reduced by approximately $8 million annually and corporate costs were reduced.  Despite the operational improvements resulting from the implementation of Alix Partners' recommendations, the Company was not able to reverse the trend in decreasing top-line sales across the sector due in large part to a major shift online in the teen space.  As a result of and simultaneous with the Company's diminishing performance, the Factors has reduced the Company's access to credit, which has had a deleterious effect on the Company's liquidity.

29.    In August and September 2014, the Company solicited the existing equity holders concerning the possibility of making capital investments to the Company.  When these efforts were unsuccessful, the Board conducted a process to consider investment bankers to investigate potential third-party sources of capital investments or loans or a sale of the Company

14

as a going concern. In September 2014, the Company retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to provide general financial advisory services to explore strategic alternatives. Such alternatives included, among others, a potential sale of the Debtors, a potential debt and/or equity investment, as well as a potential refinancing of the Debtors' existing capital structure in order to provide additional liquidity to fund the ongoing strategic turnaround.

30.    In connection with exploring the Debtors' strategic alternatives, beginning in October 2014, Houlihan Lokey contacted 79 potentially interested parties, including 61 financial sponsors/investment funds and 18 strategic buyers, regarding a potential investment or sale transaction. At the commencement of this process the Company's liquidity position was forecasted to be sufficient to run a 60 to 90 day marketing process under reasonably stable business conditions. Parties that expressed an interest in a potential transaction were asked to execute a confidentiality agreement with the Debtors. Houlihan Lokey assisted the Debtors in establishing a virtual data room (the "Dataroom") to enable those interested parties who executed confidentiality agreements with the opportunity to conduct diligence on the Debtors' financial and operational information, including management's business plan forecast. Houlihan Lokey also facilitated this process by providing additional information when requested by interested parties.

31.    At the end of October to early November, given softer than expected performance trends, the Debtors' liquidity position began to weaken substantially and a forecasted potential liquidity shortfall developed as early as mid-November. The Debtors

15

approached their lenders and sponsors seeking additional liquidity support to cover this potential

shortfall and fund operations. When it became apparent that the requested liquidity support was

not available, the Debtors began exploring numerous self-help liquidity initiatives, including

expense reductions and the deferral of rent payments, which measures provided temporary

deferral of the forecasted liquidity shortfall. It was also determined that the marketing process

should be augmented to solicit investor interest in (i) consummating a financing or sale

transaction through a near-term bankruptcy process and (ii) serving as a potential stalking horse

purchaser or plan sponsor in a bankruptcy process.

    32.    The augmented marketing process run by Houlihan Lokey did not yield a

going concern bid from a stalking horse investor/purchaser. However, I am advised that

Houlihan Lokey communicated to interested parties that there may still be the potential to bid on

the assets on a going-concern basis at a bankruptcy related auction and that there remains interest

by going concern buyers.

    33.    In connection with contingency planning for a potential Chapter 11 filing,

beginning October 29, 2014 and through early November (concurrent with the going-concern

sale and financing processes), Houlihan Lokey contacted five nationally known liquidators

capable of handling a company-wide store closing process and requested proposals from each to

serve as a stalking horse purchaser of the Debtors' assets whose contract would be subject to

potential higher and/or better bids, including potential going-concern bids, at a bankruptcy

auction. Each of these parties executed a confidentiality agreement and received access to the

16

Dataroom, as well as additional confidential information about the Debtors' assets. Several of the parties explored the possibility of entering into joint ventures with each other.

34.    By November 13, 2014, the Debtors received two preliminary proposals that are typical of such proposals in the liquidation industry for conducting store closing sales to sell inventory and disposing of FF&E in the store locations, distribution center and the corporate headquarters. In particular, each of the proposals provided that the liquidator would pay the Debtors a guaranteed amount of cash equal to a fixed percentage of the Debtors' cost value of their inventory, subject to certain adjustments. Both proposals provided for payment of certain store-related expenses of the Debtors, including but not limited to occupancy and payroll expenses, plus certain operating expenses up to certain capped amounts for the duration of store closing sales. Notably, neither proposal contemplated the purchase of the Debtors' intellectual property assets.

