IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DEB STORES HOLDING LLC, et al.,[1] | ) | Case No. 14-12676 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## MOTION FOR ENTRY OF AN ORDER: (I) AUTHORIZING DEBTORS TO (A) PAY WAGES, SALARIES, AND OTHER COMPENSATION, PAYROLL WITHHOLDINGS AND BENEFITS CONTRIBUTIONS, (B) MAINTAIN EMPLOYEE MEDICAL AND SIMILAR BENEFITS, AND (C) PAY REIMBURSABLE EMPLOYEE EXPENSES; AND (II) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT REQUESTS MADE BY DEBTORS RELATING TO THE FOREGOING

The above-captioned debtors and debtors in possession ("Deb Shops" or the

"Debtors"), hereby move (the "Motion") the Court for entry of an order, substantially in the form

annexed hereto as **Exhibit A**: (a) authorizing, but not requiring the Debtors to (i) pay and/or

honor and remit prepetition wages, salaries, and certain other compensation, payroll

withholdings and benefits contributions, (ii) maintain employee medical and similar benefits,

(iii) pay reimbursable employee expenses, and (iv) pay prepetition payroll and benefits

administrative fees and expenses, subject to caps shown below; and (b) authorizing banks and

other financial institutions to receive, process, honor, and pay all checks presented for payment

and electronic payment requests relating to the foregoing.

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Deb Stores Holding LLC (4407), Deb Stores Holding II LLC (4455), Deb Shops SDP Inc. (4120), Deb Shops SDIH Inc. (4113), Deb Shops SD Inc. (8806), Deb Shops SDE LLC (4077), Deb Shops SDW LLC (4065), Deb Shops SDE-Commerce LLC (0926), and Deb Shops SDFMC LLC (8842).  The location of the Debtors' headquarters and the service address for each of the Debtors is 9401 Blue Grass Road, Philadelphia, PA 19114.

In support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 507(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

### Background

4.      On the date hereof (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Debtors' chapter 11 cases (the "Cases") for procedural purposes only.  The Debtors are operating their

business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee (the "U.S. Trustee").

5.    The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the *Declaration of Dawn Robertson in Support of First Day Motions* (the "Robertson Declaration") filed concurrently herewith and fully incorporated herein by reference.[2]

### Debtors' Employees

6.    The Debtors utilize, in the aggregate, approximately 4,059 employees in hourly, salaried, supervisory, management, sales, distribution center personnel, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' businesses (collectively, the "Employees").[3]  Of that workforce, approximately 903 are full-time Employees, while approximately 3,156 are part-time Employees.[4]

7.    Approximately 93 full-time and 10 part-time Employees are members of the labor union –United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW) Local 10-286 (the "Union")– covering Employees at the Debtors' Philadelphia warehouse facility.  Debtor Deb Shops SD, Inc.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Robertson Declaration.
[3] Substantially all of the Employees are paid their Wages through a bank account maintained by Debtor Deb Shops SDFMC LLC.
[4] As discussed herein, the Debtors seek certain limited relief in respect to two workers utilized by the Debtors, who are provided by employment agencies.  These individuals provide necessary and important functions in the Debtors' business and operations.

and the Union are parties to that certain collective bargaining agreement dated effective as January 1, 2012 and expiring December 31, 2014 (as amended, modified or supplemented from time to time, the "CBA"). The CBA provides for certain Benefits for eligible Union Employees relevant to this Motion, as discussed further below, including in respect to vacation pay, holiday pay and other paid-time-off, medical plan related contributions/reimbursements, life insurance, and legal fund contributions. Nothing herein is intended to modify the terms of the CBA, and to the extent there is any inconsistency between the relevant Benefit description provided herein and the CBA, the latter controls. Further, nothing herein shall be deemed a request by the Debtors for authority to assume the CBA at this juncture.

8.     To minimize the personal hardships that the Employees (both those who have been terminated and those are being retained) will suffer if its prepetition employment-related obligations are not paid or honored, to maintain the morale of the retained Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations and the administration of the estates, the Debtors, by this Motion, seek authority, in their sole discretion, to: (i) pay unpaid prepetition claims for wages, salaries, non-insider bonuses, and other compensation (collectively, the "Unpaid Wages") to the Employees (both those who have been or may be terminated and those who are being retained) up to $12,475 per employee; (ii) pay and remit the Withholding Obligations (defined below) to the proper third parties; (iii) pay any prepetition fees and charges owed to the Payroll Related Administrators (as defined below); (iv) honor and maintain certain Employee related benefits (as more fully set forth in Section C below) offered by the Debtors (collectively, the "Benefits"); (v) reimburse certain unpaid

business Expense Reimbursement Obligations (defined below) incurred prepetition by Employees; and (vi) pay all costs incident to the foregoing as set forth in detail below.

