# **EXHIBIT A**

## **The Agency Agreement**

## AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of December 4, 2014, by and between Deb Shops Holding, LLC and the related entities that are signatories hereto (collectively, "Merchant") and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Agent"), it being understood and agreed that each entity comprising Agent shall be jointly and severally liable for all obligations of Agent hereunder.

Section 1. Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's two hundred eighty-eight (288) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") and, if Agent exercises the option under section 8.11, the E-Commerce Platform by means of a "store closing", "sale on everything", "going out of business", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E in the Stores, Distribution Centers, and the Corporate Offices (each such term, as defined below).

WHEREAS, ON December 4, 2014, Merchant and various subsidiaries filed voluntary petitions for relief under chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1330, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (Case No. 14-12676 (MFW)(joint administration request pending), the "Bankruptcy Case", and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agree as follows:

Section 2. Appointment of Agent/Approval Order.

(a)    Subject to entry of an order by the Bankruptcy Court authorizing Merchant to enter into this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E at the Stores in accordance with the terms and conditions of this Agreement.

(b)    Within two (2) business days after the execution of this Agreement, Merchant shall file an expedited motion with the Bankruptcy Court, which motion shall seek entry of an order, inter alia, approving this Agreement, including, but not limited to, the Bid Protections, and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof, in all events subject to Merchant's solicitation and receipt of Competing Bids in accordance with Section 16 hereof.  The Approval Order shall be substantially in the form and content attached as Exhibit "A" hereto and incorporated herein by this reference.   Any material modifications or amendments to the form of Approval Order attached as Exhibit "A" shall be subject to written approval of Merchant and Agent, which approval shall not be unreasonably withheld, conditioned or delayed.

(c)    Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "going out of business", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and

regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines, this Agreement and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Agent guarantees that Merchant shall receive an amount equal to ninety-eight and one-quarter percent (98.25%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3. The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage multiplied by (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, in consultation with the Lenders (or in the case of Distribution Center Merchandise counted in the manner and at the times provided in Section 5.1(b) hereof, the aggregate Cost Value of the Distribution Center Merchandise as determined in accordance with the inventory counting procedures set forth herein), (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement), (C) the aggregate Cost Value of On-Order Merchandise included in the Sale; and (D) the aggregate Cost Value of Returned Merchandise not otherwise included in the Inventory Taking. Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than $38,000,000 (the "Merchandise Threshold") and not more than $42,000,000 ("Merchandise Ceiling") as of the Sale Commencement Date; provided that, solely for purposes of determining whether the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Threshold or greater than the Merchandise Ceiling, no adjustment shall be made to the applicable Cost Value to account for the effect of any prevailing discount adjustment or the following discounts or price adjustments offered by the Merchant: (i) point of sale discounts or similar adjustments regardless of duration); (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for damaged, defective or "as-is" items; (vi) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (vii) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (viii) obvious ticketing or marking errors; (ix) instant (in-store) or mail in rebates; or (x) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.  To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold or Merchandise Ceiling, as applicable, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c)      The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being 31.0% (the "Cost Factor Threshold"); provided that, solely for purposes of determining whether the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, no adjustment shall be made to the applicable Cost Value to account for the following discounts or price adjustments offered by the Merchant: (i) employee discounts; (ii) member or customer appreciation points or coupons; (iii) multi-unit purchase discounts; (iv) adjustments for damaged, defective or "as-is" items; (v) coupons (Merchant's or competitors') or "buy one get one" type discounts; (vi) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (vii) obvious ticketing or marking errors; or (viii) instant (in-store) or mail-in rebates.  To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

(d)      The adjustments to the Guaranty Percentage contemplated by Sections 3.1(b) and 3.1(c) shall be independent and cumulative.

(e)      To ensure accurate sales audit functions, as well as accurate calculations of the Sharing Amount, if any, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Goods) in the Stores.

3.2      Compensation to Agent, Sharing:

(a)      After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to six and one half percent (6.5%) of the aggregate Cost Value of the Merchandise ("Agent's Fee"); and THEREAFTER: fifty percent (50%) to Agent and fifty percent (50%) to Merchant ("Sharing Amounts").  Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7(b) and shall remit such payment to the Merchant's Designated Account.

(b)      To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), subject to Merchant's right to participate in the Proceeds from the disposition thereof, such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances to the extent provided in the Approval Order, and Agent shall use diligent and commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Agent and its subsidiaries shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3      Proceeds; Time of Payments; Control of Proceeds.

(a)      For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue, in each case during the Sale Term and exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; and (c) any and

3

all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt: (1) proceeds from the sales at Merchant's Stores or through the E-Commerce Platform for periods prior to the Sale Commencement Date; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive the FF&E Commission under Section 7.1 below); (5) proceeds from the sale of Additional Agent Goods; and (6) payments made by Agent on account of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

(b)      On the first business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount (the "Initial Guaranty Payment") equal to eighty-five percent (85%) of the product of (i) the Guaranty Percentage multiplied by (ii) the estimated aggregate Cost Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records at the close of business on the last business day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount"); provided that, the Estimated Guaranteed Amount payable by Agent on the Payment Date shall be calculated based on Merchandise located in the Stores and the Distribution Center as of the close of business on the last business day immediately preceding the Sale Commencement Date, and shall expressly exclude any On-Order Merchandise not then located at a Store or Distribution Center. On the Payment Date, the Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the account designated by Merchant on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account"). The balance of the Guaranteed Amount, if any (including any portion of the Guaranteed Amount attributable to any On-Order Merchandise counted, reconciled and reported as part of the Final Inventory Report), shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Designated Account on the earlier of: (x) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Agent and Merchant, in consultation with the Lenders (the "Final Inventory Report"), and (y) the date that is thirty (30) days after the Sale Commencement Date (in the case of (y) above, Agent shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount). In the event of a dispute as to the calculation of the portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof, and Agent's failure to pay such balance or undisputed portion shall entitle the Merchant and the Lenders (individually or collectively) to draw upon the Letter of Credit in accordance with Section 3.3(i) hereof to the extent of such balance or undisputed portion. Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion. In the event that the Initial Guaranty Payment is either less than or exceeds the Guaranteed Amount, as applicable, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the sum of the Initial Guaranty Payment.

