# EXHIBIT C

# Pitts Declaration

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DEB STORES HOLDING LLC, et al.[1] | ) | Case No.: 14-12676 (MFW) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**DECLARATION OF DEREK PITTS IN SUPPORT OF DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO AGENCY AGREEMENT, (B) AUTHORIZING BIDDING PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF; (II) AUTHORIZING (A) SALE OF ASSETS AND (B) STORE CLOSING SALES AND (III) GRANTING RELATED RELIEF**

I, Derek Pitts, declare under penalty of perjury that:

1. I am a Managing Director with Houlihan Lokey Capital, Inc. (together with employees of its affiliates, its wholly-owned subsidiaries, and independent contractors, "**Houlihan Lokey**"). I am authorized to execute this declaration (this "**Declaration**") on behalf of Houlihan Lokey. I am an individual over the age of 18. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all of the facts set forth herein.[2]

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: Deb Stores Holding LLC (4407), Deb Stores Holding II LLC (4455), Deb Shops SDP Inc. (4120), Deb Shops SDIH Inc. (4113), Deb Shops SD Inc. (8806), Deb Shops SDE LLC (4077), Deb Shops SDW LLC (4065), Deb Shops SDE-Commerce LLC (0926), and Deb Shops SDFMC LLC (8842). The location of the Debtors' headquarters and the service address for each of the Debtors is 9401 Blue Grass Road, Philadelphia, PA 19114.

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Houlihan Lokey and are based on information provided by them.

2. This Declaration is being submitted in connection with the *Debtors' Motion for Orders (i)(a) Authorizing Entry into Agency Agreement, (b) Authorizing Bidding Protections, (c) Authorizing Bidding Procedures and Auction and (d) Scheduling Sale Hearing and Approving Notice Thereof, (ii) Authorizing (a) Sale of Assets and (b) Store Closing Sales and (iii) Granting Related Relief* (the "**Motion**") filed on the date hereof.

### Background & Qualifications

3. Houlihan Lokey is a nationally recognized investment banking and financial advisory firm, with seventeen offices worldwide and more than 800 professionals. Houlihan Lokey's Financial Restructuring Group, which has more than 160 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest involved with financially troubled companies in a variety of industries, both in and outside of bankruptcy.

4. I am a Managing Director at Houlihan Lokey, and in such capacity, I have worked on numerous financial restructuring, corporate finance and valuation engagements across several industries, including retail, consumer products, textiles, restaurants, energy and industrials since 2000. Prior to my employment with Houlihan Lokey, I worked for eight years in corporate financial management and business development in the financial services and software development industries. During my career, I have advised on more than 40 restructuring transactions, including approximately 19 in the retail sector.

5. I received my B.S. from Northeastern University and my M.B.A. from the Darden School of Business at the University of Virginia. I am registered with FINRA as a

General Securities Representative (Series 7 and 63) and a Limited Representative – Investment Banking (Series 79).

6. In September 2014, Deb Stores Holding LLC, on behalf of itself and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), first engaged Houlihan Lokey to provide general financial advisory services to explore strategic alternatives. Such alternatives included, among others, a potential sale of the Debtors, a potential debt and/or equity investment, as well as a potential refinancing of the Debtors' existing capital structure in order to provide additional liquidity to fund the ongoing strategic turnaround.

### Investment/Sale Marketing Process

7. In connection with exploring the Debtors' strategic alternatives, beginning in October 2014, Houlihan Lokey contacted 79 potentially interested parties, including 61 financial sponsors/investment funds and 18 strategic buyers, regarding a potential investment or sale transaction. At the commencement of this process the Company's liquidity position was forecasted to be sufficient to run a 60 to 90 day marketing process under reasonably stable business conditions. Parties that expressed an interest in a potential transaction were asked to execute a confidentiality agreement with the Debtors. Houlihan Lokey assisted the Debtors in establishing a virtual data room (the "**Dataroom**") to enable those interested parties who executed confidentiality agreements with the opportunity to conduct diligence on the Debtors' financial and operational information, including management's business plan forecast. Houlihan

Lokey also facilitated this process by providing additional information when requested by interested parties.