35.    The Debtors, having not received any going-concern stalking horse bids, and their advisors, in consultation with the Debtors' prepetition secured lender under the *Revolving Credit and Security Agreement* dated as of October 11, 2011, and proposed postpetition secured lender under the *Senior Secured Superpriority Debtor-in-Possession Revolving Credit and Security Agreement*, PNC Bank National Association ("PNC Bank"), and the secured lenders under the *Financing Agreement* dated as of October 11, 2011 with Ableco, L.L.C. as administrative and collateral agent (the "Term Loan Secured Parties"), are working with a joint venture comprised of Gordon Brothers Retail Partners and Hilco Merchant

Resources (the "Potential Stalking Horse"), to finalize a form of agency agreement, pursuant to which the Potential Stalking Horse would be designated as the Debtors' agent to conduct store closing sales and liquidate the Debtors' inventory.

36.    After months of challenging sales and lack of refinancing prospects, the Debtors have determined that the best way to maximize value for the benefit of all interested parties is to continue to negotiate the terms of an agency agreement with the Potential Stalking Horse and if a final agreement is reached, to seek approval thereof, subject to higher and better bids. The conclusion to enter into an agreement with the Potential Stalking Horse was reached following a lengthy process in which the Debtors considered and explored all reasonable strategic alternatives, as described above.

37.    In order to proceed with a transaction as expeditiously as possible, the Debtors anticipate shortly filing a motion seeking, among other things, approval of an agency agreement with the Potential Stalking Horse or a higher and better offer, grant bidding protections to the Potential Stalking Horse, establish bidding procedures for an auction and conduct a hearing on the request to conduct store closing sales and liquidate their inventory through a liquidator or to consummate an alternative transaction of the successful bidder. The Debtors believe that conducting store closing sales, or consummating a higher and better transaction, will maximize value for the Debtors' estates while minimizing the administrative expenses incurred in these Cases.

DOCS_LA:283886.1 17794/001

38.     After filing their petitions, the debtors intend to operate their businesses in the ordinary course, while pursuing all options for maximizing value.  In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct the Cases efficiently and economically.

## PART II

### First Day Motions and Applications

39.     In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

40.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

**A.     Debtors' Motion for Order Directing Joint Administration
of Related Chapter 11 Cases**

41.     The Debtors in these Cases are affiliated entities.  I am informed by counsel that the joint administration of the Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the Debtors' respective

19

estates and other parties in interest, which will result in significant savings to the estates.

Accordingly, I believe that the relief requested in the joint administration motion is in the best

interests of the Debtors' estates.

**B.      Application of Debtors for Order Under 28 U.S.C. § 156(c)
Authorizing and Approving the Retention of and Appointing
Epiq Bankruptcy Solutions, LLC as Noticing, Claims and Balloting Agent**

42.     The Debtors seek to authorize and approve the retention and appointment

of Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent in these Cases (the

"Epiq Application") to assume full responsibility for the maintenance, processing, and docketing

of proofs of claim, filed in the Cases, and such other services as the Debtors may request to the

extent set forth in the services agreement attached to the Epiq Application.  I am also informed

that Epiq has acted as the claims and noticing agent in numerous cases of comparable size in this

and other judicial districts, including, in this district and has substantial experience acting in such

capacity.  The Debtors anticipate that there will be thousands of entities to be noticed in the

Cases.  In view of the number of anticipated claimants and the complexity of the Debtors'

businesses, I believe that the appointment of Epiq as claims and noticing agent is both necessary

and in the best interests of the Debtors' estates and their creditors.

DOCS_LA:283886.1 17794/001

**C.    Motion of Debtors for Order Under 11 U.S.C. §§ 105, 345,
363, 503(b), 1107, and 1108 Authorizing (I) Maintenance of Existing
Bank Accounts, (II) Continued Use of Existing Business Forms,
(III) Continued Use of Existing Cash Management System, (IV) Continued
Performance of Intercompany Transactions and Providing for Administrative
Priority Status to Postpetition Intercompany Claims; and
(V) Waiver of Section 345(b) Deposit and Investment Requirements**

43.    The Debtors seek an order authorizing the (i) maintenance of existing

bank accounts, (ii) continued use of existing business forms, (iii) continued use of existing cash

management system for the Debtors, (iv) continued performance and funding of intercompany

transactions, and (v) limited waiver of section 345(b) of the Bankruptcy Code deposit and

investment requirements (the "Cash Management Motion").