### Debtors' Compensation and Benefits Programs

**A.    Unpaid Wages and Withholding Obligations**

**1.    Employee Wages**

9.    The Debtors' average aggregate gross payroll per paycycle including wages and salaries (collectively, "Wages") and Withholding Obligations (defined below) is approximately $2.375 million (although there are fluctuations during, for example, holiday periods). The Employees are paid in arrears, on a bi-weekly basis, typically every other Thursday, with direct deposits or checks issued on the Thursday after the close of each pay period; while checks are issued on that Thursday, such checks are not handed out to many Employees until the next day, Friday. Because of the intervening Thanksgiving holiday, the Debtors' last payroll was made on Friday, November 28th, covering Wages earned from November 9, 2014 through November 22, 2014. However, because of the timing of the filing, many of the paychecks given to Employees as part of the last prepetition payroll (totaling approximately $270,000) may not have been presented or cleared. Thus, the Debtors seek authority to honor all such checks (or reissue checks if necessary) with respect to that prepetition payroll, up to $270,000.

10.    The next payday is scheduled for Thursday, December 11, 2014, covering the pay period November 23 to December 6, 2014, with (subject to Court approval) the Debtors' funding of direct deposits to be authorized on December 9th, direct-deposit Employees' bank

accounts to receive such funds on December 11th, live checks to be issued by the Debtors generally on December 11th, and most live checks to be delivered to Employees on either Thursday December 11th or Friday, December 12th. The Debtors believe they owe an estimated $1,950,000 in gross earned but unpaid prepetition Wages for Employees (including applicable Withholding Obligations (discussed below) other than Payroll Related Tax Obligations) which would be paid as part of the December 11th payroll.[5]

11.     Based on the foregoing, the Debtors seek authority to pay the total amount of unpaid Wages for Employees up to a total aggregate amount of $2,220,000, which includes the $270,000 estimate for previously issued payroll checks (in the event an Employee did not timely deposit or cash such check before the Petition Date).

### 2.    Employer Tax Obligations and Withholding Obligations

12.     In the ordinary course of business, the Debtors routinely withhold from Wages, and also owe in connection with Wages, certain amounts required to be transmitted to taxing authorities, including, without limitation, employer payroll taxes and Employees' portions of FICA and unemployment taxes (collectively, the "Payroll Related Tax Obligations"). The Payroll Related Tax Obligations are remitted by an administrator, Ceridian, as discussed below. In the ordinary course, the Debtors also withhold contributions to the Debtors' health, vision, dental benefit plans and other insurance plans, 401(k) contributions and 401(k) loan repayments, employee medical contributions, flexible spending and dependent care accounts and other similar accounts, and withholdings for garnishment, or child support or similar obligations pursuant to

---

[5] No Employee is owed more than $12,475 in unpaid Wages as of the Petition Date.

court order or law (the "<u>Benefits Withholdings</u>" and, together with the Payroll Related Tax

Obligations, the "<u>Withholding Obligations</u>").  The Debtors estimate that Payroll Tax Related

Obligations, accrued as of the Petition Date, total approximately $430,000, which amount should

be withheld as part of the Withholding Obligations and remitted to the proper taxing authorities.

The Debtors estimate all other prepetition Withholding Obligations to total approximately

$540,000.

13.    The Debtors seek authority to withhold any and all Withholding

Obligations from the paychecks and remit such amounts to the applicable governmental entities

and other third parties, and to pay and remit the appropriate Payroll Related Tax Obligations

owed by the Debtors, in the ordinary course of business.

**3.    <u>Employment Agency Workers</u>**

14.    The Debtors utilize some workers from third party employment agencies

to fulfill important operations related functions.  One worker provides important accounting

related services to the Debtors on a temporary basis and fills a gap that had resulted from a

former employee's retirement.  The second worker provides necessary graphic design related

services including work relating to the Debtors' website.  These workers have been in place for

substantial periods prepetition.  The other temporary workers (approximately 22) provide

necessary functions at the Debtors' distribution center relating to the Debtors' ecommerce

business.  These additional workers are needed to supplement the Debtors' normal workforce

(including dealing with a large number of merchandise backorders) during the busy holiday

season, which is an extremely critical period for the Debtors' business.  All of these workers

provide functions necessary in the Debtors' operations; obtaining suitable replacements would be difficult and/or time-consuming (particularly because replacements would need time to "get up to speed"), and an ineffective use of estate resources during this critical stage of the bankruptcy cases. The Debtors estimate that the prepetition amounts accrued and owed to the employment agencies may be approximately $65,000 total.    While these workers may not be employees of the Debtors, they provide substantial, vital services to the Debtors and thus, the Debtors seek authority to pay their prepetition compensation (collectively, "Other Worker Compensation") in the ordinary course, up to an aggregate cap of $65,000.

**B.**    **Payroll/Benefits Related Administrators**

15.    The Debtors employ Ceridian Tax Service ("Ceridian") as their payroll tax administrator to process and transfer payroll tax related amounts from a given payroll to the appropriate taxing authorities. As part of each payroll, the Debtors initiate a wire to Ceridian with the applicable amounts typically on the Wednesday before the Thursday payday, and Ceridian proceeds to make payments to the taxing authorities after receipt of the funds from the Debtors. Ceridian's compensation is approximately $4,100 per month, and is paid in arrears. The Debtors estimate that, as of the Petition Date, they owed Ceridian approximately $12,000. The Debtors seek authority to pay any prepetition amounts owed to Ceridian, up to $14,000 in the ordinary course of business.