(c)      All Proceeds shall be controlled by Agent in the manner provided for below.

(i)      Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents (to the extent the same are reasonable and do not impose any potential monetary or other material liability on Merchant) to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined

4

below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder. Agent shall deliver to Merchant, not later than five (5) days following receipt thereof, copies of all bank statements and other information relating to such accounts. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions reasonably necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iii)     Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds) in such accounts from and after the Sale Commencement Date. If requested by Agent, each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank (in form and content satisfactory to each party), providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement"). If, notwithstanding the provisions of this Section 3.3(c), Merchant or any Lender (as defined below) receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant and, by joining in this Agreement (in which event only the Lender receiving such Proceeds or other amounts will be liable for such Lender's undertakings and covenants hereunder), the applicable Lender receiving such Proceeds and other amounts shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or such Lender's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)     On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s). Agent shall notify Merchant and PNC Bank, National Association ("PNC") and Ableco, L.L.C. ("Ableco") (collectively, "Lenders" and each a "Lender") of any shortfall in such payment, in which case, Merchant (or the applicable Lender, as the case may be, if such Lender received such funds from the Designated Deposit Accounts) shall promptly pay to Agent funds in the amount of such shortfall. For purposes of this Agreement, "Controlling Lender" shall mean, (x) until such time as the Revolving Credit Obligations (as defined in the DIP Financing Order) are paid in full in cash and all commitments to extend credit are terminated, PNC, and (y) at all times thereafter, Ableco. Provided that (i) the Revolving Credit Obligations (as defined in the DIP Financing Order) do not total more than $20,000,000 as of the Payment Date, (ii) not more than $20,000,000 of the Initial Guaranty Payment is used to satisfy in full in cash the Revolving Credit Obligations or other obligations that are or may become due and payable to PNC as of the Payment Date, and (iii) all commitments to extend credit by PNC are terminated as of the Payment Date, on and effective from and after the Payment Date, PNC shall not be obligated to repay any portion of the Initial Guaranty Payment received by PNC to Merchant, Agent, Ableco, or any other party. Notwithstanding the immediately preceding sentence, to the extent PNC is required to repay any portion of the Initial Guaranty Payment, PNC shall only be obligated to repay to the Merchant, Agent, Ableco, or any other party, such portion of the Initial Guaranty Payment received by PNC in excess of $20,000,000.

(d)     In the event that the Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent under Section 3.3(e) by means of an offset, and, as a result of such funding or payment, Merchant (or any Lender) received more value than Merchant (or Lender) would have otherwise received under this Agreement had Agent not funded or paid such obligations, the applicable Lender shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's written request and reasonable evidence of such overpayment to Merchant hereunder. If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount after two (2) business days written demand by Agent, the applicable Lender shall, within two (2) business days of written demand by Agent, pay to the Agent the over-funded amount. Notwithstanding anything to the contrary in this Agreement, no Lender shall be required to pay to Agent any amount in excess of the amounts actually received by such Lender pursuant to this Agreement.

(e)     Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)     In addition to the Guaranteed Amount, on the Payment Date, Agent shall purchase and pay Merchant by wire transfer to the account designated in writing by Merchant for all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

3.4     Security. To secure payment of the balance of any unpaid portion of the Guaranteed Amount, Sharing Amount (if any), Expenses and other amounts due to Merchant hereunder, Agent shall deliver to Ableco (provided the Revolving Credit Obligations are paid in full, otherwise PNC), as

Merchant's designee, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.4 attached hereto, in an original stated amount equal to the aggregate of (x) fifteen percent (15%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date, but excluding for purposes hereof the On Order Merchandise), and (y) three (3) weeks' estimated Expenses (the "Letter of Credit").   The Letter of Credit shall name Merchant and the applicable Lender, as Merchant's designee, as co-beneficiaries. The Letter of Credit shall be delivered to applicable Lender, as Merchant's designee, no later than the second business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and applicable Lender.  In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, Sharing Amount (if any), Additional Agent Goods Fee (if any) and/or Expenses as required under this Agreement, Merchant and the applicable Lender shall be entitled to draw on the Letter of Credit to fund such undisputed amount or obligation after five (5) business days' written notice to Agent. The applicable Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than two (2) weeks' Expenses (and Merchant and the applicable Lender shall cooperate with respect to each such request). The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount, Sharing Amount, and/or Expenses Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant, Lender, and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount, Sharing Amount, and/or Expenses have been paid to Merchant. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10)) business days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant and the applicable Lender shall have the right to make a drawing under the Letter of Credit in an amount equal to the amount(s) Merchant asserts are then owing to Merchant. After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including but not limited to the Guaranteed Amount, the Sharing Amount, and Expenses), Merchant and the applicable Lender shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated.  Upon the applicable Lender(s') receipt of payment in full of its claims against the Merchant, such Lender shall promptly deliver the Letter of Credit to Merchant and take all reasonable steps necessary to remove itself as a named co-beneficiary thereunder.

Section 4.  Expenses of the Sale.