8. At the end of October to early November, given softer than expected performance trends, the Debtors' liquidity position began to weaken substantially and a liquidity shortfall was forecasted to potentially occur as early as mid-November. The Debtors approached their lenders and sponsors seeking additional liquidity support to cover this shortfall and fund operations. When it became apparent that the requested liquidity support was not available, the Debtors began exploring numerous self-help liquidity initiatives, including expense reductions and the deferral of rent payments, which measures provided temporary deferral of the forecasted liquidity shortfall. It was also determined that the marketing process should be augmented to solicit investor interest in (i) consummating a financing or sale transaction through a near-term bankruptcy process and (ii) serving as a potential stalking horse purchaser or plan sponsor in a bankruptcy process.

9. Houlihan Lokey augmented the marketing process as required given the revised liquidity circumstances. To date, none of the 32 parties that executed confidentiality agreements and accessed the Dataroom have yet submitted a preliminary indication of interest for a potential financing or acquisition of the Debtors on a going-concern basis either in or out of court. Additionally, none of these potential buyers expressed interest in serving as a potential stalking horse purchaser or investor as part of a bankruptcy process. We communicated to interested parties that to the extent there was a bankruptcy filing and if they were not the stalking horse investor/purchaser, there may still be the potential to bid on the assets on a going-concern

basis at a bankruptcy related auction. There has been interest expressed by going concern buyers.

### Liquidator Bid Solicitation Process

10. In connection with contingency planning for a potential Chapter 11 filing, beginning October 29, 2014 and through early November (concurrent with the going-concern sale and financing processes), Houlihan Lokey contacted five nationally known liquidators capable of handling a company-wide store closing process and requested proposals from each to serve as a stalking horse purchaser of the Debtors' assets whose contract would be subject to potential higher and/or better bids, including potential going-concern bids, at a bankruptcy auction. Each of these parties executed a confidentiality agreement and received access to the Dataroom, as well as additional confidential information about the Debtors' assets. Several of the parties explored the possibility of entering into joint ventures with each other.

11. By November 13, 2014, the Debtors received two preliminary proposals that are typical of such proposals in the liquidation industry for conducting store closing sales to sell inventory and disposing of FF&E in the store locations, distribution center and the corporate headquarters. In particular, each of the proposals provided that the liquidator would pay the Debtors a guaranteed amount of cash equal to a fixed percentage of the Debtors' cost value of their inventory, subject to certain adjustments. Both proposals provided for payment of certain store-related expenses of the Debtors, including but not limited to occupancy and payroll expenses, plus certain operating expenses up to certain capped amounts for the duration of store

closing sales. Notably, neither proposal contemplated the purchase of the Debtors' intellectual property assets.

13. I reviewed the initial proposals and contacted the parties to discuss the key terms of each bid. I also engaged in negotiations with these parties regarding the terms of their respective proposals. I, together with the Debtors' representatives, also participated in discussions with the parties regarding the terms of their agency agreement.

13. The Debtors, after consultation with PNC Bank National Association ("**PNC Bank**"), and lenders under the *Financing Agreement* dated as of October 11, 2011 with Ableco, L.L.C. as administrative and collateral agent (the "**Term Loan Secured Parties**"), and having not received any going-concern stalking horse bids, ultimately accepted a bid from a joint venture comprised of Gordon Brothers Retail Partners and Hilco Merchant Resources (the "**Stalking Horse**"), which they considered, in their business judgment, to be highest and best. The Debtors' advisors worked with the Stalking Horse, in consultation with PNC Bank and the Term Loan Secured Parties, to finalize the form of agency agreement which is attached to the Motion as Exhibit A (the "**Agency Agreement**").

14. In my view, the process which the Debtors and their advisors pursued in order to identify an acceptable Stalking Horse agency agreement was fair, open, comprehensive and afforded all likely interested parties ample opportunity to conduct due diligence and formulate proposals if they chose to do so.

15. The Agency Agreement has been extensively negotiated between the parties at arm's length and in good faith. In the course of these negotiations, the Debtors and

6

their advisors were successfully able to negotiate an Agency Agreement that includes a "break up" fee, which represents approximately 1.0% of the total consideration under the Agency Agreement. This, together with the absence of any "no shop" or non-solicitation period under the Agency Agreement, is designed to (a) encourage participation by other prospective buyers, including going-concern buyers, evaluating a potential overbid for the Debtors' assets and (b) establish an open and fair auction process.