44.    The Debtors' cash management system (the "Cash Management System")

facilitates the timely and efficient collection, management and disbursement of funds used in the

Debtors' business. The estimated range for cash receipts is from $4 million to $7.5 million per

week in the month of December. Collections in a single day may be as high as $5 million during

that time period. Total disbursements by the Company are estimated to range between $1.4

million to $8.9 million per week. Disbursements in a single day may be as high as $5.8 million.

Because of the nature of the Debtors' business and the disruption to the business that would

result if they were forced to close their existing bank accounts, it is critical that the existing Cash

Management System remain in place.

45.    The Cash Management System consists of bank accounts (the "Bank

Accounts"), which are maintained at Wells Fargo Bank, N.A., PNC Bank, U.S. Bank, and the

DOCS_LA:283886.1 17794/001

various other banks listed on Exhibit B attached to the Cash Management Motion (collectively, the "Banks").  The Debtors propose to continue using the Bank Accounts described in the Cash Management Motion and as set forth in Exhibits C-1 through C-3 thereto, subject to their right to close certain accounts in their discretion and in accordance with any approved debtor-in-possession financing.  Continuing the Debtors' Cash Management System without interruption is vital to the success of these Cases.  The Cash Management System is an efficient mechanism whereby the Debtors are able to transfer their revenues toward the payment of their obligations.

46.     Accordingly, I believe that it is critical that the Debtors continue to utilize their existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**D.     Motion of the Debtors for Entry of an Order:(I) Authorizing the Debtors o (A) Pay Wages, Salaries, and Other Compensation, (B) Maintain Employee Medical and Similar Benefits, and (C) Pay Reimbursable Employee Expenses; and (II) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing**

47.     The Debtors seek an order (a) authorizing, but not requiring the Debtors to (i) pay and/or honor and remit prepetition wages, salaries, and certain other compensation, payroll withholdings and benefits contributions, (ii) maintain employee medical and similar benefits, (iii) pay reimbursable employee expenses, and (iv) pay prepetition payroll and benefits administrative fees and expenses, subject to caps shown below; and (b) authorizing banks and

other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing (the "Wages Motion").

48.     The Debtors utilize, in the aggregate, approximately 4,059 employees in hourly, salaried, supervisory, management, sales, distribution center personnel, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' businesses (collectively, the "Employees").   Of that workforce, approximately 903 are full-time Employees, while approximately 3,156 are part-time Employees.

49.     Approximately 93 full-time and 10 part-time Employees are members of the labor union –United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW) Local 10-286 (the "Union")– covering Employees at the Debtors' Philadelphia warehouse facility.  Debtor Deb Shops SD, Inc. and the Union are parties to that certain collective bargaining agreement dated effective as January 1, 2012 and expiring December 31, 2014 (as amended, modified or supplemented from time to time, the "CBA").  The CBA provides for certain Benefits for eligible Union Employees relevant to the Wages Motion.

50.     To minimize the personal hardships that the Employees (both those who have been terminated and those are being retained) will suffer if its prepetition employment-related obligations are not paid or honored, to maintain the morale of the retained Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations and the administration of the estates, the Debtors seek authority, in their sole discretion, to:  (i)

DOCS_LA:283886.1 17794/001

pay unpaid prepetition claims for wages, salaries, non-insider bonuses, and other compensation (collectively, the "Unpaid Wages") to the Employees (both those who have been or may be terminated and those who are being retained) up to $12,475 per employee; (ii) pay and remit the Withholding Obligations to the proper third parties; (iii) pay any prepetition fees and charges owed to the Payroll Related Administrators; (iv) honor and maintain certain Employee related benefits offered by the Debtors (collectively, the "Benefits"); (v) reimburse certain unpaid business Expense Reimbursement Obligations incurred prepetition by Employees; and (vi) pay all costs incident to the foregoing as set forth in the Wages Motion.

51.    In summary, the Debtors seek authority, in their sole discretion, to continue to honor and implement the employee related policies and practices as described above and pay Unpaid Wages, the Other Worker Compensation, and the various Benefits as described above, including the estimated amounts set forth below:

| | |
|---|---|
| Unpaid Wages (including any "floating" payroll wage and non-insider bonus checks issued in prepetition payroll, and Withholding Obligations other than Payroll Related Tax Obligations) | $2,210,000 |
| Other Worker Compensation | $20,000 |
| Expense Reimbursement Obligations | $152,000 |
| Medical Plan Obligations | $300,000 |
| Union Medical Reimbursement Claims | $1,100 |
| Debtor-Spending Account Contributions (excluding Employee-funded contributions that are part of Withholding Obligations) | $600 |