16.    The Debtors also employ Mercer Marketplace and/or its affiliate ("Mercer" and together with Ceridian, "Payroll Related Administrators") as an administrator in respect to Employees' FSA/HSA related matters and transportation funding accounts. Mercer

authorizes Employees' withdrawals and reimbursements from the Debtors' accounts in respect to such matters. The Debtors understand that Mercer is generally paid for its services as part of separate arrangements with UnitedHealthcare, which is, as discussed below, the Debtors' medical insurance coverage provider, and thus the Debtors do not believe that they owe any amounts to Mercer.

**C.    Debtors' Employee Benefits and Employee Programs**

17.    The Debtors provide eligible Employees, in the ordinary course of business, with certain Benefits, including, but not limited to (a) medical, dental and vision insurance, (b) workers' compensation, (c) vacation time and other paid time off, and (d) other miscellaneous employee benefits, each as described below.

**1.    Medical Plans**

18.    Approximately 465 of the Debtors' Employees (together with their participating dependents) receive medical benefits through the Debtors. For medical coverage, eligible Employees are offered health maintenance organization (HMO) or preferred provider organization (PPO) coverage under policies provided and operated by UnitedHealthcare (the "Medical Plan"). Premiums are paid on a cost-sharing basis. The Debtors pay UnitedHealthcare approximately $300,000 in total monthly premiums (which includes the Employees' portion of premiums that is paid by the Debtors and subsequently offset by the applicable Withholding Obligations) in advance each month. Prior to the Petition Date, typically for each payroll period, covered Employees paid approximately 28%-45% of the monthly owed premium based on the applicable plan selected. The Debtors do not believe that any amounts are owed by the Debtors

to UnitedHealthcare as of the Petition Date, but out of an abundance of caution, the Debtors are

seeking authorization to pay any and all prepetition amounts that may be owed to

UnitedHealthcare relating to the Debtors' medical insurance policies (the "Medical Plan

Obligations"), up to $300,000.

**2.      Other Healthcare Related Reimbursements/Payments**

19.      Pursuant to the CBA (Art. 22), the Debtors' Employees who are Union

members and who are covered by health insurance other than the Debtors' Medical Plan are

entitled to reimbursement from the Debtors for 50% of the Debtors' maximum monthly

contribution for that Employee (*i.e.*, $82.50 per eligible Employee per paycycle).  The Debtors

provide such payments to the applicable Employees as part of their regular paycheck ("Union

Medical Reimbursement Claims"), which payments total approximately $1,069 per paycycle.

The Debtors seek authority to pay any such amounts accrued prepetition, up to $1,100, in the

ordinary course of business.

20.      The Debtors also make contributions ("Debtor-Spending Account

Contributions") to certain Employees' flexible spending accounts, healthcare savings accounts,

and/or similar accounts (collectively, "Spending Accounts"), based on which particular

healthcare plan the Employee is in.  In an average payroll, approximately $1,800 is in relation to

the Spending Accounts – approximately $400 of which is comprised of contributions by the

Debtors on behalf of the applicable Employees and the balance is comprised of Employees' own

contributions to the Spending Accounts.

21.    The Debtors seek authority to pay, up to $600, in prepetition Debtor-Spending Account contributions, and to remit the applicable Employee Spending Account contributions –as Withholding Obligations– in the ordinary course.

**3.    COBRA**

22.    The Debtors seek to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect to former Employees and their covered dependents.  Mercer is the third-party COBRA administrator for the Debtors, and its fees are paid directly by the COBRA participants; thus, the Debtors do not believe they owe any prepetition amounts to Mercer in respect to COBRA matters.  To maintain Employee morale and ensure the orderly administration of the estates, the Debtors request authority to continue performing in their discretion any COBRA related obligations.

**4.    Dental & Vision Plans**

23.    The Debtors offer dental coverage administered by CIGNA for eligible Employees and eligible dependents (the "Dental Plan"), and a voluntary vision plan to Employees administered by VSP (the "Vision Plan").

24.    Dental Plan and Vision Plan coverage are paid for by the participating Employees.  Typically, participating Employees pay approximately $13,400 and $3,000 per month in dental and vision insurance contributions, respectively.  While funded by the participating Employees, the Debtors pay CIGNA the total monthly premium in advance each month, and such payment is offset by the Employees' payroll contributions.

25.     The Debtors do not believe that, as of the Petition Date, any amounts were owed to CIGNA or VSP in respect to insurance coverage.  However, out of an abundance of caution, the Debtors are seeking authorization to pay any such prepetition claims and/or forward the appropriate prepetition Withholding Obligations to CIGNA and VSP, up to a maximum of $18,000.

**5.     Life & Disability Insurance**

26.     The Debtors provides eligible Employees with (i) premium-based life insurance ("Life Insurance")[6] and long-term disability insurance ("Disability Insurance"),[7] both through Life Insurance Co. of North America, and (ii) access to voluntary short-term disability insurance, accidental death & dismemberment insurance, supplemental long-term disability insurance and supplemental life insurance (through Aflac and/or CIGNA, as applicable) (collectively, the "Voluntary Insurance Programs").

27.     All premiums for the Life Insurance, Disability Insurance and Voluntary Insurance Programs –totaling approximately $13,000 per month– are paid for by the Debtors. While the Debtors are responsible for payment for the Life Insurance and Disability Insurance (approximately $2,400 of the $13,000 monthly total), the balance relating to the Voluntary Insurance Programs is subsequently offset by applicable Employees' premium payments.