4.1     Expenses.   Agent shall be unconditionally responsible for all "Expenses", which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and/or Merchant and/or Lender may review or audit the Expenses at any time.  Agent shall be obligated to pre-fund any payroll-related expenses consistent with Merchant's customary payroll funding practices and timing. In addition, Agent agrees that (I) on the Payment Date, Agent shall pre-fund an amount equal to the number of days between the Sale Commencement Date and the first anticipated Weekly Sale Reconciliation (inclusive) of per diem Occupancy Expenses based on Exhibit 4.1(a) and (II) on the actual date of the first Weekly Sale Reconciliation and continuing on the dates of successive Weekly Sale Reconciliations during the Sale Term, an amount equal to seven (7) days of per diem Occupancy Expenses, which amounts Merchant and the Lenders agree shall be applied to and credited against any per diem Occupancy Expense obligations payable by Agent hereunder.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)       (i) actual Occupancy Expenses for the Stores on a per location and per diem basis in an amount up to the aggregate per diem per location amount set forth on Exhibit 4.1(a) hereto; provided, however, in the event there are any non-cash items included in Exhibit 4.1(a), such items shall not be available to Merchant to offset any per diem shortfall(s) in any other category/line item, plus (iii) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on Exhibit 4.1(a), plus (iv) the portion of any percentage rent obligations attributable to the sale of Additional Agent Goods during the Sale (in each case as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1); provided, that in respect of (iii) and (iv) above, percentage rent shall only be paid if and to the extent such percentage rent obligation for a Store is reflected on Exhibit 4.1(a) and, if no percentage rent obligation is reflected on Exhibit 4.1(a) for each such Store, Agent shall not be liable for any such percentage rent associated with each such Store;

(b)       actual wages and commissions for all Store-level Retained Employees used in conducting the Sale; provided that, Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Store-level Retained Employees used during the Inventory Taking;

(c)       any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount not to exceed 17.2% of the base payroll for each Retained Employee in the Stores (the "Payroll Benefits Cap");

(d)       Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)       advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)       credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)       bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)       costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)       all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)       Store cash theft and other store cash shortfalls in the registers;

(k)       all costs and expenses associated with Agent's on-site supervision of the Stores, Distribution Centers, and Corporate Offices, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, Distribution Centers, and Corporate Offices, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)       postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)     fifty percent (50%) of cost of the Inventory Taking Service;

(n)     Agent's actual cost of capital (including Letter of Credit fees) and insurance attributable to the Sale, and Merchant's insurance under Section 12.2  prorated only to include amounts attributable to the Sale Term;

(o)     Agent's reasonable out-of-pocket costs and expenses associated with the Sale, including, but not limited to, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents;

(p)     third party payroll processing expenses associated with the Sale;

(q)     costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of section 8.1(e);

(r)     (1) if the Agent exercises the option pursuant to section 8.12, the E-Commerce Platform Expenses or (2) if the Agent does not exercise the option under section 8.12, but uses Merchant's website(s) for purposes of advertising the Sale, costs and expenses associated with hosting the websites in an amount equal to $20,000 per month (which amount shall be pro-rated for the month of January 2015 on a per diem basis, but not for any month thereafter); and

(s)     subject to Merchant's written consent, which shall not be unreasonably withheld or delayed, the documented actual costs and expenses of Agent providing such additional services as the Agent reasonably deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(a), Exhibit 4.1(a) shall control and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)     "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology and E-Commerce Platform updates, functionality, and maintenance, and accounting (collectively, "Central Services").

(ii)     "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)     "Occupancy Expenses" means rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems, routine repairs and maintenance, taxes and licenses, costs of all local, long-distance, and international telephone, satellite broadband connections,

T-1 lines, broadband internet, and other telecommunications services, trash removal, snow removal, and ordinary course third-party cleanings, pest control services, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto and in an amount up to the specific amounts set forth on Exhibit 4.1(a) attached hereto and calculated in accordance with Section 4.1(a), plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise (including On-Order Merchandise that arrives in the Stores prior to the Receipt Deadline) and (y) Additional Agent Goods included in the Sale. Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Merchandise assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on Exhibit 4.1(a) (the "Non-CAM Trash Removal Charges"), such Non-CAM Trash Removal Charges shall be paid by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in Exhibit 4.1(a) hereof..

(iv)     "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant or Agent.

(v)     Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's Corporate Offices or Distribution Centers, including (without limitation) the Distribution Center Expenses, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2     Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e. Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled and appropriately adjusted in cash between once the actual amount of such Expense becomes available. Agent and/or Merchant may review or audit the Expenses at any time.

4.3     Distribution Center Expenses

Agent shall be responsible for allocating and designating the shipment of Merchandise from the Merchant's Distribution Centers to the Stores. Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation to the Stores of the Merchandise located at the Distribution Centers and on-order Merchandise (the "Allocation Schedule"), which shall be provided by Agent to Merchant no later than the Sale Commencement Date. Notwithstanding the foregoing, all costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations, and/or processing, transferring,

consolidating, shipping, and/or delivering goods within or from the Distribution Centers (the "Distribution Center Expenses"), shall remain the sole obligation of the Merchant.

Section 5. Gross Rings; Merchandise.

5.1    Inventory Taking.

(a)    Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level Cost Value and Retail Price physical inventory of the Merchandise located in the Stores (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store), but in any event no later than twenty-one (21) days after the Sale Commencement Date (subject to the availability of the Inventory Taking Service), and, with respect to Merchandise located in Merchant's Distribution Centers, upon transfer to the Stores. On-Order Merchandise that is in-transit as of the Inventory Date shall be subject to a supplemental Inventory Taking at the Stores where such in-transit Merchandise is delivered thereto.   Merchant and Agent shall jointly employ a mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service. Merchant shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service. Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.   Merchant, each Lender, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking (which the Merchant and Agent anticipate should not reasonably take more than one (1) day at any Store), the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store. Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking; or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store. Merchant agrees to cooperate with Agent in all reasonable respects to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs, Cost Value, and Retail Price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Cost Value and Retail Price of the Merchandise). Each Store will be closed during the Inventory Taking at that Store; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business. The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reviewed, reconciled, and mutually verified by the Merchant and Agent in writing as soon as practicable following the Inventory Taking.