16. I believe that the Agency Agreement is the best and most viable method currently available to the Debtors to maximize recoveries for all of the Debtors' stakeholders. First, I believe that it is generally more cost effective for the Stalking Horse, with its substantial experience in retail liquidations, to conduct the potential store closing sales, rather than the Debtors. Second, I believe that this arrangement will minimize the Debtors' risk, while motivating the Stalking Horse to maximize proceeds from the store closing sales. Third, I believe it provides an appropriate benchmark to conduct a bankruptcy auction and preserves the opportunity to obtain higher and/or better bids from other liquidators as well as potential going-concern buyers.

### The Need for Immediate Relief to Avoid Immediate and Irreparable Harm

17. Under these circumstances, the milestones set forth in the Agency Agreement are reasonable and warranted. The entry of the Sale Approval Order on or prior to January 7, 2015 is critical to assure the commencement of the store closing sales by January 9, 2015, if not otherwise sold to a going-concern buyer, and to preserve the value of the Debtors' estates. I believe this timeframe also allows potential competing bidders, including going-

concern buyers, ample opportunity to formulate comprehensive, binding bids to compete at an auction.

18. In light of the Debtors' pre-petition solicitation of offers from liquidators, as well as the competitive bidding process among the nation's most prominent liquidators to enter into the Agency Agreement, I believe that approval of the Agency Agreement with the Stalking Horse is the best alternative to any other form of liquidation. Accordingly, I believe it is necessary to avoid immediate and irreparable harm to the Debtors' estates that the Debtors be granted authority to enter into the Agency Agreement and be granted the relief requested in the Motion by January 7, 2015 to enable the store closing sales to begin no later than January 9, 2015.

19. Indeed, it is also critical to commence the sales as soon as possible for several important reasons, including the following:

(a) First, the guaranteed amount that potential liquidators are willing to pay to conduct the closing sales could drop if the sales cannot commence promptly.

(b) Second, the Debtors continue to incur expenses in connection with operating the store locations. However, upon approval of the proposed Agency Agreement and commencement of the store closing sales, the Stalking Horse will assume virtually all expenses of the store closing sales thus saving the Debtors' estates from incurring future expenses in connection with operating the store locations.

20. Because the Debtors' marketing efforts to date have drawn few potential alternative bidders a continued long and protracted marketing and sales process beyond the

8

proposed sale approval date of January 7, 2015 is unlikely to elicit additional offers and would, instead, threaten the value of the Debtors' estates. Nevertheless, Houlihan Lokey is still working with the Debtors to continue to market to potential alternate bidders and has continued its marketing efforts towards potential going-concern purchasers, equity investors, liquidators and third party financing sources.

21.  Over and above the robust marketing process and negotiations that occurred prior to the petition date, and that will continue post-petition in these chapter 11 cases, the Debtors have proposed a post-petition process for the sale of the Debtors' assets that will allow for an auction to be conducted should any qualified bidder ultimately desire to propose a bid with respect to all of, or any class of, the Debtors' assets. The Debtors' proposed auction process will "market test" the value the Debtors will receive in the sale of their assets so that such received value is fair and reasonable. This process, in my opinion, will ensure that the Debtors receive the greatest value possible for their assets while preserving the value of the proposals received to date.

22.  I believe that the Agency Agreement and the process negotiated with the Stalking Horse (including the timelines set forth in the Agency Agreement) are fair and reasonable under the necessarily accelerated circumstances of these chapter 11 cases, particularly in light of (a) the Debtors' and Houlihan Lokey's efforts to date; (b) the lack of alternative proposals received thus far in marketing the Debtors' assets; and (c) the opportunity for third-parties to make overbids as part of the sale process via the auction.

23. In summary, based on my experience, I believe that the Debtors' decision to move forward with the sale of assets on the timetable described in the Motion utilizing the Stalking Horse as the potential purchaser will significantly enhance recoveries. This is because: (a) the most able, nationally- recognized liquidators have been directly involved in the stalking horse bidding process; (b) those parties have expertise in quickly formulating proposals and were provided all the necessary diligence; (c) the solicitation process was typical, although expedited, for such situations; (d) the form of Agency Agreement used is customary for such transactions; (e) the terms and conditions in the Agency Agreement are customary for such transactions; (f) the terms and conditions allow for higher and/or better bids at an auction; and (g) as described in the *Declaration of Dawn Robertson in Support of First Day Motions* (the "**Robertson Declaration**"), there is no alternative bid to-date to acquire the Debtors as a going-concern despite solicitation efforts.

*[Remainder of page intentionally blank; signature on next page]*

24. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, NY
December 5, 2014

HOULIHAN LOKEY

By: *[signature]*
Derek Pitts
Managing Director