24

| Life Insurance and Disability Insurance | $15,000 |
|---|---|
| Dental and Vision Plans | $18,000 |
| Payroll Related Administrators | $7,000 |
| 401(k) Auditor | $15,000 |
| Workers' Compensation Obligations | $241,500 |
| Store Mgr. Bonuses (excluding previously issued floating checks) | $60,000 |
| District Mgr. Bonuses (excluding previously issued floating checks) | $10,000 |
| Magazine Bonuses (excluding previously issued floating checks) | $10,000 |
| DC Bonuses (excluding previously issued floating checks) | $6,000 |

provided that no Employee will be paid a total distribution of more than the $12,475 statutory priority cap on account of prepetition Wages, any prepetition bonuses, and accrued Paid Time Off (if applicable).

52.    Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses.  These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business.  Moreover, the Debtors believe that if they are unable to honor accrued Unpaid Wages and Benefits described in the Wages Motion, Employee morale and loyalty will be jeopardized at a time when support by the remaining Employees is critical.  Further, as discussed in the Wages Motion, in respect to the Debtors' request to pay the Other Worker Compensation, the applicable members of the Debtors' workforce, while technically not

25

Employees, provide critical and necessary marketing and accounting related services to the Debtors. Failure to pay the Other Worker Compensation may jeopardize these workers continuing to provide important functions for the Debtors, thereby adversely affecting the Debtors' operations.

53.     The Payroll Related Tax Obligations and certain other amounts either voluntarily or involuntarily withheld from Employee paychecks do not constitute property of the Debtors' estates and principally represent employee earnings that governments (in the case of taxes), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the applicable Employees may face legal action due to the Debtors' failure to submit these payments.

54.     Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the estates given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, and the withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estates.

26

55.     Generally, the Employees are critical components to the success of these Cases.  Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets.  Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to ensure continued, efficient operation in order to maximize value for all creditors.

56.     Accordingly, I believe that the relief requested in the Wages Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**E.    Motion Of The Debtors For An Order (I) Authorizing The Debtors To Pay Prepetition Sales, Use And Similar Taxes And Regulatory Fees In The Ordinary Course Of Business And (II) Authorizing Banks And Financial Institutions To Honor And Process Checks And Transfers Related Thereto**

57.     The Debtors seek an order (i) authorizing, but not directing, the Debtors to pay certain prepetition taxes, including, sales and use taxes, franchise taxes, and similar taxes and fees in the ordinary course of business, as the Debtors, in their sole discretion, deem necessary; and (ii) authorizing banks and financial institutions to receive, process, honor and pay all checks and transfers related thereto (the "Taxes Motion").

58.     In the ordinary course of business, the Debtors collect and pay taxes, including, but not limited to, sales and use taxes, franchise taxes, and certain other business license fees, to various taxing authorities in multiple jurisdictions (the "Taxing Authorities").

59.     The Debtors collect and remit sales, use and related taxes ("Sales and Use Taxes") to the Taxing Authorities in all 50 states, and/or certain municipal or governmental subdivisions or agencies of those states in connection with the sale of their products or services at store locations in those states, or through shipments of products purchased through the Debtors' website to customers.  As of the Petition Date, the Debtors estimate that they currently owe approximately $1,300,000.00 in unremitted Sales and Use Taxes.

60.     The Debtors are required to pay franchise taxes (the "Franchise Taxes") to certain Taxing Authorities to operate their businesses in the applicable taxing jurisdiction. Certain states may refuse to qualify a debtor to do business in a state or recognize a name change, merger or other activity if franchise taxes have not been paid.  As of the Petition Date, the Debtors do not believe they there are any Franchise Taxes due and owing, but if any amounts are due and owing, the Debtors submit that such amounts are de minimis and request authority to pay such amounts if necessary, up to an amount of $5,000.00.  The Debtors are required to pay various taxes and fees for business licenses, annual reports, various permits, and other similar types of taxes and fees (the "Business Fees") in order to continue conducting their businesses pursuant to state and local laws.  As of the Petition Date, the Debtors do not believe they there are any Business Fees due and owing.  Out of an abundance of caution, however, the Debtors' request authority to pay any such Business Fees up to an amount of $5,000.00.