---

[6] Pursuant to the CBA (Art. 22), the Debtors pay for full-time Union Employees who have completed 6 months of employment as of the first day of a given month, the individual rate cost for Life Insurance.  More specifically, the Debtors provide $5,000 of Life Insurance coverage for eligible Union Employees with up to 5 years' service, and $7,000 of Life Insurance coverage for eligible Union Employees with over 5 years' service. The Debtors also pay for certain Life Insurance coverage for eligible office Employees, field supervisors, store managers and non-Union distribution center Employees.

[7] Such Disability Insurance is provided to the Debtors' Vice-Presidents.

28.    As of the Petition Date, the Debtors believe that up to approximately $15,000 in premiums in respect to the Life Insurance, Disability Insurance and Voluntary Insurance Programs have accrued, and seek authority to pay such amounts in the ordinary course, up to that estimated amount. Further, the Debtors seek authority to continue to offer the Life Insurance, Disability Insurance, and Voluntary Insurance Programs postpetition in the ordinary course of business, in the Debtors' discretion.

### 6.    **Workers' Compensation**

29.    Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtors. For Employees other than Employees in Ohio, North Dakota, and Washington (discussed further below), the Debtors maintain a workers' compensation benefits program through Travelers (the "Travelers WC Program"). The Travelers WC Program provides benefits to all Employees in each of the states in which the Debtors operate other than Ohio, North Dakota, and Washington, for claims arising from or related to the Employee's employment with the Debtors (together with any premiums, fees and/or other charges payable to Travelers, the "Travelers WC Obligations"). Under the Travelers WC Program, Travelers acts as a third party administrator and provides guaranteed insurance coverage at the statutorily-required level for the states in which the Debtors operate. The Debtors pay Travelers approximately $986,000 per coverage year, in ten installments. Given the timing of the bankruptcy filing, a prepetition installment payment to Travelers may not have cleared, and the Debtors expect to make the last installment payment in the ordinary course.

Out of an abundance of caution, the Debtors seek authority to pay to Travelers any amounts that may be related to the prepetition period, up to $200,000.

30.     In respect to Employees in Ohio, the Debtors have state-mandated compensation insurance fund coverage (the "Ohio Program"). Under the Ohio Program, the Debtors' premiums are generally based on the number of Employees insured during each policy year. The Debtors made payment in September 2014 to the Bureau of Workers' Compensation ("BWC"), for the period January to June 2014. The Debtors will make payment to the BWC, for the period July to December 2014, in February 2015. The Debtors pay approximately $40,000 per year to the BWC. As of November 30, 2014, the Debtors estimate accrued liabilities at approximately $33,500; based on that estimate, the Debtors estimate that approximately $38,000 may be accrued as of the Petition Date. The Debtors seek authorization to pay any amounts owed or that may be payable to the BWC, which relate to the prepetition period, when they come due in the ordinary course of business, up to a maximum of $38,000.

31.     In respect to Employees in North Dakota and Washington, the Debtors have workers' compensation insurance fund coverage similar to the situation in Ohio (the "North Dakota Program" and "Washington Program," respectively, and together with the Travelers WC Program and Ohio Program, the "Workers' Compensation Programs"). In respect to the North Dakota Program, the Debtors made payment in August, 2014 to the ND Workforce Safety & Insurance (the "North Dakota Agency"), for the period July 2014 to June 2015. The Debtors pay approximately $2,500 per year to the North Dakota Agency. As of December 2, 2014, the Debtors estimate accrued liabilities at approximately $1,050 and based on that estimate, the

Debtors estimate that approximately $1,050 may be owed to the North Dakota Agency as of the Petition Date. In respect to the Washington Program, the Debtors made payment in October, 2014 to the Washington Department of Labor and Industry (the "Washington Agency"), for the period July, 2014 to September, 2014. The Debtors will make payment to the Washington Agency, for the period October, 2014 to December, 2014, in January, 2015. The Debtors pay approximately $9,000 per year to the Washington Agency. As of December 2, 2014, the Debtors estimate accrued liabilities at approximately $1,500 and based on that estimate, the Debtors estimate that approximately $1,500 may be owed to the Washington Agency as of the Petition Date. The Debtors seek authorization to pay any amounts owed or that may be payable to the North Dakota Agency and Washington Agency, which relate to the prepetition period, when they come due in the ordinary course of business, up to a maximum of $1,500 and $2,000 respectively.

32.    In sum, the Debtors seek authorization to, in their sole discretion, pay any prepetition claims arising from or relating to their workers' compensation related obligations for the current and prior coverage years (collectively, the "Workers' Compensation Obligations"), up to the caps specified above. The Debtors submit that the continuance of their Workers' Compensation Programs is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation insurance in accordance with applicable law postpetition in the ordinary course of business.

7.    **Vacation and other PTO**

33.    The Debtors seek authorization to honor eligible Employees' accrued vacation time, sick, paid holiday and other leave policies and practices in the ordinary course of business (collectively, "Paid Time Off").[8]  The Debtors generally do not allow Employees to "cash-out" any accrued Paid Time Off, including any vacation time, except (i) in respect to Union Employees who can cash-out sick and vacation time and (ii) in the case of termination or other circumstances to the extent mandated under applicable state law.