(b)    At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store. Register receipts shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale. Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.0% of the aggregate Cost Value of Merchandise sold during the Gross Rings Period. All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice. Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

11

5.2    <u>Merchandise Subject to This Agreement.</u>

(a)    For purposes of this Agreement, "<u>Merchandise</u>" shall mean all (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) Damaged Merchandise, (iii) Non-Conforming Merchandise, and (iv) Distribution Center Merchandise and On-Order Merchandise received at the Stores no later than fourteen (14) days after the later of (x) Sale Commencement Date and (y) the date on which Agent provides Merchant with the Allocation Schedule, provided that if such goods are received at the Stores after such 14-day period, but on or before twenty-eight (28) days after the later of (x) and (y) (such date, the "<u>Receipt Deadline</u>"), such goods shall be included in the Sale as Merchandise at the Cost Value and Retail Price of each good multiplied by the inverse of the then prevailing Sale discount for each such good. "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Damaged Merchandise; (4) Merchant's Consignment Goods; (5) Additional Agent Goods; (6) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (collectively, "FF&E") or improvements to real property; <u>provided</u> that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below; or (7) Distribution Center Merchandise, On Order Merchandise, or goods in the Distribution Centers, in-transit or on order received at the Stores after the Receipt Deadline.    For the avoidance of all doubt, so long as Merchant complies with the Allocation Schedule, goods shall be included as "Merchandise," regardless of whether such goods are subsequently further transferred at Agent's request or direction.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"<u>Damaged Merchandise</u>" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course. Examples of Damaged Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mismated, parts, items typically sold as a set which are incomplete, or gift with purchase items.

"<u>Excluded Damaged Merchandise</u>" means any item of (i) Damaged Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Cost Value and (ii) obsolete or discontinued goods. Excluded Damaged Merchandise shall be identified as such during the Inventory Taking.

"<u>Distribution Center Merchandise</u>" means all new, finished, first-quality saleable goods in the ordinary course of business located at Merchant's warehouse/distribution centers (collectively, the "<u>Distribution Centers</u>") and reflected on Exhibit 5.2(b).

"<u>On-Order Merchandise</u>" means all new, finished, first-quality saleable goods in the ordinary course of business that are on-order or in-transit and reflected on Exhibit 5.2(b).

"<u>Merchandise File</u>" shall mean Merchant's "Merchandise Analysis Database" together with all updated files received by Agent from the Merchant or its representatives.

5.3     Valuation.

(a)     For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) the lowest cost of such item as reflected in the Merchandise File and (ii) the Retail Price.

(b)     For purposes of this Agreement, "Retail Price" shall mean with respect to each item of Merchandise, the lower of the lowest (i) ticketed price, (ii) marked price, (iii) shelf price, (iv) Merchandise File price, (v) in-Store point of sale price, E-Commerce Platform equivalent price, or other retail channel equivalent price if, and only if, such point of sale, E-Commerce Platform, or other retail channel price was the result applying a discount of 50% or greater at any time during the 45-day period immediately preceding the Sale Commencement Date, or (vi) other file price as reflected in Merchant's books and records for such item.    For the avoidance of doubt, "BOGOs" are excluded from the determination of Retail Price.

(c)     Notwithstanding the provisions of Section 5.3(a), with respect to each item of (i) Damaged Merchandise, the parties shall mutually agree upon the Cost Value and Retail Price (and if Agent and Merchant are unable to mutually agree on the Cost Value and Retail Price of any one or more items of Damaged Merchandise, such items shall be deemed Excluded Damaged Merchandise) and (ii) Non-Conforming Merchandise, the "Cost Value" shall be the Cost Value, as determined under section 5.3(a), multiplied by 50% and the "Retail Price" shall be the Retail Price, as determined under section 5.3(b), multiplied by 50%.

5.4     Excluded Goods.  Merchant shall retain ownership and all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods").  The Agent shall retain 20% of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive 80% of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Closing Stores at Merchant's expense as soon as practicable and shall not be shipped to the Closing Stores from the Distribution Centers absent Agent's express written consent.  Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1     Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the date that is one (1) day after the Bankruptcy Court enters the Approval Order (the "Sale Commencement Date"), but in no event later than January 9, 2015.  Agent shall complete the Sale at each Store no later than April 30, 2014 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than seven (7) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store; provided, however, that, notwithstanding the foregoing proviso and solely with respect to Occupancy Expenses, the Agent's obligations to pay all Occupancy Expenses for each Store shall continue until the 15th of a calendar month if the Vacate Notice applicable to each such Store is

13

provided on or before the 8th day of such calendar month and the Vacate Date is on or before the 15th day of such calendar month; provided further that, Agent shall use commercially reasonable efforts to provide for a Vacate Date for each Store that is as close as possible to the end of a calendar month.

      6.2    Vacating the Store. At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition and otherwise in at least as good condition as on the Sale Commencement Date, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below. Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant. Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store, subject to the provisions of Section 6.1 above.

      Section 7. FF&E.

      7.1    Owned FF&E. Agent shall sell all FF&E at the Stores, the Distribution Centers or Merchant's corporate headquarters and other corporate offices (the "Corporate Offices") owned by Merchant (the "Owned FF&E") pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; provided, however, that Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in an amount not to exceed $141,000, which shall be paid in accordance with the following. The proceeds from the sale of the Owned FF&E shall be paid as follows: (i) the first $70,000 to Agent; (ii) the next $142,000, 50% to Agent and 50% to Merchant; and (iii) all proceeds in excess of the sum of (i) and (ii), 20% to Agent and 80% to Merchant. Alternatively, if Agent and Merchant mutually agree with the prior written consent of Lenders, Agent shall have the right to sell the Owned FF&E on a guaranteed basis pursuant to which Merchant and Agent shall mutually agree upon the guaranteed amount and the Owned FF&E inclusion and exclusion list and pursuant to which Agent shall bear all costs and expenses associated with the sale of the Owned FF&E (other than rent and other occupancy costs associated with the Distribution Centers and corporate offices, which amounts shall be the obligations of and paid by Merchant when due).

      7.2    Abandonment of FF&E. Agent shall be authorized to abandon any and all sold and unsold Owned FF&E in place without any cost or liability to any party.

      Section 8. Conduct of the Sale.