61.     In summary, the Debtors seek authorizing to pay any Sales and Use Taxes, Franchise Taxes, and Business Fees (collectively, the "Prepetition Tax Obligations") to the

28

respective Taxing Authorities or to the parties who ordinarily collect the Prepetition Tax Obligations in the ordinary course of the Debtors' business, including, without limitation, Sales and Use Taxes or Franchise Taxes subsequently determined on audit to be owed for periods prior to the Petition Date.  The Debtors seek authority to remit Prepetition Tax Obligations in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared and amounts that may be subsequently determined on audit to be owed a particular Taxing Authority or party who ordinarily collect the Prepetition Tax Obligations) not to exceed $1,310,000.00 (the "Prepetition Tax Obligations Cap"), without prejudice to the Debtors' rights to contest the amounts of any Prepetition Tax Obligations on any grounds they deem appropriate.

62.     Payment of the Prepetition Tax Obligations are critical as (i) portions of the Prepetition Tax Obligations not property of the estate; (ii) portions of the Prepetition Tax Obligations are entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code; (iii) the Taxing Authorities or the parties who ordinarily collect the Prepetition Tax Obligations may file liens, initiate audits, or otherwise proceed against Debtors for unpaid Prepetition Tax Obligations and such actions will result in unnecessary expense and distraction from the Debtors' efforts to maximize the value of their estates.

63.     Accordingly, I believe that the relief requested in the Taxes Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

DOCS_LA:283886.1 17794/001

**F.    Debtors' Motion for an Order Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Shippers and Granting Related Relief**

64.    The Debtors seek an order (i) authorizing, but not directing, the Debtors to pay certain prepetition claims of shippers and customs representatives, and (ii) authorizing financial institutions to receive, process, honor and pay all checks issued and electronic payment requests made relating to the foregoing (the "Shippers Motion").

65.    In particular, the Debtors seek the authority to continue to pay, in the ordinary course of business, certain prepetition claims of the Debtors' shippers, customs representatives and warehousemen (the "Shippers and Customs Representatives") who have (or may have) non-bankruptcy law remedies available to secure payment of their claims.  The Debtors propose to pay such claims, when, in the Debtors' sole discretion, such creditors' exercise of such remedies would unduly disrupt the Debtors' business.  The Debtors request the authority, but not the obligation, to pay up to $1,300,000 on account of such claims (the "Shipping and Custom Charges"), as described further in the Shippers Motion.

66.    The Debtors' business depends on the daily process of importing and shipping its clothing products to stock the Debtors' stores.  Annually, the Debtors acquire merchandise with an approximate retail value of over $250 million dollars to stock the Debtors' stores.  The Debtors acquire the merchandise primarily from domestic vendors (the "Domestic Merchandise") with a smaller quantity acquired from foreign manufacturers (the "Foreign Merchandise", together with the Domestic Merchandise, the "Merchandise").  The flow of Merchandise to stock the Debtors' stores is dependent on the services provided by custom

30

brokers, freight forwarders, common carriers, and the warehouse that serves as the Debtors' distribution center.

67.     The value of the Merchandise that is in transit with the Shippers and Customs Representatives or stored in the Distribution Center substantially outweighs the Shipping and Custom Charges. The Debtors anticipate that the Shippers and Customs Representatives will demand immediate payment from the Debtors. Even absent a valid lien, the Shippers and Customs Representatives' mere possession (and retention) of the Debtors' goods and supplies could severely disrupt the Debtors' operations and efforts to maximize the value of their estates for the benefit of their creditors.

68.     Accordingly, I believe that the relief requested in the Shippers Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**G.      Motion For Entry Of An Order Pursuant To Sections 105(a),363(c), 1107(a), And 1108 Of The Bankruptcy Code And Bankruptcy Rules 6003 And 6004 Authorizing The Debtors To Honor Prepetition Obligations To Customers And To Otherwise Continue Customer Practices And Programs In The Ordinary Course Of Business**

69.     The Debtors seek an order (a) authorizing the Debtors to maintain and administer the Customer Programs and honor prepetition obligations to customers related thereto in their discretion in the ordinary course of business and in a manner consistent with past practice; (b) continue, replace, implement, modify and/or terminate on or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court; and (b) granting related relief (the "Customer Programs Motion").