34.    Generally, vacation time is provided to eligible Employees and accrual rates vary based on years of service, while up to ten sick days can be accrued by an eligible Employee depending on years of service.  More specifically, in the case of eligible non-Union workers, such Employees with one year's service get 10 vacation days per year, Employees with five years' service get 15 vacation days per year, and Employees with ten years' service get 20 vacation days per year.  Such vacation time must be used or is forfeited, and there is no "cash-out" of unused vacation pay in the case of non-Union workers.  In respect to eligible Union Employees, pursuant to the CBA, the vacation day accrual rates are generally as follows:

| Less than 6 months service in preceding calendar year | 3 vacation days in current calendar year |
| More than 6 months service but less than 1 ½ years of service prior to beginning of a calendar year | 5 vacation days in that calendar year |
| 1 ½ years of service but less than 4 ½ years of service prior to beginning of calendar year | 10 vacation days in that calendar year |

---

[8]  Certain paid holidays are required for eligible Union Employees under the CBA (Art. 10).  The CBA also provides certain vacation pay accrual for eligible Union Employees (Articles 11 and 12) and sick pay accrual (Art. 13).

| 4 ½ years of service or more prior to beginning of calendar year | 15 vacation days in that calendar year |
|---|---|

The CBA also provides certain sick leave accrual rates:

| 6 months of employment | 3 paid sick days (which can be used through end of calendar year) |
|---|---|
| Upon beginning of new calendar year, prior to Employee's 1 year anniversary | 3 additional paid sick days |
| Upon beginning of new calendar year, after Employee's 1 year anniversary to end of calendar year | 2 additional paid sick days |
| In calendar year following Employee's 1 year anniversary date | 5 paid sick days |
| Upon 2nd year anniversary date | 5 additional paid sick days |
| In all subsequent years | 10 paid sick days |

Pursuant to the CBA, unused sick leave is paid at the end of the calendar year (in the following February) to eligible Union Employees who have 2 full years or more of service.  The CBA also provides for certain paid funeral leave (Art. 14).

35.    The Debtors seek authorization, in their discretion, to honor eligible Employees' accrued vacation time, sick,  paid holiday and other Paid Time Off policies and practices in the ordinary course of business; provided, however, the Debtors do not seek authority to provide any cash-out of prepetition accrued Paid Time Off except in the case of Union Employees.  In the case of Union Employees, the Debtors also seek authority to cash-out their prepetition accrued Paid Time Off (those continuing to provide services to the Debtors postpetition and those who may be terminated or resign postpetition) in the ordinary course, up to $25,000 in total for all such prepetition Paid Time Off, provided that any such cash-out for a particular Employee shall be subject to the aggregate $12,475 cap on priority wages and

compensation.  The Debtors estimate that there is less than $25,000 in prepetition-accrued Paid

Time Off for eligible Union Employees.

### 8.    401(k) Savings Plan

36.    The Debtors maintain a 401(k) plan for the benefit of Employees (the

"401(k) Plan").  The 401(k) Plan provides for automatic pre-tax salary deductions of eligible

compensation up to certain limits set by the Internal Revenue Code.  The Debtors do not pay any

employer matching contributions to the 401(k) Plan.  As of the Petition Date, there are no

accrued but unfunded matching contributions with respect to the 401(k) Plan.  The Debtors

utilize PNC Advisors as the administrator, which also serves as the 401(k) Plan trustee.  The

Debtors pay PNC Advisors an approximately $300 annual fee; the Debtors do not believe they

owe any prepetition amounts to PNC Advisors.  All other 401(k) Plan related fees are paid with

funds out of the 401(k) Plan, other than the audits (discussed below).

37.    The Debtors pay approximately $13,800 each year for the audit of the

401(k) Plan.  An audit for the last plan year was recently done and filed in November 2014.  The

Debtors request authority to pay the auditor, BDO Seidman ("401(k) Auditor"), on account of

any prepetition claims, up to $15,000.

38.    The Debtors remit 401(k) Plan contributions and loan repayments

(collectively, "401(k) Contributions") to the appropriate parties.  Failure to timely remit 401(k)

Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as

amended, resulting in potential personal liability for a debtor's officers for such amounts.  The

Debtors believe that there are certain unremitted 401(k) Contributions totaling approximately

$11,000.

39.     The Debtors believe that maintaining the 401(k) Plan at this point is important to maintaining Employee morale.  Accordingly, the Debtors seek authority to continue, in their sole discretion, the 401(k) Plan and pay and/or remit (as applicable) any related prepetition amounts described above as may be necessary, including the forwarding of 401(k) Contributions.

**10.    Business Expense Reimbursements**

40.     The Debtors customarily reimburse eligible Employees (primarily executive and field management and personnel who purchase merchandise for the Debtors or otherwise incur mileage charges) who incur business related expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, car rental and car mileage, lodging, meal charges, and telephone charges, sample merchandise purchases, certain operational expenses, and miscellaneous other allowed business expenses (the "Expense Reimbursement Obligations").  The majority of Expense Reimbursement Obligations are charged to VISA corporate credit cards (issued by PNC) provided by the Debtors and are paid by the Debtors in the ordinary course; some Employees submit expense reports and are reimbursed by the Debtors.