      8.1    Rights of Agent. In addition to any other rights granted to Agent elsewhere in this Agreement, subject to entry of the Approval Order, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws. The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a diligent, professional and commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order. Agent shall at all times conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "Sale Guidelines"). In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion shall have the right to the extent provided in the Approval Order and consistent with the Sale Guidelines:

          (a)    to establish Sale prices and discounts and Store hours;

(b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of the Merchant located at the Stores or the Distribution Centers (whether owned, leased, or licensed);

(c)    (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale, but in no event shall Merchant be required to (x) provide any such services or facilities at a level in excess of the levels such services and facilities are currently provided among the entities comprising Merchant, or (y) hire or retain personnel not presently employed or engaged by Merchant; (ii) to use not to exceed three reasonably sized offices located at Merchant's Corporate Offices to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions imposed by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)    to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "going out of business", "everything must go", or similar themed including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers;

(e)    to transfer Merchandise between and among the Stores at Agent's expense; provided, however, the Agent shall not transfer Merchandise between and among Stores if such transfers would make Merchandise unavailable for purposes of the Inventory Taking;

(f)    subject to the option under Section 8.12 below, to use Merchant's E-Commerce Platform in connection with the Sale to fulfill customer orders made during the Sale Term and otherwise promote the Sale; and

(g)    subject to the provisions of Section 8.10 below, to include Additional Agent Goods as part of the Sale.

8.2    Terms of Sales to Customers; Final/As Is Sales. All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash or nationally recognized bank credit cards. Agent shall accept and honor coupons during the Sale Term, including but not limited to, Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term. The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date. Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to, Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3    <u>Sales Taxes</u>.

(a)    During the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise and Additional Agent Goods as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and Additional Agent Goods and collected by Agent in trust for Merchant at time of sale and paid over to Merchant. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>"). If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to immediately draw on the Letter of Credit in the full amount of Sales Taxes collected by Agent in the preceding week. Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional Agent Goods and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "<u>Additional Taxes and Penalties</u>"). Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Agent shall add Sales Tax to the sales price of all Additional Agent Goods sold and Agent shall collect Sales Taxes attributable to the sales of Additional Agent Goods and deposit such amounts into existing accounts, trust accounts, or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "<u>Merchant Indemnified Parties</u>") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lenders, any taxing authority, or any other party, and Merchant (or if Merchant shall be unable to or otherwise for any reason fails to, and the applicable Lender has received such payment, such Lender) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    Supplies. Agent shall have the right to use, without charge, all existing supplies located at the Stores, including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"). In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to reasonably cooperate with Agent to obtain the same, if reasonably available, for which Agent shall, within three (3) business days of receipt, reimburse the Merchant at Merchant's cost therefor.

8.5    Returns of Merchandise. During the first thirty (30) days of the Sale, Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise"). Agent shall maintain and deliver to Merchant a detailed Returned Merchandise log, including copies of all relevant merchandise receipts and credits, and shall mark the Returned Merchandise in such a fashion so as to render such merchandise readily identifiable by Merchant and Agent. Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise. To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and (i) if returned during the first 14 days of the Sale, shall be valued at the Cost Value and Retail Price applicable to such item or (ii) if returned after such 14 day period, (i) if returned during the first 14 days of the Sale, shall be valued at the Cost Value and Retail Price applicable to such item multiplied by the inverse of the then prevailing Sale discount. Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the applicable Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly. If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; provided that, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, than such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly Sale reconciliation pursuant to Section 8.7(a) hereof. Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the final Sale reconciliation provided for under Section 8.7(b) hereof.

8.6    Gift Certificates; Membership Program.

(a)    During the first sixty (60) days of the Sale, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant in accordance with Merchant's policies and the terms and conditions applicable to such items (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7. Agent shall not sell any Gift Certificates.

(b)    During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7    Sale Reconciliation.

(a)    Weekly Reconciliation. On each Wednesday during the Sale Term (each a "Weekly Sale Reconciliation"), commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant (in consultation with Lenders) shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), pursuant to procedures agreed upon by Merchant (in consultation with Lenders) and Agent. On a weekly basis, Agent shall also provide Merchant (and a copy to each Lender) with a report (in electronic format acceptable to Merchant) of all sales of Additional Agent Goods, which report shall detail by Store, at a minimum, gross and net sales and type of items sold.

(b)    Final Reconciliation.

(i) Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Agent and Merchant (in consultation with the Lenders) shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days after completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent (the "Final Reconciliation Settlement Date"). In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 8.7(b)(ii) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant (in consultation with the Lender) and Agent shall have reasonable access to Merchant's and Agent's records with respect to Merchandise, Proceeds, Sales Taxes, Expenses, and other Sale-related items to review and audit such records.

(ii)    In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution. In the event of a dispute as to (x) or (y) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.4 hereof, as applicable. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant and/or Lender shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant.

8.8    Force Majeure. If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores for a period of five (5) consecutive days, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or any Lender to the extent such Lender has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent, if applicable, for the amount by which the Guaranteed Amount is so reduced.

8.9    Right to Monitor. Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business;

provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10   Additional Agent Goods.

(a)     So long as such actions do not detract from the Sale or Merchant's anticipated recoveries on account of the sale of Merchandise, Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent, whether from Merchant's existing orders or otherwise, that are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Agent Goods"). The Additional Agent Goods shall be purchased by Agent as part of the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense). Sales of Additional Agent Goods shall be run through Merchant's systems, provided however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods. Additionally, Agent shall provide signage through all retail channels notifying customers that the Additional Agent Goods have been included in the Sale.

(b)     In addition to all other compensation due to Merchant under this Agreement, Agent shall pay to Merchant an amount equal to five percent (5.0%) of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "Additional Agent Goods Fee") and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods. Agent shall pay Merchant its Additional Agent Goods Fee in connection with each Weekly Sale Reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week.

(c)     Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(d)     Merchant shall, at Agent's sole expense (and not as an Expense), endeavor to insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(e)     Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code. Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).

(f)     Each Lender hereby acknowledges receipt of notice of the consignment of the Additional Agent Goods and consents to the payments to Agent of Additional Agent Goods proceeds.

8.11    <u>Collective Bargaining Agreements; Leases</u>.  Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in sections 4.1(a) and 4.1(c) herein.   Agent acknowledges that Merchant's employees at the Distribution Center are subject to a collective bargaining agreement, which may affect the conduct of operations at the Distribution Center.  In no event shall Merchant be required to take any action pursuant to this Agreement if such action would be prohibited or restricted by the terms of any applicable collective bargaining agreement, or would otherwise be inconsistent with Merchant's obligations under any such agreement.