31

70.    Maintaining the loyalty, support, and goodwill of their customers is critical to the Debtors' reorganization efforts.  In addition, the Debtors must maintain positive customer relationships and their reputation for reliability to ensure that their customers continue to purchase the Debtors' products.  Achieving these goals will be particularly important while operating in chapter 11.  In the ordinary course of business, the Debtors provide customers with certain Customer Programs that engender goodwill, maintain loyalty, increase the Debtors' sales opportunities, and allow the Debtors a comparative advantage over their competition.  Specifically, the Customer Programs generally relate to the Debtors' programs by which they offer gift cards, refunds and exchanges, lay-a-away, coupons and other promotional offers to their customers, as well as processing customer purchases through the use of credit cards and other commonly accepted payment methods.  The Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, to meet competitive market pressures, and to ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all the Debtors' stakeholders.

71.    The Customer Programs are standard in the industry for any retail company.  If the Debtors are not able to offer any of the Customer Programs, their ability to conduct business and generate sales will be severely hampered.  On the other hand, continuing to administer their Customer Programs without interruption during the pendency of these Cases will

help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the

benefit of all of the Debtors' creditors and will benefit the estates.  In addition, continued

maintenance of the Customer Programs will allow the Debtors to maintain their competitive edge

in the industry.  Importantly, the Debtors' competitors maintain similar programs.  As such, the

Debtors' various customers have a ready audience willing to meet such customers' needs and

take such customers' business away from the Debtors.  Thus, if the Debtors are unable to

continue their Customer Programs postpetition or to pay amounts due and owing to their

customers under the various Customer Programs, the Debtors risk alienating certain customer

constituencies, losing at least some of such customers to the Debtors' competitors, and suffering

the corresponding losses in customer loyalty and goodwill that will harm the Debtors' goal of

maximizing value for all constituents.

      72.     Accordingly, I believe that the relief requested in the Customer Programs

Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**H.    Motion of the Debtors for an Order Under Section 366 of the Bankruptcy
Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing
Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C)
Establishing Procedures for Determining Adequate Assurance of Payment**

      73.     The Debtors seek interim and final orders (a) approving the Debtors'

Proposed Adequate Assurance of payment for future utility services, (b) prohibiting Utility

Companies from altering, refusing, or discontinuing services, (c) approving the Debtors'

proposed procedures for resolving Adequate Assurance Requests, and (d) granting related relief

(the "Utilities Motion").

DOCS_LA:283886.1 17794/001

74.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telephone, water, waste disposal, and other similar services (collectively, the "Utility Services") from a number of utility companies or brokers (collectively, the "Utility Companies").  A nonexclusive list of the Utility Companies and their affiliates that provide Utility Services to the Debtors as of the Petition Date (the "Utility Services List") is attached to the Utilities Motion as Exhibit C.

75.     To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to the Debtors' undisputed invoices for prepetition Utility Services.  On average, the Debtors pay approximately $565,318.50 each month for third party Utility Services.  Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $282,659.25.  To the best of the Debtors' knowledge, none of the Utility Companies hold deposits from the Debtors, nor do the Debtors have any existing prepayments with respect to any Utility Companies.

76.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner.  Cash held by the Debtors, cash generated in the ordinary course of business, and cash available to the Debtors through their debtor in possession financing facility, will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with prepetition practice.

77.     To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $282,659.25 (the "Adequate Assurance Deposit"), which

34

represents an amount equal to approximately one half of the Debtors' average monthly cost of

Utility Services, calculated based on the Debtors' average third party utility expenses over the 12

months ended December 31, 2013.  The Adequate Assurance Deposit will be held in the

segregated account for the duration of these Cases and may be applied to any postpetition

defaults in payment to the Utility Companies.  The Debtors submit that the Adequate Assurance

Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance

with prepetition practice (collectively, the "Proposed Adequate Assurance"), constitutes

sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the

Bankruptcy Code.

      78.     Uninterrupted Utility Services are essential to the Debtors' ongoing

business operations.  The Debtors' operations require electricity and gas for lighting, heating,

trash, sewer services, and air conditioning.  Should any Utility Provider refuse or discontinue

service, even for a brief period, the Debtors' business operations could be severely disrupted, and

such disruption would jeopardize the Debtors' ability to operate their business.  Accordingly, it is

essential that the Utility Services continue uninterrupted during the Cases.

      79.     Accordingly, I believe that the relief requested in the Utilities Motion is

both necessary and in the best interests of the Debtors' estates and their creditors.

DOCS_LA:283886.1 17794/001

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December ___4___, 2014

By:    Dawn Robertson
Title:    Chief Executive Officer