41.     It is difficult for the Debtors to determine the exact amount of Expense Reimbursement Obligations that has accrued as of the Petition Date since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis.  As one example, as much as approximately $130,000 per month has been charged to the corporate credit

cards in some instances.  Additionally, there may be some delay between when an Employee

(who does not charge the expense to a corporate credit card) incurs an expense and submits the

corresponding expense report for processing.  Based on historical experience, the Debtors seek

authority to pay, in their discretion, any prepetition Expense Reimbursement Obligations, up to a

total amount of $152,000 and to continue to honor Expense Reimbursement Obligations incurred

postpetition in the ordinary course of business.

11.    **Debtors' Employee Bonus Programs**

42.    In the ordinary course of business and as an important component to their

wages and compensation structure, certain Employees are eligible to receive bonuses based on

certain criteria.  Generally, such bonuses are calculated based on sale and/or other operations

related criteria.  The Debtors' prepetition bonus plans (collectively, the "Bonus Programs")

include the following[9]:

(1)    **Store Manager Sales Bonus Program ("Store Mgr. Program"):**

This bonus program's objective is to provide the Debtors' store managers (who are not

officers or insiders of the Debtors) special incentive to perform at optimum levels so as to

maximize sales volume at the applicable store.[10]  These discretionary bonuses ("Store

Mgr. Bonuses") may be earned each month through achievement of the monthly sales

plan and on an annual basis based on annual year-end sales volume benchmarks; the

bonus recipient must be, among other things, an active Employee in good standing at the

---

[9] The descriptions above are general summaries only, subject to the specific terms, conditions and criteria of each Bonus Program.  Generally, each Bonus Program is discretionary and may be terminated, and the terms and conditions thereof are subject to change by the Debtors.

[10] Store managers, for purposes of the bonus program, include store managers and assistant managers.

time of payout.  Any earned bonus is paid monthly in arrears, during the following month.  Typically, the highest bonus amount for a particular store manager is approximately $750.  Approximately $43,000 in Store Mgr. Bonuses for October were accrued and paid to the relevant Employees as part of the last prepetition payroll; however, because of the timing of the bankruptcy filing, many of the checks for the October Store Mgr. Bonuses may not have been presented or cleared prior to the Petition Date.  As of the Petition Date, another approximately $60,000 in such bonuses may have accrued for November (which would be paid later in December).  The Store Mgr. Program is important to incentivizing the applicable managers to optimize store performance, redounding to the benefit of the Debtors' overall business enterprise.

(2)    **District Manager Sales Bonus Program ("District Mgr. Program"):**  This bonus program's objective is to provide the Debtors' district sales managers (who are not officers or insiders of the Debtors) special incentive to perform at optimum levels so as to maximize sales volume for the applicable district.[11]  These discretionary bonuses ("District Mgr. Bonuses") may be earned through achievement of certain sales plans; the bonus recipient must be, among other things, an active Employee at the time of payout.  Any earned bonus is paid monthly in arrears, during the following month.  Approximately $3,000 in District Mgr. Bonuses for October were accrued and paid to the relevant Employees as part of the last prepetition payroll; however, because of

---

[11] The position of district manager entails various responsibilities such as managing the stores in their district to ensure that they are properly staffed, merchandise is appropriately presented and protected, and customers are serviced efficiently, and each district manager is responsible for business operations at approximately 10 stores.

the timing of the bankruptcy filing, many of the checks for the October District Mgr. Bonuses may not have been presented or cleared prior to the Petition Date.  As of the Petition Date, another approximately $10,000 in such bonuses may have accrued for November (which would be paid later in December).  Such bonuses may be owed to approximately five district managers (with the highest bonus amount for a particular district manager being approximately $1,500 for a typical month).  The District Mgr. Program is important to incentivizing the applicable managers to maximize district and store performance, for the overall benefit of the Debtors' enterprise.

(3)    **Magazine Sales Bonus Program ("Magazine Sales Program"):**

This bonus program's objective is to incentive store personnel to sell magazine subscriptions to store customers (*e.g.*, Cosmopolitan, Seventeen, People, Us Weekly). The Debtors receive certain monies for such subscriptions; store employees earn money from the Debtors for each subscription sold under the Magazine Sales Program ("Magazine Bonuses").  In a given month, approximately 1,820 store Employees may earn Magazine Bonuses.  Approximately $10,000 in total Magazine Bonuses for October were accrued and paid to the relevant Employees as part of prepetition payrolls; however, because of the timing of the bankruptcy filing, some of the checks for prior Magazine Bonuses may not have been presented or cleared prior to the Petition Date.  As of the Petition Date, another approximately $10,000 in such bonuses may have accrued in total for November.  The Magazine Sales Program serves to incentivize the applicable store

personnel to sell subscriptions to magazines, with whom the Debtors have business relationships and which also help foster the Debtors' brand.

(4)    **Distribution Center Bonus Program ("DC Program"):**  This bonus program's objective is to incentive eligible non-insider personnel at the Debtors' distribution centers to meet certain productivity and safety related criteria.  These discretionary bonuses ("DC Bonuses") may be earned each month, and are paid monthly in arrears during the following month.  In a given month, the highest DC Bonus amount for a particular Employee may be approximately $140, and the Debtors estimate that approximately $6,000 in total DC Bonuses for November may have accrued.  The DC Program is important to incentivizing the applicable personnel, who are mostly on-the-floor personnel.