8.12    <u>E-Commerce Platform</u>.  Agent shall have the option, exercisable in writing by no later than the Sale Commencement Date, to use Merchant's e-commerce site and related platform ("E-Commerce Platform") in connection with the Sale to fulfill customer orders made during the Sale Term and otherwise promote the Sale (in Agent's capacity as Agent hereunder).  If Agent exercises the option to use the E-Commerce Platform to fulfill customer orders, (i) Merchant shall continue to provide for the operation and maintenance of the E-Commerce Platform and provide Agent with reasonable assistance with respect to the functionality of the E-Commerce Platform, fulfillment of orders, and promotion of the Sale and (ii) Agent shall pay Merchant (as an Expense, which shall be in addition to all other Expenses contemplated by this Agreement) for the actual costs and expenses (x) incurred and paid by Merchant after the Sale Commencement Date through the date on which the Agent directs the Merchant to cease fulfilling customer orders, (y) that are directly attributed to the operation and maintenance of the E-Commerce Platform during the Sale Term, and (z) reflected on Exhibit 8.12 ((ii)(x)-(z) (the "E-Commerce Platform Expenses"); provided, however, that Agent is only obligated to pay the E-Commerce Platform Expenses to the extent such E-Commerce Platform Expenses are not otherwise included as an Expense of the Sale under Section 4.1 hereof (including, but not limited to, as part of Central Services)).  If Agent exercises the option to use the E-Commerce Platform to fulfill customer orders, in addition to the foregoing, Agent shall provide Merchant with written notice of such election no later than the Sale Commencement Date, (i) all Merchandise sold through the E-Commerce Platform shall be counted based on shipments to customers, (ii) Merchant and Agent shall mutually agree upon an allocation of Merchandise to be sold using the E-Commerce Platform, which Merchandise shall not be subject to the requirement to arrive at the Stores by the Receipt Deadline, (iii) Agent shall be authorized to sell Additional Agent Goods through the E-Commerce Platform (subject to the same limitation as applies to Agent's right to include Additional Agent Goods in the Sale conducted from the Stores), and (iv) activities relating to the E-Commerce Platform shall be subject to such other processes, procedures, and agreements as  Agent and Merchant (in their respective reasonable discretion) may agree upon for the efficient and continued operation of the E-Commerce Platform.  In the event Agent elects not to exercise its rights to use the E-Commerce Platform as a sales platform, Merchant agrees that it shall not complete any sales for its own account utilizing the E-Commerce Platform during the Sale Term and Merchant shall otherwise comply with Merchant's obligations under this Agreement in respect of the E-Commerce Platform.

Section 9.  <u>Employee Matters</u>.

9.1    <u>Merchant's Employees</u>.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent reasonably deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.   Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all

applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

9.3    Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4    Employee Retention Bonuses.  Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its reasonable discretion.  Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10. Conditions Precedent and Subsequent.

(a)    The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)    All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Lender has executed this Agreement (with all Exhibits attached hereto) solely to bind itself to the provisions specifically relating to Lender herein.

(iii)    The Bankruptcy Court shall have entered an order approving bidding procedures, in form and substance reasonably acceptable to Merchant and Agent (such order, the "Bidding Procedures Order"), by December 23, 2014, or such later date as mutually agreed upon by the Merchant and Agent.

(iv)    The Bankruptcy Court shall have entered the Approval Order by January 7, 2015, or such later date as mutually agreed upon by the Merchant and the Agent (the "Approval Order Deadline").

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the Merchant:

(i)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Each Lender has executed this Agreement (with all Exhibits attached hereto) solely to bind itself to the provisions specifically relating to such Lender herein, subject to the Approval Order.

Section 11.  Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties and Covenants.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)    Each of the entities comprising Merchant (i) is an entity duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) subject to the applicable provisions of the Bankruptcy Code, has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to

be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder. Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)      Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise free and clear of all liens, claims, and encumbrances of any nature other than the liens and security interests of the Agent hereunder and of the Lenders; and (ii) Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, in each case other than the liens and security interests of Agent hereunder and of Lenders and any other liens and security interests granted pursuant to Merchant's debtor-in-possession financing and cash collateral usage.

(d)      Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)      Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark (including normal course hard markdowns), all items of inventory at, or received at, the Stores in a manner consistent with similar Merchandise located at the Stores, and in all instances in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory. Since November 1, 2014, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)      Since November 1, 2014, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the Sale Commencement Date other than in accordance with the Allocation Schedule.

(g)      To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance in all material respects with all applicable federal, state and local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)      Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores. Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores. Except as otherwise restricted by the Bankruptcy

Code or as provided herein and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

(i)     Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since November 1, 2014, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was or is due an annual raise in the ordinary course or contractually due a raise.

(k)     Since November 1, 2014, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business.

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(m)     Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)     On and as of the Sale Commencement Date, the level of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix set forth on Exhibit 11.1(o).

(p)     Merchant has not purchased or transferred and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(q)     Merchant has not since November 1, 2014 shipped any Excluded Damaged Merchandise from the Distribution Centers to the Stores, other than what is typically done in the ordinary course with respect to clearance sections and clearance stores. Merchant will not ship any Excluded Damaged Merchandise from the date of this Agreement from the Distribution Centers to the Stores, other than what is typically done in the ordinary course with respect to clearance sections and clearance stores.

(r)    Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)    Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at the Stores or any other retail channel, except as detailed on Exhibit 11.1(s).

(t)    Merchant covenants to use Merchant's commercially reasonable efforts to promptly and timely obtain entry of an order extending the deadline to assume or reject unexpired leases of real property through and including the Sale Termination Date.