(5)    **Management Incentive Bonuses:**  The Debtors note that certain officers and other Corporate Office team members have been eligible for certain management incentive bonuses ("Management Incentive Bonuses") in the past.  Any and all such bonuses earned prepetition were paid prepetition.  More specifically, fiscal year 2013 management incentive bonuses were paid out in March 2014.  There are currently no such bonus payments anticipated for fiscal year 2014.  The Debtors reserve their rights to subsequently file a motion seeking approval of any management incentive program and/or similar relief.

(6)    **Miscellaneous Executive Bonuses:**  Certain bonuses will be payable to the Debtors' executives in 2015 ("Miscellaneous Executive Bonuses"),

including a sign-on bonus for the Debtors' Chief Financial Officer and a guaranteed

bonus for the Debtors' Chief Merchandising Officer. The Debtors do not seek by this

Motion any specific relief with respect to such bonuses, but reserve their rights to file

additional pleadings related to such matters.

43.    The Debtors request the authority, to be exercised in their sole discretion,

to continue paying amounts earned by non-insider Employees for bonuses under the Bonus

Programs other than any Management Incentive Bonuses and Miscellaneous Executive Bonuses

(collectively, the "Non-Insider Bonus Programs"), including any bonus amount that may relate to

the prepetition period, in the ordinary course of business, up to the caps set forth in the proposed

order, provided that, if and to the extent any of the bonuses accrued prepetition, no applicable

Employee will receive more than the priority wage cap on account of unpaid prepetition Wages

and any prepetition bonus amount.

**12.    Equity Incentive Plans and Other Executive Payments**

44.    Prior to the Petition Date, the Debtors had in place certain equity incentive

plans including the Deb Stores Holding LLC Class D Management Profits Interest Plan and the

Deb Shops LLC Bonus Equity Plan (collectively, "Equity Plans"). Further, the Debtors have

certain contractual severance pay obligations that may be owed to certain executives

(collectively, "Insider Severance Obligations"). The Debtors seek no specific relief at this time

with respect to the Equity Plans and any Insider Severance Obligations, but reserve their rights to

file additional pleadings relating to such matters.

9.    **Union Legal Fund Contributions**

45.    As part of each payroll, pursuant to the CBA (Art. 24), the Debtors contribute to a legal fund for and used by the Union, based on $0.18 per hour per full-time Union Employee (subject to certain terms and conditions). In the most recent prepetition payroll, the Debtors remitted approximately $1,242 to such fund. The Debtors seek authority, in their sole discretion, to continue to make such contributions in the ordinary course, including in respect to any amounts that may relate to the prepetition period.

10.    **Merchandise Discount Benefit**

46.    As an employee benefit, the Debtors offer a 40% merchandise discount for all Employees. This employee benefit does not entail any cash outlay, and the Debtors request authority to continue with such benefit in the ordinary course, in the Debtors' sole discretion.

D.    **Summary**

47.    The Debtors seek authority, in their sole discretion, to continue to honor and implement the employee related policies and practices as described above and pay Unpaid Wages, the Other Worker Compensation, and the various Benefits as described above, including the estimated amounts set forth below:

| | |
|---|---|
| Unpaid Wages (including any "floating" payroll wage and non-insider bonus checks issued in prepetition payroll, and Withholding Obligations other than Payroll Related Tax Obligations) | $2,220,000 |
| Other Worker Compensation | $65,000 |
| Expense Reimbursement Obligations | $152,000 |

| | |
|---|---|
| Union Medical Reimbursement Claims | $1,100 |
| Debtor-Spending Account Contributions (excluding Employee-funded contributions that are part of Withholding Obligations) | $600 |
| Cash-out of prepetition Paid Time Off for Union Employees | $25,000 |
| Life Insurance and Disability Insurance | $15,000 |
| Dental and Vision Plans | $18,000 |
| Payroll Related Administrators | $14,000 |
| 401(k) Auditor | $15,000 |
| Workers' Compensation Obligations | $241,500 |
| Store Mgr. Bonuses (excluding previously issued floating checks) | $60,000 |
| District Mgr. Bonuses (excluding previously issued floating checks) | $10,000 |
| Magazine Bonuses (excluding previously issued floating checks) | $10,000 |
| DC Bonuses (excluding previously issued floating checks) | $6,000 |

provided that no Employee will be paid a total distribution of more than the $12,475 statutory priority cap on account of prepetition Wages, any prepetition bonuses, and accrued Paid Time Off (if applicable).

### Relief Requested[12]

48.     Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtors seek authority to pay, remit or honor, in their sole discretion:

        a.     the Unpaid Wages, including any associated payroll processing related obligations and any prepetition amounts owed under the Non-Insider Bonus Programs;

        b.     the Other Worker Compensation;

---

[12] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

c.     all Withholding Obligations;

d.     the Expense Reimbursement Obligations;

e.     all prepetition obligations under the Benefits;

f.     all Workers' Compensation Obligations, including those obligations incurred in or relating to the prepetition period and liquidated postpetition;

g.     prepetition Paid Time Off, as to the extent required by applicable law but only to the extent of the statutory priority cap; and

h.     any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein.