(u)    Merchant hereby acknowledges that, as of and after the date of this Agreement, Agent intends to begin to make arrangements for the purchase of Additional Agent Goods from Agent's suppliers of goods as well as Merchant's existing suppliers of goods, all at no cost or expense whatsoever to Merchant and at Agent's sole risk. To assist Agent in that regard, from and after the date of this Agreement, Merchant shall use Merchant's commercially reasonable efforts to assist and cause Merchant's employees to assist Agent with Agent's efforts to negotiate orders with Merchant's suppliers for goods that Agent is interested in purchasing as Additional Agent Goods, provided that (i) such assistance does not unreasonably interfere with or disrupt Merchant's business operations, (ii) the appropriate employees to perform such activities then remain employees of Merchant, it being agreed that Merchant shall in no event be required to retain any such employee for the purpose of rendering such assistance, (iii) Merchant shall have no liability whatsoever in connection with any orders placed for such Additional Agent Goods or otherwise in connection with the activities contemplated by this subpart (u).

11.2    Agent's Representations, Warranties and Covenants. Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)    Each entity comprising Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

25

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)     Absent prior written consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     To the best of Agent's knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise located in the Stores.

Section 12.  Insurance.

12.1    Merchant's Liability Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall use its commercially reasonable efforts to continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall use its commercially reasonable efforts to cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or  negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2    Merchant's Casualty Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall use commercially reasonable efforts to provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    Agent's Insurance.    Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors or any employee or independent contractor acting at the direction of Agent or its representatives or under the control of Agent or its representatives). Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    Worker's Compensation Insurance.    Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

12.5    Risk of Loss.    Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement, Agent shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term (an "Agent Claim"). In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.  Indemnification.

13.1    Merchant's Indemnification.    Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect

27

thereof; (iii) provided that Agent timely satisfies its funding obligations hereunder with respect to payroll, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vii) so long as Agent complies with Agent's obligations under this Agreement with respect to the payment or reimbursement of Occupancy Expenses to Merchant, any failure of Merchant to pay to any Occupancy Expenses to landlords in accordance with the Bankruptcy Code or Central Service Expenses during the Sale Term; and (viii) except to the extent such persons are acting at the direction or request of Agent or its representatives, the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

13.2    Agent Indemnification.  Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) any consumer warranty, products liability claims or other claims of any type or kind and by any party whatsoever relating to Additional Agent Goods; (v) as set forth in section 8.3 above; (vi) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Merchant Indemnified Party by reason of acts or omissions of Agent or Agent's representatives in connection with the Sale, and (vii) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

(a)    The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) business days after receipt of written notice thereof;

(b)    Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) business days after written notice to the defaulting party; or

(c)    The granting of a motion by any party to convert the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the granting of a motion by any party to appoint a chapter 11 trustee.

(d)    The Sale is terminated prior to the Sale Termination Date or the Sale is materially interrupted or materially impaired for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or

entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15. <u>Agent's Security Interest</u>.

(a)      In consideration of and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the applicable Lender, as Merchant's designee, Merchant hereby grants to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (iv) the FF&E Commission; (v) Agent's percentage share in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC as applicable in the state of Delaware) of each of the foregoing (all of which are collectively referred to herein as the "<u>Agent Collateral</u>"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit to the Lender, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)      Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lenders and Merchant), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, <u>provided</u>, <u>however</u>, that (x) until the Merchant receives payment in full of the Guaranteed Amount, the Additional Agent Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission), and such other amounts due to Merchant hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of Lenders in the Agent Collateral (subject to the carve out for professionals in the Bankruptcy Case) but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Additional Agent Goods Fee (if any), the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the FF&E Commission), and such other amounts due to Merchant hereunder, and (y) upon payment in full of the Guaranteed Amount, the Additional Agent Goods Fee (if any), the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the FF&E Commission), and such other amounts due to Merchant hereunder, any security interest or lien of the Lender in the Agent Collateral and the carve out for professionals in the Bankruptcy Case shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral. Merchant shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement. For the avoidance of all doubt, the liens and security interests of Lenders shall at all times be subject to the carve-out for professionals in the bankruptcy Case.

(c)      Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of the Agent Collateral other than in favor of the Agent and each Lender.

(d)      In the event of an occurrence of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

Section 16. <u>Bidding and Auction</u>.    The Bidding Procedures Order shall provide that, in consideration of Agent conducting its due diligence and entering into this Agreement (which may serve as

a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("Auction"); then in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to terminate this Agreement (which it shall be entitled to do upon written notice to Agent) and pursue an alternative higher/better transaction (whether with another party serving as liquidating agent, as a going concern buyer, or otherwise, an "Alternative Transaction") and provided that there is no Event of Default by Agent then pending hereunder, Merchant shall pay Agent from and out of the proceeds to Merchant of such other transaction (and shall only be required to pay Agent out of such proceeds) an amount equal to the sum of (i) $400,000 ("Breakup Fee"), (ii) an expense reimbursement of up to $200,000 to cover Agent's reasonable out-of-pocket costs and expenses associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of this Agreement and the bid procedures (the "Expense Reimbursement" and together with the Breakup Fee, the "Bid Protections"), and (iii) Agent's actual out-of-pocket costs of signage and freight in an amount not to exceed $450,000 (the "Signage Costs"); provided, however, that the Bidding Procedures Order shall (i) require the successful bidder to reimburse Agent up to the amount of the Signage Costs, and (ii) that Merchant shall have no liability for such Signage Costs. For avoidance of doubt, Agent's right to receive payment of the Bid Protections and reimbursement of the Signage Costs from the proceeds of an Alternative Transaction as provided herein shall be the sole and exclusive remedy of Agent in the event of termination of the Agency Agreement. At the Auction: (i) the Bid Protections shall not be eligible to be "credit bid" by Agent; (ii) the first overbid by a competing bidder shall be an amount equal a Guaranty Percentage of not less than 101.0% (as quantified by the Merchant), plus each competing bidder shall agree to reimburse the Merchant for the Signage Costs to be paid to Agent, with successive overbids in increments of not more than 0.1% absent Agent's consent; and (iii) all competing liquidation bids shall be on the same terms and conditions as this Agreement other than as to the increased Guaranty Percentage as determined by Merchant in its sole discretion. For the avoidance of all doubt, the requirements of clause (iii) of the immediately preceding sentence shall not apply to any going concern bids received by Merchant.