The Debtors represent that they will not pay any amounts in excess of the caps for a particular category of prepetition claim identified herein without further order from this Court.

49.     To enable the Debtors to accomplish the foregoing, the Debtors request that the Court authorize the Debtors' banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

## Basis for Relief

50.     Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*). Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing. Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

51.    The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[13] The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee moral--two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing* H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation

---

[13] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims).

52.    This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re Ablest, Inc.,* Case No. 14-10717 (KJC) (Bankr. D. Del. April 2, 2014); *In re iBAHN Corporation,* Case No. 13-12285 (PJW) (Bankr. D. Del. Sept. 9, 2013; *.In re Revstone Industries, LLC,* Case No. 12-13262 (BLS) (Bankr. D. Del. Jan. 10, 2013); *In re Digital Domain Media Group, Inc., et al.,* Case No. 12-12568 (BLS) (Bankr. D. Del. Oct. 22, 2012); *In re Prince Sports, Inc., et al.,* Case No. 12-11439 (KJC) (Bankr. D. Del. May 2, 2012); *In re Summit Business Media Holding Co.*, Case No. 11-10231 (PJW) (Bankr. D. Del. Jan. 28, 2011).

53.    The "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek authority to pay pursuant to this Motion because the Debtors' Employees are critical assets necessary both to the Debtors' operations and the successful prosecution of these chapter 11 cases.

54.    Pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $12,475 per Employee. The Debtors do not seek to pay Unpaid Wages to any Employee in excess of $12,475. When combined, Sections 507(a)(4) and

507(a)(5) of the Bankruptcy Code entitle the Unpaid Wages to priority treatment. To confirm a chapter 11 plan, the Debtors must pay priority claims in full. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation, severance, and sick pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein affects only the timing of payments to Employees, and does not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of Employee claims at this time enhances value for the benefit of all interested parties.

      55.    Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued Unpaid Wages and Benefits described above, Employee morale and loyalty will be jeopardized at a time when support by the remaining Employees is critical. Further, as discussed above, in respect to the Debtors' request to pay the Other Worker Compensation, the applicable members of the Debtors' workforce, while not Employees, provide critical and necessary accounting, website, ecommerce, and distribution center related services to the Debtors. Failure to pay the Other Worker Compensation may jeopardize these workers continuing to provide important functions for the Debtors, thereby adversely affecting the Debtors' operations.

56.    The Payroll Related Tax Obligations and certain other amounts either voluntarily or involuntarily withheld from Employee paychecks do not constitute property of the Debtors' estates and principally represent employee earnings that governments (in the case of taxes), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the applicable Employees may face legal action due to the Debtors' failure to submit these payments.

57.    Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the estates given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, and the withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estates. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

58.    Generally, the Employees are critical components to the success of these chapter 11 cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their

assets. Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to ensure continued, efficient operation in order to maximize value for all creditors.

**B.    Satisfaction of Bankruptcy Rule 6003 and Waiver of Bankruptcy Rule 6004**

59.    Finally, pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 21 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as supported by the Robertson Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

60.    To implement the foregoing successfully and insure the wages and benefits owed to Employees are not interrupted, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
Processing Fees Associated with Payment of Employee Wages and Benefits**

61.    The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment

and to honor all fund transfer requests made by the Debtors to Employees and/or on account of any Benefits, whether such checks were presented or fund transfer requests were submitted prior to, on, or after the Petition Date.  The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Unpaid Wages and honor Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business.  Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to Unpaid Wages and Benefits.  Further, the Debtors seek to retain the discretion to decide which Unpaid Wages and Benefits they will pay and honor, and nothing in this Motion shall be deemed an admission by the Debtors that any Unpaid Wages and Benefits will in fact be paid or honored.

62.    Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Unpaid Wages and Benefits as described in this Motion.

### Notice

63.    The Debtors will provide notice of this Motion to the following parties, or their counsel, if known: (a) the Office of the United States Trustee; (b) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c) the Debtors' prepetition and postpetition lenders; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

64.    No prior motion for the relief requested herein has been made to this or

any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Court should authorize, but not require, the Debtors to pay

and honor all of the Unpaid Wages and Benefits described in this Motion, including prepetition

wages, salaries, non-insider bonuses, and other compensation, benefits withholdings, payroll and

benefits administrative fees, and reimbursable employee expenses, and authorize banks and other

financial institutions to receive, process, honor, and pay all checks presented for payment and

electronic payment requests relating to the foregoing, and grant such other and further relief as is

just and proper.


Dated:  December 4, 2014             PACHULSKI STANG ZIEHL & JONES LLP

                                     Laura Davis Jones (DE Bar No. 2436)
                                     David M. Bertenthal (CA Bar No. 167624)
                                     Joshua M. Fried (CA Bar No. 181541)
                                     Peter J. Keane (DE Bar No. 5503)
                                     919 North Market Street, 17th Floor
                                     P.O. Box 8705
                                     Wilmington, DE  19899-8705
                                     Telephone: 302/652-4100
                                     Facsimile:  302/652-4400
                                     E-mail:     ljones@pszjlaw.com
                                                 dbertenthal@pszjlaw.com
                                                 jfried@pszjlaw.com
                                                 pkeane@pszjlaw.com

                                     [Proposed] Counsel for the Debtors and Debtors in
                                     Possession