Section 17.  Miscellaneous.

17.1    Notices. All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

If to the Agent:        HILCO MERCHANT RESOURCES, LLC
                        5 Revere Drive, Suite 206
                        Northbrook, IL 60062
                        Attention: Ian S. Fredericks
                        Tel: (847) 418-2075
                        Fax: (847) 897-0859
                        Email: ifredericks@hilcotrading.com

                        GORDON BROTHERS RETAIL PARTNERS, LLC
                        Prudential Tower
                        800 Boylston Street
                        Boston, MA 02119
                        Attn:   Michael Chartock
                        Tel:    617.210.7116
                        Email: mchartock@gordonbrothers.com

If to the Merchant:    Deb Shops Inc.
                       9401 Blue Grass Road
                       Philadelphia, Pennsylvania 19114
                       Attn: Keith Spirgel, Chief Financial Officer
                       Tel: _____
                       Email: KSpirgel@debshops.com

If to the Lender:      PNC Bank, National Association
                       340 Madison Avenue
                       New York, NY 10007
                       Attention:    Marc Hansen
                       Tel:    (212) 752-6043
                       Fax:    (212) 303-0060
                       Email: marc.hansen@pnc.com

                       With a copy to (which shall not constitute notice):

                       Hahn & Hessen LLP
                       488 Madison Avenue
                       New York, New York 10022
                       Attention:    Daniel M. Ford
                       Tel:    (212) 478-7200
                       Fax:    (212) 478-7400
                       Email: dford@hahnhessen.com

                              -and-

                       Ableco, L.L.C.
                       875 Third Avenue
                       New York, NY 10022
                       Attn: Joseph Naccarato, Managing Director
                       Tel: (212) 909-1455
                       Fax: (212) 284-7906
                       Email: jnaccarato@cerberuscapital.com

                       With a copy to (which shall not constitute notice):

                       David A. Fidler, Esq.
                       Klee, Tuchin, Bogdanoff & Stern LLP
                       1999 Avenue of the Stars
                       Thirty-Ninth Floor
                       Los Angeles, CA 90067-6049
                       Tel: (310) 407-4000
                       Fax: (310) 407-9090
                       Email: dfidler@ktbslaw.com

                              -and-

31

Riemer & Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn: Steven E. Fox, Esq.
Tel: 212.789.3150
Fax: 212.719.0140
Email: sfox@riemerlaw.com

17.2    Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    Amendments.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of the parties hereto and consented to in writing by the Ableco and PNC (unless and until the Revolving Credit Obligations are paid in full), which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that any modification or amendment to Section 6.1 of the Agency Agreement purporting to extend the Sale Term shall be subject to the prior consent of the Secured Lenders in their sole discretion.

17.4    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5    Currency.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other (which consent may be granted or withheld in the applicable party's sole discretion).

17.7    Execution in Counterparts.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever

waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

    17.8    <u>Section Headings</u>.    The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

    17.9    <u>Wiring of Funds</u>.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

    17.10    <u>Nature of Remedies</u>.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under sections 3.1(b), 3.1(c), 3.4 and 11.1(o) shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.  For the avoidance of all doubt and notwithstanding anything to the contrary in this Agreement, the rights granted to Agent pursuant to Section 16 shall be Agent's sole and exclusive rights and remedies in the event of a termination of this Agreement by Merchant under Section 16.

    17.11    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

[Signatures Appear Next Page]

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____

Print Name and Title:  Ian S. Fredericks, VP & AGC, Managing Membe

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____

Print Name and Title:

Deb Stores Holding LLC

By:_____

Print Name and Title:

Deb Stores Holding II LLC

By: _____

Print Name and Title:

Deb Shops SDP Inc.

By: _____

Print Name and Title:

Deb Shops SDIH Inc.

By: _____

Print Name and Title:

[Merchant's Signatures Continued on Next Page]

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:
Richard Edwards
co President

Deb Stores Holding LLC

By:_____
Print Name and Title:

Deb Stores Holding II LLC

By: _____
Print Name and Title:

Deb Shops SDP Inc.

By: _____
Print Name and Title:

Deb Shops SDIH Inc.

By: _____
Print Name and Title:

[Merchant's Signatures Continued on Next Page]

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:

Deb Stores Holding LLC

By: _____
Print Name and Title:  Dawn Robertson, CEO

Deb Stores Holding II LLC

By: _____
Print Name and Title:  Dawn Robertson, CEO

Deb Shops SDP Inc.

By: _____
Print Name and Title:  Dawn Robertson, CEO

Deb Shops SDIH Inc.

By: _____
Print Name and Title:  Dawn Robertson, CEO

[Merchant's Signatures Continued on Next Page]

[Merchant's Signatures Continued from Prior Page]

Deb Shops SD Inc.

By: _____

Print Name and Title:  Dawn Robertson, CEO

Deb Shops SDE LLC

By: _____

Print Name and Title:  Dawn Robertson, CEO

Deb Shops SDW LLC

By: _____

Print Name and Title:  Dawn Robertson, CEO

Deb Shops SDE-Commerce LLC

By: _____

Print Name and Title:  Dawn Robertson, CEO

Deb Shops SDFMC LLC

By: _____

Print Name and Title:  Dawn Robertson, CEO

Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:

**PNC BANK, NATIONAL ASSOCIATION,**

By: _____

     Name: *Ryan Peak*

     Title: *Senior Vice President*

**ABLECO, L.L.C.**

By: _____

     Name: _____

     Title: _____

**Agreed and Accepted as to Sections**
**3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:**

PNC BANK, NATIONAL ASSOCIATION,

By: _____
Name: _____
Title: _____

ABLECO, L.L.C.

By: _____
Name: _____ *Kevin Genda* _____
Title: _____ *Senior Managing Director* _____

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.3(a) – Merchant's Designated Account
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(a) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center and On-Order Merchandise
Exhibit 8.1 – Sale Guidelines
Exhibit 8.12 – E-Commerce Platform Expense Schedule
Exhibit 11.1(o) – Mix Schedule
Exhibit 11.1(s) – Promotions Schedule
1775088.2