# **Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DEB STORES HOLDING LLC, et al.[1] | ) | Case No.: 14-12676 (MFW) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**Proposed Procedures Hearing Date: December 19, 2014 at To Be Determined Time**
**Proposed Procedures Objections Due: December 17, 2014 at 5:00 p.m. Eastern Time**

**DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO
AGENCY AGREEMENT, (B) AUTHORIZING BIDDING PROTECTIONS,
(C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND
(D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF;
(II) AUTHORIZING (A) SALE OF ASSETS AND (B) STORE CLOSING SALES AND
(III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession herein (collectively, the

"Debtors") hereby move (the "Motion") this Court for entry of orders (i) (a) authorizing the entry

into that certain Agency Agreement, dated as of December 4, 2014 (the "Agency Agreement"),

attached hereto as **Exhibit A** (which is inclusive of the Sale Guidelines (the "Sale Guidelines"),

attached hereto as **Exhibit B**), with a contractual joint venture composed of Hilco Merchant

Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Stalking Horse"),

(b) authorizing bidding protections for the Stalking Horse, (c) authorizing the bidding procedures

and related auction and (d) scheduling a sale hearing and approving notice thereof (the "Bidding

Procedures Order") and (ii) authorizing (a) sale of Assets (defined below) and (b) store closing

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Deb Stores Holding LLC (4407), Deb Stores Holding II LLC (4755), Deb Shops SDP Inc. (4120), Deb Shops SDIH Inc. (4113), Deb Shops SD Inc. (8806), Deb Shops SDE LLC (4077), Deb Shops SDW LLC (4065), Deb Shops SDE-Commerce LLC (0926), and Deb Shops SDFMC LLC (8842).  The location of the Debtors' headquarters and the service address for each of the Debtors is 9401 Blue Grass Road, Philadelphia, PA 19114.

DATE _12/5/14_

DOCKET # _37_

sales and (iii) granting related relief (the "Approval Order").  In support of the Motion, the

Debtors represent as follows:

## JURISDICTION

      1.     This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has jurisdiction over

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of*

*Reference* from the United States District Court for the District of Delaware dated as of February

29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b).

      2.     The statutory predicates for the relief requested herein are sections 105(a),

363, 364, 365, 503, 507 and 554 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.**     **General Background**

      3.     On the date hereof (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently

herewith, the Debtors have filed a motion with this Court requesting joint administration of the

Debtors' chapter 11 cases (the "Cases") for procedural purposes only.  The Debtors are operating

their business and managing their properties as debtors and debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the

appointment of a trustee or an examiner in these cases, and no official committee has yet been

appointed by the Office of the United States Trustee (the "U.S. Trustee").

4.      The factual background regarding the Debtors, including their current and

historical business operations and the events precipitating their chapter 11 filings, are set forth in

detail in the *Declaration of Dawn Robertson in Support of First Day Motions* (the "Robertson

Declaration") filed on the Petition Date and fully incorporated herein by reference.[2]

5.      The Debtors have filed this Motion seeking authority, in part, to conduct

an auction for the sale of the Debtors' (i) inventory, (ii) furniture, fixtures and equipment,

(iii) intellectual property, (iv) accounts receivable and cash on hand in the stores or other closing

locations, (v) real property leases and (vi) customer lists (each, an "Asset Class" and collectively,

the "Assets"), either on a going-concern basis or via chain-wide store closing sales (the "Store

Closing Sales") and liquidation. The Store Closing Sales process would result in the liquidation

of the Debtors inventory and furniture, fixtures and equipment.  It is also anticipated that the

Debtors would seek to separately sell certain intellectual property assets to the extent the Debtors

are not sold on a going-concern basis at auction.

6.      In furtherance of the Debtors' efforts to maximize the value of the Assets

in a sales process, the Debtors are also seeking authority, in part, to enter into an agency

agreement for a Store Closure Sales process that would serve as the stalking horse bid which

would be subject to higher and/or better bids at an auction.

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Robertson
Declaration.

**B.**     **Facts Specific to the Relief Requested**

7.     Prior to the Petition Date (specifically September and October 2014), the

Debtors, in consultation with their legal and financial advisors, investigated and began a

marketing process targeted at a broad range of strategic alternatives including, among others, a

potential sale of the Debtors, a potential debt and/or equity investment, as well as a potential

refinancing of the Debtors' existing capital structure in order to provide additional liquidity to

fund the ongoing strategic turnaround of the business.  At the commencement of this process the

Company's liquidity position was forecasted to be sufficient to run a 60 to 90 day marketing

process under reasonably stable business conditions. Near the end of October, however, given

softer than expected performance trends, the Debtors' liquidity position began to weaken

substantially and a forecasted liquidity shortfall developed as early as mid-November.  Houlihan

Lokey modified the marketing process as required given the revised liquidity circumstances to

solicit investor interest in (i) consummating a financing or sale transaction through a near-term

bankruptcy process and (ii) serving as a potential stalking horse purchaser or plan sponsor in a

bankruptcy process.

8.     Additional factual background relating to the Debtors' decision to file this

Motion is contained in the Robertson Declaration.  The Debtors' secured lenders support the

Debtors' pursuit of maximizing value at a potential auction including the entry by the Debtors

into the Agency Agreement with the Stalking Horse or other agreement put forward by the

successful bidder after an auction and all of the relief requested herein.

9.     As mentioned above, the Debtors believe that it is crucial that they

commence the Store Closing Sales (or close a  going-concern Alternative Transaction) on their

proposed timeline in order to maximize value for the Debtors' estates and all stakeholders while minimizing administrative expenses. Further, pursuant to their postpetition financing agreement, the Debtors have agreed to commence, at a minimum, the Store Closing Sales no later than January 9, 2015. The Agency Agreement (defined below) provides that the Store Closing Sales commence on or prior to January 9, 2015 (the "Sale Commencement Date"). The Debtors propose to commence the Store Closing Sales immediately following the Sale Hearing or otherwise close on the sale of the Assets to a going-concern buyer.

10.     The details of the process of soliciting bids from and pursuing the selection of a nationally-recognized liquidator to serve as a stalking horse buyer are described in detail in the *Declaration of Derek Pitts in Support of the Debtors' Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* attached hereto as **Exhibit C** (the "Pitts Declaration").

11.     As a result of this process, the Debtors, in consultation with their secured lenders, determined that the Stalking Horse bid represented the highest and best offer as of the date hereof, subject to a future auction, and thus that it was in the best interests of the Debtors, their estates, creditors and other parties-in-interest to enter into the Agency Agreement. As part of the consideration for entry into the Agency Agreement, the Debtors request authority to pay the Stalking Horse a break-up fee and provide for an expense reimbursement that will be payable

to the Stalking Horse in certain circumstances where the Stalking Horse is not the successful

bidder after an auction.

        12.      Pursuant to the Agency Agreement, the Stalking Horse will serve as the

Debtors' exclusive agent to (a) sell all of the merchandise (the "Merchandise") located at all of

the Debtors' retail locations and, if requested by the Stalking Horse, through e-commerce

platforms (the "Sale") and (b) dispose of any owned fixtures, furnishings and equipment (the

"Owned FF&E") in the Debtors' retail locations, distribution center and corporate offices

(together with the Sale, the "Transaction").

        13.      The significant terms of the Agency Agreement are as follows:[3]

| Provision | Description of Provision |
| --- | --- |
| Sale<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse shall be retained as the Debtors' exclusive agent to liquidate the Merchandise from all of the Debtors' retail store locations and, if requested by the Stalking Horse, through the Debtors' e-commerce platform free and clear of all claims, liens or encumbrances of any kind (collectively, "Liens") pursuant to a "going out of business," "store closing," "sale on everything," "total liquidation," "everything must go," or similarly themed sale (which shall comply with the Sale Guidelines). The Merchandise includes (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date, (ii) certain damaged and other merchandise (as provided in the Agency Agreement), and (iii) merchandise at the distribution center and on-order that is received at the Stores no later than fourteen |

---

[3] This summary is provided in accordance with Rule 6004-1(b)(iv) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") and is qualified in its entirety by reference to the provisions of the Agency Agreement and the Sale Guidelines. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Agency Agreement and the Sale Guidelines. To the extent there exists any inconsistency between this summary and the provisions of the Agency Agreement and the Sale Guidelines, the provisions of the Agency Agreement and the Sale Guidelines, as applicable, shall control.

| Provision | Description of Provision |
|---|---|
| | (14) days after the later of (x) Sale Commencement Date and (y) the date on which the Stalking Horse provides the Debtors with an allocation schedule as provided in the Agency Agreement.<br><br>*See Agency Agreement Sections 1 & 5.2(a).* |
| Guaranteed Amount<br><br>*Local Rule 6004-1(b)(iv)* | As a guaranty of the Stalking Horse's performance under the Agency Agreement, the Stalking Horse will guarantee the Debtors' receipt of 98.25% (subject to certain potential adjustments) of the Cost Value of the Merchandise included in the Sale (the "Guaranteed Amount"). The Cost Value of such Merchandise is estimated to be between $38,000,000 and $42,000,000.<br><br>*See Agency Agreement Sections 3.1(a), 3.1(b), 3.1(c).* |
| Sharing Amount<br><br>*Local Rule 6004-1(b)(iv)* | To the extent that Proceeds from the Store Closing Sales exceed the sum of the Guaranteed Amount and expenses of the Sale, all remaining Proceeds shall be paid first to pay the Agency Fee (defined below) and next will be shared with 50% going to the Debtors and 50% going to the Stalking Horse.<br><br>*See Agency Agreement Section 3.2(a).* |
| Transfer of Remaining Merchandise<br><br>*Local Rule 6004-1(b)(iv)* | To the extent that there is Merchandise remaining upon completion of the Sale at each store (the "Remaining Merchandise"), such Remaining Merchandise will be deemed transferred to the Stalking Horse free and clear of all Liens. The Stalking Horse shall use commercially reasonable efforts to dispose of such Remaining Merchandise by means of bulk sale/wholesale or otherwise.<br><br>*See Agency Agreement Section 3.2(b)* |
| Agency Fee<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse shall receive as a fee 6.5% of the aggregate Cost Value of the Merchandise (the "Agency Fee").<br><br>*See Agency Agreement Section 3.2(a).* |

| Provision | Description of Provision |
|---|---|
| Payment Date<br><br>*Local Rule 6004-1(b)(iv)* | On the first business day following entry of the Approval Order, the Stalking Horse will pay to the Debtors 85% of the estimated Guaranteed Amount with respect to Merchandise other than On-Order Merchandise. The balance of the Guaranteed Amount shall be paid by the Stalking Horse on the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service verified by the Debtors and the Stalking Horse. To secure payment of the balance, the Stalking Horse will furnish the Debtors with an irrevocable stand-by letter of credit for the remaining 15% of the estimated Guaranteed Amount plus an agreed amount equal to three weeks of estimated expenses, naming the Debtors and Secured Lenders as co-beneficiaries.<br><br>*See* Agency Agreement Sections 3.3(b) and 3.4. |
| Additional Stalking Horse Merchandise<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse is entitled, at its expense, to include in the Store Closing sales additional merchandise procured by the Stalking Horse which is of like kind, and no lesser quality to, the Merchandise. The Stalking Horse will pay the Debtors an amount equal to 5.0% of the gross proceeds of the sale of any Additional Stalking Horse Merchandise.<br><br>*See* Agency Agreement Section 8.10. |
| Sale of Owned FF&E<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse will sell the Debtors' Owned FF&E located at the stores, the distribution center and the corporate offices, free and clear of all Liens on (a) a commission basis or (b) upon mutual agreement of the Stalking Horse and the Debtors, with consent of the Secured Lenders, on a guaranteed fee basis, at the Debtors' option. The commission option entitles the Debtors to receive a commission equal to 20% of the gross proceeds from the sale of such Owned FF&E but obligates the Debtors to pay expenses incurred in connection with such disposition not to exceed $141,000. The proceeds from the sale of the Owned FF&E shall be paid as follows:  (i) the first $70,000 to Agent; (ii) the next $142,000, 50% to Agent and 50% to Merchant; and (iii) all proceeds in excess of the sum of (i) and (ii), 20% to Agent and 80% to Merchant. The guaranteed fee option entitles the Stalking Horse to |

| Provision | Description of Provision |
|---|---|
| | pay a lump sum to the Debtors to be agreed upon, but requires that all costs associated with disposition will be paid by the Stalking Horse in return for realization of all proceeds from the sale of the Owned FF&E.<br><br>*See* Agency Agreement Section 7. |
| Cost Value of Merchandise<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse's proposal is subject to the aggregate Cost Value of the Merchandise, as calculated in accordance with the Agency Agreement, being not less than $38,000,000 nor more than $42,000,000 subject to certain adjustments and conditions set forth in the Agency Agreement.<br><br>*See* Agency Agreement Section 3.1(b). |
| Store Closing Sales Expenses<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse will pay all Expenses of the Sale. The actual costs and expenses of the operations of the distribution center and transfer and delivery of Merchandise and Additional Stalking Horse Goods to and from the distribution center shall remain the sole obligation of the Debtors. In addition, as described above, the Debtors may be liable for the expenses incurred in connection with the Sale of FF&E, in the event that they elect to execute the FF&E Commission option.<br><br>*See* Agency Agreement Section 4. |
| Releases<br><br>*Local Rule 6004-1(b)(iv)(C)* | The Agency Agreement and Approval Order do not provide for any releases. |
| Record Retention<br><br>*Local Rule 6004-1(b)(iv)(J)* | The Agency Agreement does not contemplate the transfer of the Debtors' books and records to the Stalking Horse. |
| Relief from Bankruptcy Rule 6004(h)<br><br>*Local Rule 6004-1(b)(iv)(O)* | As set forth herein, the Debtors seek relief from the stay requirements of Bankruptcy Rule 6004(h). |

| Provision | Description of Provision |
|---|---|
| Sale Period<br><br>*Local Rule 6004-1(b)(iv)* | The Stalking Horse will commence the Store Closing Sales on or prior to January 9, 2015 and expects to end the Store Closing Sales on or about April 30, 2015; *provided, however,* the Stalking Horse would have the right to terminate the Sale at any store or the distribution center on seven days' notice.  Expenses will be paid until the applicable vacate date for a Closing Location; *provided, however,* that the Stalking Horse shall remain obligated to pay occupancy expenses until the fifteenth of a calendar month for any Closing Location for which the Stalking Horse did not provide a notice of vacate prior to the eighth day of such month.<br><br>*See* Agency Agreement Section 6. |
| Bidding Protections<br><br>*Local Rule 6004-1(b)(iv)(D), 6004-1(b)(iv)(G) and 6004-1(c)(i)(C)(2)* | If (a) the Court approves an alternative transaction, or a motion or other request to approve an alternative transaction is filed by or on behalf of the Debtors (subject to the terms of the Agency Agreement) or (b) the Stalking Horse is not approved as the successful bidder at the Auction contemplated by the Bidding Procedures Order then the Stalking Horse shall be entitled to receive: (i) $400,000 ("Breakup Fee"), (ii) an expense reimbursement of up to $200,000 to cover the Stalking Horse's reasonable out-of-pocket costs and expenses associated with due diligence and professionals' fees and expenses (the "Expense Reimbursement" and together with the Breakup Fee, the "Bid Protections"), and (iii) the Stalking Horse's actual out-of-pocket costs of signage and freight in an amount not to exceed $450,000 (the "Signage Costs"); *provided, however*, that  the Bidding Procedures Order shall  (i) require the successful bidder to reimburse the Stalking Horse up to  the amount of the Signage Costs, and (ii) that the Debtors shall have no liability for such Signage Costs.  Neither the Break Up Fee nor the Expense Reimbursement shall be eligible to be "credit bid" by the Stalking Horse.<br><br>*See* Agency Agreement Section 16. |
| Merchandise Returns / Gift Certificates / Membership Program<br><br>*Local Rule 6004-1(b)(iv)* | Sales of all items of Merchandise sold during the Sale Period will be "final sales."  During the first thirty (30) days of the Sale Period, the Stalking Horse will accept returns sold prior to the Sale Commencement Date pursuant to the Debtors' |

| Provision | Description of Provision |
|---|---|
| | return policy.  During the first sixty (60) days of the Sale Period, the Stalking Horse shall accept the Debtors' gift certificates and gift cards and the Debtors shall reimburse the Stalking Horse in cash for such amounts during the weekly sale reconciliation.  After the first sixty (60) days of the Sale Period, the Stalking Horse will have no obligation to accept the Debtors' gift certificates and gift cards and, if the Stalking Horse does accept such gift certificates and gift cards, it will not be entitled to any reimbursement from the Debtors.  During the Sale Period, the Stalking Horse will honor (i) discounts afforded by the Debtors or (ii) the then-prevailing Sale discounts being offered by the Stalking Horse but not both on a cumulative basis.<br><br>*See* Agency Agreement Sections 8.2, 8.5 and 8.6. |
| Superpriority Claims and Liens<br><br>*Local Rule 6004-1(b)(iv)* | Subject to the Stalking Horse having satisfied its obligation to pay the Initial Guaranty Payment and issuance of the letter of credit, the Debtors grant Liens upon (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) the Stalking Horse's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 of the Agency Agreement; (iv) the FF&E Commission; (v) the Stalking Horse's percentage share in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC as applicable in the state of Delaware) of each of the foregoing, to secure the full payment and performance of all obligations of the Debtors to the Stalking Horse hereunder. |
| Use of Proceeds<br><br>*Local Rule 6004-1(b)(iv)(H)* | It is contemplated that, pursuant to the proposed DIP financing arrangements between the Debtors and PNC Bank, all amounts pursuant to the Agency Agreement and the Approval Order for which the Debtors are entitled to payment shall be paid over by the Debtors to the DIP Revolving Credit Agent and the Term Loan Agent (as such terms are defined in the proposed form of *Interim Financing Order Authorizing Borrowing and the Use of Cash Collateral, Granting Liens and Providing Super-Priority Administrative Expense Status* |

| Provision | Description of Provision |
|---|---|
| | *and Granting Adequate Protection Pursuant to Sections 363 and 364 of the Bankruptcy Code)* (the "Proposed Interim DIP Order") in the manner set forth in paragraphs 16-18 of the Proposed Interim DIP Order. Approval Order, ¶ 40. |

**C.    The Proposed Bidding Procedures and Auction**

14.    Although the Debtors have entered into the Agency Agreement with the Stalking Horse, the Debtors are continuing their marketing efforts to attract competing bidders for an auction with the aim of selecting the highest and/or best bid at auction, including the potential for a going-concern buyer to be selected as the winning bidder.  Accordingly, the Debtors and their advisors will seek to hold an auction at 10:00 a.m. prevailing Eastern Time on January 6, 2015 (the "Auction"), pursuant to the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1 ("Bidding Procedures"). As indicated previously, it is anticipated that the Debtors would seek to also sell certain intellectual property assets to the extent the Debtors are not sold on a going-concern basis at auction.

15.    Accordingly, the Debtors have proposed the following timeline:[4]

| Action | Deadline |
|---|---|
| Bid Procedures Hearing | December 19, 2014 |
| Submission Deadline for Qualified Bids | December 31, 2014 |
| Auction | January 6, 2015 |
| Store Closing/Transaction Approval Hearing | January 7, 2015 |

---

[4] The Debtors, in the exercise of their business judgment, reserve the right to change these sale-related dates in order to maximize the value of the Transaction.

| Consummation of Transaction | January 9, 2015 |
|---|---|

16.    The significant terms of the Bidding Procedures are as follows:[5]

| Provision | Description of Provision |
|---|---|
| **Delivery of Financial Information and Confidentiality of Debtor Information**<br><br>*Local Rule 6004-1(c)(i)(A)(1), 6004-1(c)(i)(A)(2), and 6004-1(c)(i)(A)(3)* | The Bidding Procedures contemplate that each entity who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver:<br><br>(a) a written disclosure of the identity of each entity, including involvement in any joint venture, that will be bidding (or participating in a bid) on the Assets or certain Asset Classes;<br><br>(b) adequate assurance information, including (i) adequate information (in the Debtors' reasonable business judgment) about the financial condition of the Potential Bidder, such as federal tax returns for the previous two years, a current financial statement, and/or current bank account statements; and (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed transaction;<br><br>(c) an executed confidentiality agreement in form and substance satisfactory to the Debtors; and<br><br>(d) a *bona fide* non-binding letter of intent or expression of interest with respect to a purchase of the Assets or certain Asset Classes which shall describe, among other things, the cash, financing commitments, or other sources of consideration that the Potential Bidder will use to consummate the proposed transaction, which of the Debtors' Assets or certain Asset Classes are proposed to be acquired in the proposed transaction, and any conditions to consummating the proposed transaction including any required internal approvals, syndication requirements, or |

---

[5] This summary is provided in accordance with Rule 6004-1(c)(i) of the Local Rules and is qualified in its entirety by reference to the provisions of the Bidding Procedures. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Bidding Procedures. To the extent there exists any inconsistency between this summary and the provisions of the Bidding Procedures, the provisions of the Bidding Procedures shall control.

| Provision | Description of Provision |
|---|---|
| | other contingencies or approvals. |
| **Non-Binding Indication of Interest**<br><br>*Local Rule 6004-1(c)(i)(A)(4)* | Qualified Bidders must include a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the back-up bidder (the "Back- Up Bidder"); *provided that* if such Qualified Bidder is selected as the Successful Bidder or Back-Up Bidder, its offer will remain irrevocable until the date that is three business days after the commencement of the Sale and provided further that in the event the Stalking Horse is the Back-Up Bidder, the Stalking Horse shall be required to close only if such closing occurs prior to [January 9, 2015]. |
| **Qualified Bids Deadline**<br><br>*Local Rule 6004-1(c)(i)(B)(1)* | Qualified Bidders must submit their bid by 4:00 p.m. prevailing Eastern time on December 31, 2014. The Debtors will notify all Qualified Bidders not later than two business days after the Bid Deadline as to whether or not any bids constitute Qualified Bids and whether such Qualified Bidder's bid constitutes a Qualified Bid with respect to any Asset Class. |
| **Qualified Bids Form**<br><br>*Local Rule 6004-1(c)(i)(B)(2)* | Qualified Bidders must include a duly authorized and executed copy of the Stalking Horse Agency Agreement (as modified to reflect such Qualified Bidder's proposed transaction including all exhibits and schedules thereto, an "Alternative Transaction Agreement"), together with copies marked to show any amendments and modifications to (a) the Stalking Horse Agency Agreement and (b) the proposed Approval Order. |
| **Good Faith Deposit**<br><br>*Local Rule 6004-1(c)(i)(B)(3)* | All Qualified Bids must be accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, in an amount equal to ten percent of the value of such Qualified Bidder's Qualified Bid (as quantified by the Debtors). A Successful Bidder that breaches any of its obligations under the Successful Bidder Agreement shall forfeit its Deposit. The forfeiture of the Deposit shall be in addition to any other rights, claims and remedies that the Debtors and their estates may have against such Successful Bidder. |
| **Qualified Bids and Qualified Bidders** | In addition to the provisions required of each Qualified Bid above, each Qualified Bid must: |

| Provision | Description of Provision |
|---|---|
| *Local Rule 6004-1(c)(i)(B)(4)* | (a) state with specificity the Asset Classes such Qualified Bidder offers to purchase, in cash, (which shall consist of at least the Asset Classes described in the non-binding letter of intent submitted by such Qualified Bidder) and the liabilities and obligations to be assumed by the Qualified Bidder upon the terms and conditions set forth in the Alternative Transaction Agreement; |
| | (b) disclose any connection or agreements with the Debtors, the Stalking Horse, any other known Potential Bidder and/or any officer, director or equity security holder of Deb Stores Holding LLC; |
| | (c) contain written confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement, including, but not limited to, any additional due diligence, inventory evaluation or financing conditions, and that all necessary approvals have been obtained prior to the date of submission of the bid; |
| | (d) include evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Stalking Horse Agency Agreement or Alternative Transaction Agreement; |
| | (e) include an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, regarding the Assets or the completeness of any information provided except as expressly stated in the Stalking Horse Agency Agreement or Alternative Transaction Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee or similar type of payment in connection with its bid; and |
| | (f) is accompanied by a letter (i) stating with specificity the Assets or Asset Classes such Qualified Bidder wishes to bid on and the liabilities and obligations to be assumed by such Qualified Bidder, (ii) specifying all material terms of |

| Provision | Description of Provision |
|---|---|
| | the bid that are substantially the same as or better than those of the Stalking Horse bid, to the extent the bid is on the same Asset Class as the Stalking Horse bid, (iii) stating that its offer is a *bona fide* offer that it intends to consummate if it is selected as the Successful Bidder and (iv) stating that such Qualified Bidder has not engaged in any collusion with respect to the bidding process. |
| **No Shop or No Solicitation**<br><br>*Local Rule 6004-1(c)(i)(C)(1)* | Neither the Agency Agreement nor the Bidding Procedures limit the Debtors' ability to solicit higher or otherwise better bids. |
| **Break Up Fee and Expense Reimbursement**<br><br>*Local Rule 6004-1(c)(i)(C)(2)* | If the Court approves a Successful Bidder, other than the Stalking Horse, to ultimately consummate the Transaction, the Stalking Horse will be entitled to a Break-Up Fee, Expense Reimbursement and the Stalking Horse's actual out-of-pocket costs of signage and freight in an amount not to exceed $450,000. |
| **Bidding Increments**<br><br>*Local Rule 6004-1(c)(i)(C)(3)* | Bidding at the Auction for the Asset Classes of inventory and FF&E will begin at an amount equal to a Guaranty Percentage of not less than 100.25% (as quantified by the Debtors), plus each competing bidder shall agree to reimburse the Debtors for the Signage Costs to be paid to the Stalking Horse, with successive overbids in increments of not more than 0.10% absent the Stalking Horse's consent.  Bidding at the Auction will continue in increments of at least 0.10%.  After conclusion of the auction, the highest or otherwise best bid with respect to Merchandise and Owned FF&E will be deemed the Winning Asset Class Bid for such Asset Classes.<br><br>Bidding at the Auction for Asset Classes other than Merchandise and Owned FF&E will begin with the Highest or Best Asset Class Bid for such Asset Class and will continue in increments of at least $50,000 above the prior bid for such Asset Class.  After conclusion of the auction, the highest or otherwise best bid with respect to each Asset Class will be deemed the Winning Asset Class Bid for such Asset Class.<br><br>After determination of each Winning Asset Class Bid, bidding at the auction will proceed with the Highest or Best Asset Bid (meaning the aggregate consideration for the Winning Asset Class Bids or a Qualified Bidder for the Assets), *plus* $100,000 and will continue in increments of |

| Provision | Description of Provision |
|---|---|
| | at least $100,000. |
| **Break Up Fee and Expense Reimbursement at Auction**<br><br>*Local Rule 6004-1(c)(i)(C)(4)* | The Stalking Horse will not receive a "credit" equal to the Break Up Fee or Expense Reimbursement at the Auction, but the Debtors reserve the right, in their business judgment, to take such amounts into account in determining which bid is the highest and best bid for the Transaction. |
| **Modification of Bidding Procedures**<br><br>*Local Rule 6004-1(c)(i)(D)* | The Bid Deadline may be extended by the Debtors with the consent of the Stalking Horse and each of the Notice Parties (which consent shall not be unreasonably withheld). The Debtors retain the right, upon consultation with the Secured Lenders and the Committee, to waive or modify the terms of the Bidding Procedures when determining which bids may be deemed Qualified Bids, *provided, however,* that waiver by the Debtors of the requirement of a Deposit is subject to the prior consent of the Secured Lenders. |
| **Closing with Alternative Backup Bidders**<br><br>*Local Rule 6004-1(c)(i)(E)* | If an Auction is conducted, the Qualified Bidder(s) with the second highest or otherwise best Qualified Bid at the Auction for the Assets or for any Asset Class, as determined by the Debtors in the exercise of their business judgment, and upon consultation with the Secured Parties, will be required to serve as the Back-Up Bidder and keep such bid open and irrevocable until the date that is three business days after the commencement of the Store Closing Sales or, if a going-concern bid is the Successful Bid, until the closing of the Sale. Following the Sale Hearing, if the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of such Successful Bidder, the applicable Back-Up Bidder will be deemed to be the new Successful Bidder for the Assets or applicable Asset Class, and the Debtors will be authorized but not required, to consummate the Sale with such Back-Up Bidder without further order of the Bankruptcy Court. The Back-Up Bidder shall be required to close within three (3) business days following receipt of notice from the Debtors of the Successful Bidder's failure to close, *provided, however,* that in the event the Stalking Horse is the Back-Up Bidder, the Stalking Horse shall be required to close only if such closing occurs prior to [January 9, 2015]. |

17.     The Debtors believe that conducting the Auction is critical to the integrity of their search process for the highest and/or best bid. Accordingly, within three (3) business days of entry of the Bidding Procedures Order, the Debtors will serve a notice (the "Auction Notice"), attached as Exhibit 2 to the Bidding Procedures Order, by first class mail upon: (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) counsel to the Debtors' prepetition and postpetition secured lenders; (c) all parties who are known to assert a security interest, lien, or claim in any of the Merchandise; (d) all the Debtors' landlords; (e) all applicable federal, state, and local taxing authorities; (f) all applicable county and state consumer protection agencies; (g) all applicable state attorneys general; (h) all other government agencies required to receive notice under the Bankruptcy Rules; (i) the 30 largest unsecured creditors of the Debtors; (j) any other party that files a notice of opposition in the case; (k) any parties known by the Debtors to be potentially interested in participating in the proposed auction; and (l) any other party appearing on the Debtors' creditor matrix (collectively, the "Notice Parties"). In order to maximize notice, the Debtors are providing notice of this Motion to (a) the U.S. Trustee, (b) the Debtors' prepetition and postpetition secured lenders, (c) any parties known by the Debtors to be potentially interested in participating in the proposed auction and (d) the 30 largest unsecured creditors of the Debtors, upon filing of the Motion.

18.     Any bidder that desires to make a bid will deliver written copies of its bid to (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Laura Davis Jones and David M. Bertenthal; and (b) the Debtors' investment banker, Houlihan Lokey Capital, Inc., 245 Park

Avenue, 20th Floor, New York, New York 10167, Attn: Derek Pitts and Surbhi Gupta, so as to be received not later than 4:00 p.m. prevailing Eastern time on December 31, 2014 (the "Bid Deadline").

19.     Objections to the Motion must be in writing, conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court and served upon (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn: Laura Davis Jones and David M. Bertenthal; (b) the Debtors' investment banker, Houlihan Lokey Capital, Inc., 245 Park Avenue, 20th Floor, New York, New York 10167, Attn: Derek Pitts and Surbhi Gupta; (c) co-counsel to the prepetition term loan agent, Klee, Tuchin, Bogdanoff & Stern LLC, 1999 Avenue of the Stars, Los Angeles, California 90067, Attn: Michael L. Tuchin and David A. Fidler; (d) co-counsel to the prepetition term loan agent, Riemer & Braunstein LLP, Times Square Tower, Suite 2506, Seven Times Square, New York, New York 10036, Attn: Steven E. Fox; (e) counsel to the prepetition revolving loan lender and DIP lender, Hahn & Hesson LLP, 488 Madison Avenue, New York, New York 10022, Attn: Joshua I. Divack and Daniel M. Ford; (f) counsel for any committee appointed in these chapter 11 cases; (g) the U.S. Trustee, 855 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Mark Kenney; (h) Hilco Merchant Resources, LLC 5 Revere Drive, Suite 206, Northbrook, IL 60062, Attn: Ian S. Fredericks; (i) Gordon Brothers Group, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199, Attn: Michael D. Chartock and (j) counsel to the Stalking Horse, DLA Piper LLP (US), 203 N. LaSalle St., Suite 1900, Chicago, Illinois 60601, Attn: Chris Dickerson.

## RELIEF REQUESTED

20.     By this Motion, the Debtors seek the entry of two orders:

(a)     the Bidding Procedures Order substantially in the form attached hereto as **Exhibit D**, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, (a) authorizing entry into Agency Agreement, (b) authorizing Bidding Protections, (c) authorizing Bidding Procedures and setting the time, date and place of the Auction and (d) approving the form of Auction Notice and (ii) setting a hearing (the "Sale Hearing"), to be held on January 7, 2015, to consider the entry of the Approval Order; and

(b)     following the Sale Hearing, the Debtors request the entry of the Approval Order substantially in the form attached hereto as **Exhibit E**, pursuant to Sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code and Bankruptcy Rule 6004, approving (i) the Agency Agreement and any Agency Transaction Agreement or other successful overbid with the parties submitting the highest or otherwise best bid at the Auction (each a "Successful Bidder") and (ii) the Transaction in relation to the Store Closing Sales (or such other higher or better bid) and waiving the Debtors' compliance with state and local laws, statutes, rules, ordinances and/or lease provisions restricting the Store Closing Sales.

## BASIS FOR RELIEF REQUESTED

**A.      Authorizing Entry into Agency Agreement, Bidding Protection and Bidding Procedures and Auction**

21.     Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

22.     Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124

B.R. 169, 175-76 (D. Del. 1991) (finding that the sale of substantially all of the Debtor's assets

satisfied the sound business reason test). *See also Myers v. Martin (In re Martin)*, 91 F.3d 389,

395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th

Cir. 1991)) (noting that the Court defers to the trustee's judgment so long as there is a legitimate

business justification); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722

F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b)

application expressly find from the evidence presented before him at the hearing a good business

reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns- Manville

Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in

question should be approved under section 363(b)(1). Indeed, when applying the "business

judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v.

First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989

WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . .

must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or

in gross abuse of the bankrupt's retained discretion.").

      23.     Liquidation sales are a routine part of chapter 11 cases. *See, e.g., In re

Ames Dept. Stores, Inc.*, 136 B.R. at 359 (holding that "going-out-of-business" sales are an

important part of "overriding federal policy requiring Debtor to maximize estate assets").

Bankruptcy courts in this and other districts have approved similar liquidation sales. *See, e.g., In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) (authorizing debtors' entry into agency agreement to liquidate inventory); *In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (authorizing debtors' entry into agency agreement to conduct full-scale liquidation of stores); *In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (authorizing debtors' entry into agency agreement to conduct store closing sales on first day); *In re Goody's LLC*, No. 09-10124 (Bankr. D. Del. Jan. 21, 2009) (authorizing debtors' assumption of prepetition agency agreement and to conduct full-scale liquidation through store closing sales at the outset of the case); *In re Circuit City Stores Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); *In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (authorizing debtors' entry into an agency agreement to conduct store closing sales); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); *In re G&G Retail, Inc.*, No. 06-10152 (RDD) (Bankr. S.D.N.Y. Feb. 17, 2006); *In re Sharper Image Corp.*, No. 08-10322 (KG) (Bankr. D. Del. May 30, 2003) (authorizing debtor's entry into an agency agreement to conduct store closing sales).

1.    ***The Bidding Protections Requested Are Reasonable and Justified***

24.    If the Stalking Horse is not the Successful Bidder, the Debtors propose to provide the Stalking Horse with the following Bidding Protections: (a) the Break Up Fee; and (b) the Expense Reimbursement. The Bidding Protections are in consideration for the Stalking Horse conducting its due diligence, entering into the Agency Agreement and agreeing to subject

its bid to the Auction. The Bidding Protections were negotiated at arm's-length and in good faith and are necessary to secure the Stalking Horse's participation in the Debtors' sale process. Further, based on discussions with the Stalking Horse, the Debtors believe that the Stalking Horse would not enter into the Agency Agreement without the Bidding Protections.

25.     The Debtors have determined that the Store Closing Sales or closing of another higher and/or better Alternative Transaction are critical to preserving the value of their estates and submit that providing the Bidding Protections to the Stalking Horse is an actual, necessary cost of going forward with the Store Closing Sales. Therefore, the Debtors hereby respectfully request that the Court approve the Bidding Protections.

26.     In the Third Circuit, bid protections, including traditional breakup fees and expense reimbursement provisions, will be approved where they are necessary for the preservation of the debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). Accordingly, bid protections may be awarded where they induce the stalking horse bidder to make an initial bid or adhere to its bid after the court orders an auction and where they promote more competitive bidding. *In re O'Brien*, 181 F.3d at 537.

27.     The Bidding Protections should be approved and accorded administrative expense status under sections 503(b)(1)(A) and 507 of the Bankruptcy Code because they provide a clear benefit to the Debtors' estates and the Stalking Horse expressly conditioned its willingness to enter into the Agency Agreement upon the Debtors' agreement to, and Court approval of, the Bidding Protections. The Bidding Protections will enable the Debtors to secure

an adequate consideration floor for a going concern bid as well as for competing liquidating bids for the Merchandise and, thus, ensure that competing bids will be materially higher or better than that contained in the Agency Agreement. Accordingly, the Debtors' ability to offer the Bidding Protections enables them to ensure the sale of the Merchandise to a contractually-committed bidder at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to their estates.

28.     The Debtors submit that the amount of the Break Up Fee (approximately 1.0% of the total consideration under the Agency Agreement) and Expense Reimbursement are reasonable in light of the efforts and expenses that the Stalking Horse has undertaken in its due diligence review, negotiating the terms of the Agency Agreement and preparing for the commencement of the Store Closing Sales.

29.     In addition, payment of the Bidding Protections will not diminish the Debtors' estates. The Debtors do not intend to terminate the Agency Agreement if to do so would incur an obligation to pay the Bidding Protections, unless they are accepting an alternative bid, which bid must exceed the consideration offered by the Stalking Horse by an amount sufficient to pay the Bidding Protections. Moreover, pursuant to the terms of the Agency Agreement, the Bidding Protections are only payable from the proceeds of an Alternative Transaction.

30.     The Court has approved protections similar to the Break Up Fee as reasonable and consistent with the type and range of bidding protection typically approved. *See, e.g.*, *In re Coldwater Creek, Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) [Docket

No. 266] (approving break up fee of 1.5% in connection with a $90-100 million sale of assets, a $800,000 reimbursement plus the cost of additional merchandise acquired by the stalking horse for inclusion in the sale); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) [Docket No. 206] (approving break up fee of 3.0% in connection with a $258 million sale of assets and a $2.5 million expense reimbursement); *In re Solyndra LLC*, No. 11-12799 (MFW) (Docket No. 1113) (Bankr. D. Del. Sept. 29, 2012) (approving break up fee of 2.6% in connection with $90 million sale of assets); *In re Northstar Aerospace (USA) Inc.*, No. 12-11817 (MFW) (Bankr. D. Del. June 27, 2012) [Docket No. 119] (approving break up fee of 3.5% in connection with $70 million sale of assets); *In re Anchor Blue Retail Grp., Inc.*, No. 09-11770 (PJW) (Bankr. D. Del. June 12, 2009) (authorizing stalking horse expense reimbursement up to $1,000,000.00).

**2.      *Entry into the Agency Agreement Is a Sound Exercise of the Debtors' Business Judgment***

31.      Entry into the Agency Agreement is a sound exercise of the Debtors' business judgment, utilizing a professional liquidating agent with substantial experience and expertise in conducting orderly simultaneous Store Closing Sales will maximize proceeds for the Debtors' estates in the event no higher and/or better Alternative Transaction is consummated. In particular, the terms of the Agency Agreement provide for a guaranteed return (with an additional increased potential shared recovery) to the estates, which minimizes the Debtors' risks while at the same time motivating the Stalking Horse (or other Successful Bidder) to maximize proceeds to the estates.

32.     Additionally, it is more cost effective for the Debtors to allow the Stalking

Horse or other liquidator that is a Successful Bidder to conduct the Store Closing Sales than for

the Debtors to conduct such sales on their own because, among other reasons, the Stalking Horse

or such other liquidator will reimburse the Debtors for expenses of the Store Closing Sales.

These significant cost savings would increase the overall recovery for creditors of the Debtors'

estates in the event that a higher and/or better Alternative Transaction is not consummated.

Moreover, the Stalking Horse or other liquidator the Debtors selects has, or will have, extensive

knowledge, expertise and experience in conducting store closing sales.

33.     Similarly, a sound business purpose exists for the Debtors to consummate

a sale to any Successful Bidder that is contemplating a purchase of substantially all of the

Debtors' assets as a going concern.  In the context of a sale of a debtor's assets, the court in *In re*

*Delaware & Hudson Railway Co.*, observed:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised
> values of the Property; and whether the asset is decreasing or
> increasing in value.[6]

34.     The Debtors submit that the exercise of their business judgment in

consummating any going-concern transaction that prevails at the Auction would meet the above-

referenced standards.  As noted, the Debtors extensively marketed the Assets and have pursued a

sale process designed to maximize the purchase price realized from the Sale.  As a result of the

---

[6] 124 B.R. 169, 176 (D. Del. 1991).

marketing efforts that have been undertaken and that the Debtors will continue to undertake, the

highest or otherwise best offer(s) obtained through the sale process will provide maximum value

to the Debtors under the current circumstances.  Other potential buyers will be served with this

Motion and/or notice thereof.  The fairness and reasonableness of the consideration to be paid by

the Successful Bidder(s) is demonstrated by the marketing efforts that the Debtors have

undertaken, followed by a fair and reasonable sale process, and culminating in one or more

proposed sales.  Inasmuch as adequate notice of the material terms of the Agency Agreement and

the transactions contemplated by such agreement is given by this Motion and has been provided

to the Debtors' major constituents the Debtors submit that no further hearing or notice should be

necessary with respect to approval of either the Agency Agreement or any other, materially

similar agreement based on the form of Stalking Horse Agency Agreement, as modified to

reflect such Successful Bidder's proposed transaction or other higher or better transaction (an

"Alternative Transaction Agreement") with the Successful Bidder.

      35.      The Debtors submit, and will demonstrate at the Sale Hearing, that the

Agency Agreement is, and that any Alternative Transaction Agreement will be, the result of

good faith arms'-length negotiations and the good faith extension of credit by the Stalking Horse

and/or any other Successful Bidder, as well as the other financial accommodations, as set forth in

the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of

the Bankruptcy Code and, as such, the reversal or modification on appeal of the Court's

authorization to consummate the transactions contemplated by the Agency Agreement or any

Alternative Transaction Agreement, and the security interest granted thereunder, should not affect the validity of such transactions unless such authorization has been stayed pending appeal.

36.     The Debtors submit that the consideration provided pursuant to the Agency Agreement is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and other applicable Federal and State laws of the United States, any territory or possession, and the District of Columbia.

37.     Based upon the foregoing, the Pitts Declaration and the Robertson Declaration, the Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their prudent business judgment. Accordingly, the Debtors respectfully request that the Court approve the Agency Agreement with the Stalking Horse, or authorize the Debtors to enter into a substantially similar agreement or other higher or better transaction with the Successful Bidder.

### 3.     *Bidding Procedures*

38.     The Debtors believe that the solicitation of bids to serve as the Debtors' agent in connection with the Store Closing Sales or to serve as a going-concern buyer is the best way to maximize the value of the Debtors' Merchandise and Owned FF&E, and an Auction for all Asset Classes as described herein with the Stalking Horse leading the bidding for Merchandise and Owned FF&E will result in the most beneficial arrangement for the Debtors and their estates. Based on the Auction results, the Debtors will consummate the Agency Agreement and/or enter into an Alternative Transaction Agreement with the Successful Bidder.

Accordingly, the Debtors respectfully request that the Court approve the Bidding Procedures, as set forth in Exhibit 1 to the Bidding Procedures Order.

39.     The use of the Agency Agreement, upon which all bids for the Asset Classes will be based, will enable the Debtors and other parties-in-interest to easily compare and contrast any differing terms of the Bids made for the Asset Classes by the Qualified Bidders (defined in the Bidding Procedures) at the Auction.  The Debtors reserve the right to amend or otherwise change the terms of the Agency Agreement in such manner as the Debtors deem to be in their best interests after consultation with the Consultation Parties (defined in the Bidding Procedures) and agreement of the Stalking Horse.

40.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the Store Closing Sales, the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested herein. Within three days of entry of the Bidding Procedures Order, the Debtors will serve the Auction Notice by first class mail upon the Notice Parties.  In order to maximize notice, the Debtors are providing notice of this Motion to (a) the U.S. Trustee, (b) the Debtors' prepetition and postpetition secured lenders, (c) any parties known by the Debtors to be potentially interested in participating in the proposed auction and (d) the 30 largest unsecured creditors of the Debtors, upon filing of the Motion.

41.     The Debtors submit that the form of Auction Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, is reasonably calculated to provide

timely and adequate notice of the proposed Store Closing Sales, the Bidding Procedures, the

Auction and the Sale Hearing to the Debtors' creditors and all other parties-in-interest that are

entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the

Assets on a going concern or liquidation basis.  Accordingly, the Debtors request that the Court

approve the notice procedures set forth in this Motion, including the form and manner of service

of the Auction Notice, and that no other or further notice of the Store Closing Sales, the Bidding

Procedures or the Auction is required.

   42. The Debtors submit that the foregoing procedures are fair, transparent and

will derive the highest and best bids for the Assets.

**B.** **Scheduling Sale Hearing and Notice Thereof**

   43. The Debtors request that the Court hold the Sale Hearing on January 7,

2015.

   44. As mentioned above, in the event no higher and/or better Alternative

Transaction is consummated with a going-concern buyer or other liquidator, the Debtors propose

to commence the Store Closing Sales immediately following the Sale Hearing.  Under this

circumstance, the Debtors believe that going forward on an expedited basis will in no way impair

recoveries because (a) all nationally-recognized potential liquidators (the other parties that can

effectuate a transaction of this magnitude) have been involved in the process the Debtors

engaged in prepetition to select the Stalking Horse, (b) those parties were provided all necessary

diligence and have expertise in quickly formulating and executing such bids, (c) the solicitation

process run by the Debtors' advisors was routine for such situations and the form of agency

agreement used is customary and (d) the Debtors' secured lenders have had direct input in the

process.

45.    Further, without a higher and/or better Alternative Transaction with a

going-concern buyer, the Debtors believe that it is crucial that they commence the Store Closing

Sales on their proposed timeline to maximize value for the Debtors' estates while minimizing

administrative expenses and, pursuant to the Agency Agreement, their postpetition financing

agreement and the plan support agreement, they are obligated to do so no later than January 9,

2015. Thus, the Debtors respectfully request that the Court hold the Sale Hearing on January 7,

2015.

**C.    The Store Closing Sales**

     *1.    Approval of Store Closing Sales Under Section 363 of the Bankruptcy Code Is Warranted*

46.    The Debtors, exercising their business judgment and in consultation with

their advisors and key constituents, have determined that, in the event there is no viable higher

and/or better Alternative Transaction with a going concern buyer, it is in the best interests of the

Debtors, their estates, creditors, and other parties-in-interest to conduct Store Closing Sales.

Based on applicable precedent, the Court should authorize the Debtors to do so as set forth

herein in order to enable the estates to recover as much as possible from the Sale.

47.    Delays in a sale or liquidation process could cause portions of the Debtors'

inventory to become less valuable, not only due to lack of replenishment, but also due to changes

in the quality of the inventory mix due to ongoing sales and lack of seasonally appropriate

merchandise.  The realization of fair value for the Assets as promptly as possible will inure to the

benefit of all parties in interest. Thus, time is of the essence to preserve and maximize the value of the Debtors' Assets through one or multiple sales.

48.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); *see also In re Ames Dep't Stores, Inc. (Ames II)*, No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 20, 2001) (approving store closing sales and agency agreement on first day). Courts in this and other Districts have approved similar requests by debtors to conduct store closing sales, finding the debtors' requested relief consistent with applicable provisions of the Bankruptcy Code. *See, e.g., In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) (authorizing store closing sales); *In re Namco, LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No. 124] (same); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del. June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Docket No. 81] (same); *In re Tweeter Home Entm't Grp., Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re Three A's Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

**2.     *Sale of Assets Should Be Free and Clear of Liens, Claims and Encumbrances***

49.     Sections 105(a) and 363(b) of the Bankruptcy Code authorize the sale of a debtor's assets after notice and hearing.  Section 105(a) states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a).  More specifically, section 363(b) of the Bankruptcy

Code provides that a debtor-in-possession "after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  *See In

re Ames Dept. Stores., Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-

of-business" sales are governed by section 363(b)).  To obtain court approval to use property

under section 363(b) of the Bankruptcy Code for the purpose of a liquidation sale at auction, the

Debtors need only show a legitimate business justification for the proposed action.  *See, e.g., In

re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir.

1991)); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722

F.2d 1063, 1070 (7th Cir. 1983) (same); *In re Delaware and Hudson Ry. Co.*, 124 BR. 169 (D.

Del. 1991) (noting that Third Circuit has adopted "sound business judgment" test for section

363(b) asset sales).

      50.    If a valid business justification exists, the law vests the debtor's decision

to use property out of the ordinary course of business with a strong presumption "that in making

a business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interests of the company." *In re Integrated

Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (*quoting Smith v. Van Gorkom*, 488 A.2d

858, 872 (Del. 1985)).  Accordingly, parties challenging a debtor's decision must make a

showing of "bad faith, self-interest or gross negligence." *Integrated Resources*, 147 B.R. at 656

(citations omitted).

51.     Courts examine four factors in determining whether a sound business purpose or justification exists for a sale of assets under section 363(b) of the Bankruptcy Code: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration will be provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice has been provided. *See Lionel*, 722 F2d at 1071.

52.     As set forth in the Robertson Declaration, ample business reasons exist for conducting the Store Closing Sales. As previously described to the Court, the Debtors and their advisors have analyzed exhaustively the Debtors' business and various strategic alternatives and determined that an immediate liquidation of the Debtors' retail locations is the most likely path to maximize recoveries for the Debtors' estates in the event there is no viable Alternative Transaction with a going concern buyer. The Pitts Declaration describes how the Assets will be monetized most efficiently and expeditiously through an orderly process conducted by an experienced liquidation firm.

53.     Moreover, immediate Store Closing Sales in accordance with the terms of the Agency Agreement will minimize the administrative expenses of the estates by reallocating a significant portion of the risks and costs of the Store Closing Sales from the Debtors to the Successful Bidder. If the Debtors are not allowed to commence the Store Closing Sales, the estates would suffer significant detriment from the resulting delay, added postpetition expenses, depreciation in the value of the Assets and further time and efforts the Debtors would be required to expend to reformulate a different liquidation strategy.

54.    Additionally, there are substantial business reasons to consummate a going-concern transaction, if the Successful Bidder at the Auction seeks to purchase the Assets as a going-concern. As noted, the Debtors extensively marketed the Assets and have pursued a sale process designed to maximize the purchase price realized from the Sale. As a result of the marketing efforts that have been undertaken and that the Debtors will continue to undertake, the highest or otherwise best offer(s) obtained through the sale process will provide maximum value to the Debtors under the current circumstances. Other potential buyers will be served with this Motion and/or notice thereof. The fairness and reasonableness of the consideration to be paid by the Successful Bidder(s) is demonstrated by the marketing efforts that the Debtors have undertaken, followed by a fair and reasonable sale process, and culminating in one or more proposed sales.

55.    To facilitate the sale of Merchandise, the Debtors request authority to enter into the Agency Agreement to enable the sale of the Debtors' Assets on a final "as is" basis, free and clear of all Liens in accordance with section 363(f) of the Bankruptcy Code, with any such Liens on the Merchandise and Owned FF&E attaching to the Guaranteed Amount and any other consideration received pursuant to Alternative Transaction Agreements in the same order or priority and with the same force, validity and effect as such Liens had with respect to such Merchandise and Owned FF&E prior to the Transaction.

56.    Section 363(f) of the Bankruptcy Code allows a debtor to sell property "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is met:

(a) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(b) the party asserting the lien, claim or interest consents to the sale;

(c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;

(d) the interest is the subject of a bona fide dispute; or claim.

(e) such entity could be compelled to accept a money satisfaction of such

11 U.S.C. § 363(f); *see also In re Elliott*, 94 B.R. 343, 345 (E.D. Pa 1988) (noting that section 363(f) is written in the disjunctive, thereby allowing sales "free and clear" if any one of the subsections is met).

57.     As noted above, the Debtors' secured lenders not only have consented to the Store Closing Sales, the Debtors' proposed postpetition lender, PNC Bank, has required that the Debtors conduct them in accordance with milestones contained in the Debtors' agreement with them, thereby satisfying section 363(f)(2) of the Bankruptcy Code.

58.     Furthermore, to the extent there are any entities with an interest in any of the Merchandise that have not already consented to the Store Closing Sales, such entity could be compelled to accept a money satisfaction of such interest.  Specifically, the Debtors propose that any Liens asserted against the Merchandise attach to any proceeds realized from the sale of such Merchandise, in the same order of priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto.

**3.    *Restrictive Provisions Impeding Store Closing Sales are Unenforceable***

59.    The Debtors lease all of their retail store locations and thus, the Store Closing Sales may be inconsistent with certain provisions of the governing leases or other documents to which the Debtors are a party, whether or not filed of record, with respect to any of the leased retail store locations, including, for example, reciprocal easements, "go dark" provisions, landlord recapture rights, and other covenants that purport to restrict or prohibit the Debtors from conducting store closing or similar themed sales.  Such restrictive provisions are unenforceable in bankruptcy as they constitute an impermissible restraint on a debtor's ability to effectively administer its estate and maximize the value of its assets under the Bankruptcy Code. *See In re Ames Dep't Stores*, 136 B.R. at 359 (holding that enforcement of lease restrictions would "contravene overriding federal policy requiring Debtors to maximize estate assets"); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (finding that landlord could not recover for breach of covenant to stay open because debtor had a duty to maximize value to the estate by conducting a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (concluding that a debtor's reorganization would be significantly impaired if lease provisions prohibiting inventory liquidation were enforced); *In re Libson Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct GOB sale).

60.    Similarly, to the extent there are restrictive provisions in any of the governing leases dictating the manner, method, dimensions relating to or otherwise prohibiting the use of advertising materials or signage to be used relating to the conduct of the Store Closing

Sales, the Debtors request that such restrictive provisions be invalidated as improper interference with the Debtors' ability to effectively conduct the Store Closing Sales and maximize the liquidation value of the Assets.  Courts in this and other Districts have routinely granted similar relief and held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) [Docket No. 355]; *In re Namco LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No. 124] (authorizing store closing sales without the necessity of compliance with any lease provision); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Docket No. 81] (same); *In re Tweeter Home Entm't Grp., Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re Three A's Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

61.    Accordingly, to the extent that any provisions or restrictions exist in any of the leases governing the retail store locations, the Debtors respectfully request that the Court invalidate such provisions and authorize the Debtors and/or the Successful Bidder to conduct the Store Closing Sales in accordance with the Sale Guidelines without interference by any landlords or other persons affected in any way, directly or indirectly, by the Store Closing Sales.

### 4.    *Store Closing Sales Should be Exempt from Federal, State, and Local Laws, Statutes, Rules and Ordinances Relating to Liquidations*

62.    The Debtors operate their retail locations across numerous states that may have cumbersome state and local laws, statutes, regulations, rules and ordinances governing store

closing, liquidation, or similar themed sales, that require long waiting periods, special licenses and permits, or restrictions against bulk sales and augmentation (collectively, the "Liquidation Laws"). However, some state statutes provide that where a liquidation or bankruptcy sale is court authorized, then a company need not comply with such Liquidation Laws. *See e.g.*, Tex. Bus. & Com. Code § 17.91 (2004). Moreover, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies, and the Court has the authority, under section 105(a) of the Bankruptcy Code, to permit the Store Closing Sales notwithstanding contrary Liquidation Laws. *See generally Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) (noting that debtors have unique fiduciary and legal obligations pursuant to the Bankruptcy Code and that state statutes "cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

63.    Here, the Debtors' ability to use and sell the Merchandise pursuant to section 363 of the Bankruptcy Code, in order to maximize recovery for their estates and creditors, would be severely undermined if the Court does not provide for a waiver of the Liquidation Laws. Courts in this and other Districts have routinely granted comparable relief. *See, e.g., In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) [Docket No. 355]; *In re Namco, LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013) [Docket No. 124] (authorizing store closing sales with waiver of federal and state "going out of business" laws); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del. June 28, 2013) [Docket No. 113] (same); *In re Samsonite Co. Stores, LLC*, No 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Docket No. 81] (same); *In re Tweeter Home Entm't Grp., Inc.*,

No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) [Docket No. 452] (same); *In re Three A's Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) [Docket No. 278] (same).

64.    Requiring the Debtors to comply with each state's applicable local Liquidation Laws would be extremely burdensome and adjudication of disputes with local authorities over the application and interpretation of local laws would be tremendously expensive for the estates. Moreover, in the context of a bankruptcy proceeding, waiving compliance with Liquidations Laws is entirely appropriate as the Debtors and their Assets are subject to the Court's exclusive jurisdiction and the Court would be able to supervise and ensure proper conduct of the Store Closing Sales. Additionally, governmental units and parties-in-interest will receive notice of this Motion and the opportunity to be heard on any objections. Thus, the Debtors respectfully request that the Court expressly approve the Sale Guidelines and authorize the Debtors and/or the Successful Bidder to conduct the Store Closing Sales without the added costs and delay of complying with applicable local Liquidation Laws.

65.    The requested waiver is narrowly tailored to facilitate the successful conduct of the Sale. The Debtors are not seeking a general waiver of all state and local laws, but only those specifically governing liquidation or similarly themed sales. The Debtors fully intend to comply with applicable state and local environmental, tax, employment, public health and safety laws, and consumer protection laws (regulating deceptive practices), except as explicitly set forth in this Motion.

   *5.    Sale is Exempt from "Fast Pay" Laws and Regulations*

66.     Many states in which the Debtors operate also have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws"). In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The sweeping nature of the Sale contemplated by this Motion will result in a substantial numbers of employees being terminated. The Debtors' payroll systems might be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

67.     As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies. Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

68.     It will be necessary to have the Debtors' payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. With employee terminations on the scale necessitated by the Sale at the Closing Locations, this process could easily take several days.

69.     To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures. However, if the Debtors are required to comply with these state laws and regulations, their efforts to wind-down their operations and stem unnecessary payroll costs could be hampered. If forced to comply, the Debtors could face the choice of (a) having to incur the costs of keeping employees "employed"

after the conclusion of the Sale while payroll is prepared or (b) staging terminations to the

detriment of the Debtors' estates. Both of these choices would provide no benefit to the Debtors'

estates and would only increase the administrative costs of conducting the Sale.

70. Accordingly, the Debtors respectfully submit that in this instance, Fast Pay

Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtors

should be granted relief from their requirements. *See, e.g., Loehmann's Holdings Inc.*, No. 13-

14050 (MG) (waiving "fast pay" laws and regulations in connection with approval of store

closing sales) [Docket No. 200] (Bankr. S.D.N.Y. Dec. 13, 2013); *Filene's Basement, LLC*, No.

11-13511(KJC) (same) [Docket No. 189] (Bankr. D. Del. Nov. 2, 2011).

**D.    Other Related Relief**

*1.    The Debtors Should be Authorized to Abandon Certain Property Following the
Conclusion of the Store Closing Sales*

71. After notice and a hearing, a debtor "may abandon any property of the

estate that is burdensome to the estate or that is of inconsequential value and benefit to the

estate." 11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657

(3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of

action, he deems less valuable than the cost of asserting that claim").

72. Pursuant to the Agency Agreement, the Successful Bidder is authorized to

sell Owned FF&E remaining in the retail store locations following the conclusion of the Store

Closing Sales. However, the Debtors (or the Successful Bidder) may determine that the costs

associated with holding and/or selling certain property and/or Owned FF&E exceeds the

proceeds that will be realized upon its sale, or that such property is not sellable at all. In such

event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

73.     To maximize the value of the Debtors' Assets and to minimize the costs to the estates, the Debtors respectfully request authority for themselves and/or the Successful Bidder (in coordination) to abandon any of their remaining Owned FF&E or other property located at the retail store locations without incurring liability to any person or entity.  The Debtors further request that the landlords of each retail store location with any abandoned Owned FF&E or other property be authorized to dispose of such property without liability to any third parties.

### 2.    *Sale of the Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman*

74.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.

75.     Pursuant to the Agency Agreement, the Successful Bidder will be permitted only to use the Debtors' customer lists when acting as the Debtors' agent and in connection with the Sale.  The Successful Bidder will be subject to reasonable restrictions by the Debtors in order to comply with the Debtors' privacy policy[7] and applicable laws governing the use and dissemination of confidential consumer personal data.  The Debtors will not sell or lease

---

[7] Among other things, the Debtors' privacy policy provides that the Company will not transfer information that it has collected from customers unless the acquirer of all or substantially all of the Company's assets agrees to provide the same or substantially similar privacy protections as those established by the Company] and that encryption technology is used for sales through their website in order to ensure the secure transmission of personal information. The Debtors' privacy policy is posted at http://www.debshops.com/privacy-policy.html.

any personally identifiable information to the Successful Bidder.  Therefore, appointment of a

consumer privacy ombudsman is unnecessary.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

76.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of Property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such Property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders as the sale.  *See* 11 U.S.C. § 363(n).  Although the

Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith ... speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good faith
> status at a judicial sale involves fraud, collusion between the Buyer
> and other bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

788 F.2d at 147 (citations omitted).

77.    The Agency Agreement is a negotiated, arm's length transaction, in which

the Stalking Horse has acted in good faith, without collusion or fraud, and in compliance with the

*Abbotts Dairies* standards.  The Stalking Horse is not an "insider" or "affiliate" of the Debtors as

those terms are defined in the Bankruptcy Code.  Neither the Debtors nor the Stalking Horse has

engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect to the consummation of the Transaction.  In addition, if a party other than the Stalking Horse is the Successful Bidder, the Debtors intend to make an appropriate showing at the Sale Hearing that the purchase agreement with the other Successful Bidder is a negotiated, arm's length transaction, in which the Successful Bidder at all times has acted in good faith under and otherwise in accordance with such standards.

78.     The Debtors thus request that the Court find that the Stalking Horse or the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### Authorization of Assumption and Assignment of Assumed Contracts

79.     As discussed above, the Agency Agreement contemplates a process whereby the Debtors would shut down operation of ITS stores and the Agent would liquidate the Merchandise and Owned FF&E, without assuming any of the Debtors' obligations under its retail store leases.  However, as discussed herein, the Debtors are also actively seeking participation by bidders interested in purchasing the Debtors' business as a going concern.  If the Successful Bidder at the auction seeks to purchase the business as a going concern (as opposed to a liquidation of the business) and contemplates assumption of the Debtors' retail leases, then the Debtors request authorization to assume and assign any executory contracts and unexpired real

property leases as may be identified in the agreement with the Successful Bidder (the "Assumed

Contracts")[8] to the Successful Bidder(s).

80. Thus, if the Successful Bidder seeks to acquire the Assets on a going

concern basis (and take assignment of certain of the Debtors' executory contracts), the Debtors

propose approval of the assumption and assignment of Assumed Contracts to the Successful

Bidder(s) upon the closing of the transactions contemplated under the applicable agreement and

payment of the cure costs (the "Cure Costs"), which amounts, if any, are what the Debtors

believe are owed to each counterparty (each a "Counterparty," and collectively, the

"Counterparties") to an Assumed Contract in order to cure any defaults that exist under such

contract or lease.

81. If a contract or lease is assumed and assigned pursuant to the Court's order

approving same, then unless the affected counterparty properly files and serves an objection to

the Cure Costs and satisfies all its burdens on any such objection, the Counterparty will receive

at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs, with

payment made pursuant to the terms of the applicable asset purchase agreement, or the

agreement of the applicable Successful Bidder.

82. The Successful Bidder(s), on behalf of the Debtors, shall promptly pay or

cause to be paid the Cure Costs with respect to the Assumed Contracts, other than those Cure

Costs, if any, which are to be paid by the Debtors pursuant to the agreement with the Successful

---

[8] The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Contract.

Bidder(s). The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing or in the case of any Assumed Contracts not assumed and assigned to the Successful Bidder(s) at the Sale Hearing, at such other hearing to approve assumption and assignment of such Assumed Contract to the Successful Bidder(s). The Debtors request that Cure Costs disputed by any Counterparty be resolved by the Court at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant contract or lease.

83.     Except to the extent otherwise provided in the agreement(s) entered into with the Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of any Assumed Contracts will not be subject to any liability to the assigned contract or lease counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

84.     The Debtors further request that the Sale Order provide that the Assumed Contracts will be assigned to, and remain in full force and effect for the benefit of, the applicable Successful Bidder, notwithstanding any provisions in the Assumed Contracts, including those described in sections 365(b)(2) and (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such assignment.

85.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

86.    Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Taylor*, 913 F.2d 102 (3d Cir.

1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989).

Accordingly, assumption or rejection of any executory contract is appropriate where the

assumption or rejection would benefit the estate. *Sharon Steel*, 872 F.2d at 40.  The assumption

and assignment of the Assumed Contracts, or any of them, to the extent it is a necessary part of

the proposed Sale will benefit the estates of the Debtors.

       87.    As set forth above with respect to Assumed Contracts to be assumed and

assigned pursuant to the Sale, the Debtors will have sent notice of the Motion and a cure notice

in the form attached to the Motion as **Exhibit F** (the "Cure Notice") to all Counterparties to the

Assumed Contracts, notifying such Counterparties of the potential assumption by the Debtors

and assignment to the Successful Bidder(s) of the Assumed Contracts at the Sale Hearing.

       88.    The Counterparties will have sufficient opportunity to file an objection to

the proposed cure costs (the "Cure Costs") set forth on the Cure Notice.  To the extent no

objection is filed with regard to a particular cure amount, such cure amount shall be binding on

the applicable contract or lease counterparty.  The payment of the Cure Costs set forth in the

Cure Notice (or a different amount either agreed to by the Debtors or resolved by the Court as a

result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final

satisfaction of all obligations to cure defaults and compensate the Counterparties for any

pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy

Code, unless the Debtors determine that a particular contract is not truly executory, and does not

need to be cured to transfer the Assets to the Successful Bidder or, alternatively, the Successful

Bidder subsequently elects not to have any Assumed Contracts assumed or assigned to it prior to the Sale Hearing.

89.     The Stalking Horse Purchaser or other Successful Bidder is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of any Assumed Contracts.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also, e.g.*, *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Successful Bidder shall provide evidence of its ability to provide adequate assurances to Counterparties at the Sale Hearing.

## FURTHER RELIEF

90.     The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above and in the Pitts Declaration, time is of the essence and it is imperative that the Debtors be able to assume the Agency Agreement or, in the alternative, enter into the Alternative Transaction Agreement, and commence the Store Closing

Sales on the timeline proposed.  In order to maximize the value of the Assets and minimize the

estates' unnecessary administrative expenses, the Debtors believe a waiver of the 14-day stay

imposed by Bankruptcy Rules 4001(a), 6004(h) and 6006(d), to the extent that they apply, is in

the best interest of the Debtors' estates and stakeholders.

## NOTICE

91.     Notice of this Motion will be provided to:  (a) the Office of the United

States Trustee; (b) the Debtors' thirty (30) largest unsecured creditors; (c) the Debtors'

prepetition and postpetition lenders; (d) counsel to the Stalking Horse; (e) all landlords of the

Closing Locations; (f) all applicable county and state consumer protection agencies; (g) all

applicable state attorneys general; (h) any potentially interested parties and (i) parties entitled to

notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the

relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

92.     No prior motion for the relief requested herein has been made to this or

any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the forms annexed hereto as **Exhibits D and E**: (i) granting the Motion; and

(ii) granting such other and further relief as the Court deems appropriate.

Dated: Wilmington, Delaware
        December 5, 2014

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:     ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            jfried@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in
Possession

# **EXHIBIT A**

## The Agency Agreement

**AGENCY AGREEMENT**

   This Agency Agreement ("Agreement") is made as of December 4, 2014, by and between Deb Shops Holding, LLC and the related entities that are signatories hereto (collectively, "Merchant") and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Agent"), it being understood and agreed that each entity comprising Agent shall be jointly and severally liable for all obligations of Agent hereunder.

   Section 1. Recitals.

     WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's two hundred eighty-eight (288) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") and, if Agent exercises the option under section 8.11, the E-Commerce Platform by means of a "store closing", "sale on everything", "going out of business", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E in the Stores, Distribution Centers, and the Corporate Offices (each such term, as defined below).

     WHEREAS, ON December 4, 2014, Merchant and various subsidiaries filed voluntary petitions for relief under chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1330, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (Case No. 14-12676 (MFW)(joint administration request pending), the "Bankruptcy Case", and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

     NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agree as follows:

   Section 2. Appointment of Agent/Approval Order.

     (a)  Subject to entry of an order by the Bankruptcy Court authorizing Merchant to enter into this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E at the Stores in accordance with the terms and conditions of this Agreement.

     (b)  Within two (2) business days after the execution of this Agreement, Merchant shall file an expedited motion with the Bankruptcy Court, which motion shall seek entry of an order, inter alia, approving this Agreement, including, but not limited to, the Bid Protections, and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof, in all events subject to Merchant's solicitation and receipt of Competing Bids in accordance with Section 16 hereof. The Approval Order shall be substantially in the form and content attached as Exhibit "A" hereto and incorporated herein by this reference. Any material modifications or amendments to the form of Approval Order attached as Exhibit "A" shall be subject to written approval of Merchant and Agent, which approval shall not be unreasonably withheld, conditioned or delayed.

     (c)  Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "going out of business", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and

regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines, this Agreement and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.  Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Agent guarantees that Merchant shall receive an amount equal to ninety-eight and one-quarter percent (98.25%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3. The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage multiplied by (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, in consultation with the Lenders (or in the case of Distribution Center Merchandise counted in the manner and at the times provided in Section 5.1(b) hereof, the aggregate Cost Value of the Distribution Center Merchandise as determined in accordance with the inventory counting procedures set forth herein), (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement), (C) the aggregate Cost Value of On-Order Merchandise included in the Sale; and (D) the aggregate Cost Value of Returned Merchandise not otherwise included in the Inventory Taking. Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than $38,000,000 (the "Merchandise Threshold") and not more than $42,000,000 ("Merchandise Ceiling") as of the Sale Commencement Date; provided that, solely for purposes of determining whether the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Threshold or greater than the Merchandise Ceiling, no adjustment shall be made to the applicable Cost Value to account for the effect of any prevailing discount adjustment or the following discounts or price adjustments offered by the Merchant: (i) point of sale discounts or similar adjustments regardless of duration); (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for damaged, defective or "as-is" items; (vi) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (vii) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (viii) obvious ticketing or marking errors; (ix) instant (in-store) or mail in rebates; or (x) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.  To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold or Merchandise Ceiling, as applicable, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c)     The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being 31.0% (the "Cost Factor Threshold"); provided that, solely for purposes of determining whether the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, no adjustment shall be made to the applicable Cost Value to account for the following discounts or price adjustments offered by the Merchant: (i) employee discounts; (ii) member or customer appreciation points or coupons; (iii) multi-unit purchase discounts; (iv) adjustments for damaged, defective or "as-is" items; (v) coupons (Merchant's or competitors') or "buy one get one" type discounts; (vi) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (vii) obvious ticketing or marking errors; or (viii) instant (in-store) or mail-in rebates. To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

(d)     The adjustments to the Guaranty Percentage contemplated by Sections 3.1(b) and 3.1(c) shall be independent and cumulative.

(e)     To ensure accurate sales audit functions, as well as accurate calculations of the Sharing Amount, if any, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Goods) in the Stores.

3.2     Compensation to Agent, Sharing:

(a)     After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to six and one half percent (6.5%) of the aggregate Cost Value of the Merchandise ("Agent's Fee"); and THEREAFTER: fifty percent (50%) to Agent and fifty percent (50%) to Merchant ("Sharing Amounts"). Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7(b) and shall remit such payment to the Merchant's Designated Account.

(b)     To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), subject to Merchant's right to participate in the Proceeds from the disposition thereof, such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances to the extent provided in the Approval Order, and Agent shall use diligent and commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise. Agent and its subsidiaries shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo. The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3     Proceeds; Time of Payments; Control of Proceeds.

(a)     For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue, in each case during the Sale Term and exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; and (c) any and

3

all proceeds received by Agent from the disposition of Remaining Merchandise.  For the avoidance of doubt: (1) proceeds from the sales at Merchant's Stores or through the E-Commerce Platform for periods prior to the Sale Commencement Date; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive the FF&E Commission under Section 7.1 below); (5) proceeds from the sale of Additional Agent Goods; and (6) payments made by Agent on account of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

       (b)     On the first business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount (the "Initial Guaranty Payment") equal to eighty-five percent (85%) of the product of (i) the Guaranty Percentage multiplied by (ii) the estimated aggregate Cost Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records at the close of business on the last business day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount"); provided that, the Estimated Guaranteed Amount payable by Agent on the Payment Date shall be calculated based on Merchandise located in the Stores and the Distribution Center as of the close of business on the last business day immediately preceding the Sale Commencement Date, and shall expressly exclude any On-Order Merchandise not then located at a Store or Distribution Center. On the Payment Date, the Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the account designated by Merchant on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account").  The balance of the Guaranteed Amount, if any (including any portion of the Guaranteed Amount attributable to any On-Order Merchandise counted, reconciled and reported as part of the Final Inventory Report), shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Designated Account on the earlier of: (x) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Agent and Merchant, in consultation with the Lenders (the "Final Inventory Report"), and (y) the date that is thirty (30) days after the Sale Commencement Date (in the case of (y) above, Agent shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount). In the event of a dispute as to the calculation of the portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof, and Agent's failure to pay such balance or undisputed portion shall entitle the Merchant and the Lenders (individually or collectively) to draw upon the Letter of Credit in accordance with Section 3.3(i) hereof to the extent of such balance or undisputed portion.  Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion. In the event that the Initial Guaranty Payment is either less than or exceeds the Guaranteed Amount, as applicable, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the sum of the Initial Guaranty Payment.

       (c)    All Proceeds shall be controlled by Agent in the manner provided for below.

         (i)     Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents (to the extent the same are reasonable and do not impose any potential monetary or other material liability on Merchant) to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined

below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder. Agent shall deliver to Merchant, not later than five (5) days following receipt thereof, copies of all bank statements and other information relating to such accounts. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions reasonably necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iii)    Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned by, and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds) in such accounts from and after the Sale Commencement Date. If requested by Agent, each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank (in form and content satisfactory to each party), providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement"). If, notwithstanding the provisions of this Section 3.3(c), Merchant or any Lender (as defined below) receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant and, by joining in this Agreement (in which event only the Lender receiving such Proceeds or other amounts will be liable for such Lender's undertakings and covenants hereunder), the applicable Lender receiving such Proceeds and other amounts shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or such Lender's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)    On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s). Agent shall notify Merchant and PNC Bank, National Association ("PNC") and Ableco, L.L.C. ("Ableco") (collectively, "Lenders" and each a "Lender") of any shortfall in such payment, in which case, Merchant (or the applicable Lender, as the case may be, if such Lender received such funds from the Designated Deposit Accounts) shall promptly pay to Agent funds in the amount of such shortfall. For purposes of this Agreement, "Controlling Lender" shall mean, (x) until such time as the Revolving Credit Obligations (as defined in the DIP Financing Order) are paid in full in cash and all commitments to extend credit are terminated, PNC, and (y) at all times thereafter, Ableco. Provided that (i) the Revolving Credit Obligations (as defined in the DIP Financing Order) do not total more than $20,000,000 as of the Payment Date, (ii) not more than $20,000,000 of the Initial Guaranty Payment is used to satisfy in full in cash the Revolving Credit Obligations or other obligations that are or may become due and payable to PNC as of the Payment Date, and (iii) all commitments to extend credit by PNC are terminated as of the Payment Date, on and effective from and after the Payment Date, PNC shall not be obligated to repay any portion of the Initial Guaranty Payment received by PNC to Merchant, Agent, Ableco, or any other party. Notwithstanding the immediately preceding sentence, to the extent PNC is required to repay any portion of the Initial Guaranty Payment, PNC shall only be obligated to repay to the Merchant, Agent, Ableco, or any other party, such portion of the Initial Guaranty Payment received by PNC in excess of $20,000,000.

(d)    In the event that the Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent under Section 3.3(e) by means of an offset, and, as a result of such funding or payment, Merchant (or any Lender) received more value than Merchant (or Lender) would have otherwise received under this Agreement had Agent not funded or paid such obligations, the applicable Lender shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's written request and reasonable evidence of such overpayment to Merchant hereunder. If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount after two (2) business days written demand by Agent, the applicable Lender shall, within two (2) business days of written demand by Agent, pay to the Agent the over-funded amount. Notwithstanding anything to the contrary in this Agreement, no Lender shall be required to pay to Agent any amount in excess of the amounts actually received by such Lender pursuant to this Agreement.

(e)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)    In addition to the Guaranteed Amount, on the Payment Date, Agent shall purchase and pay Merchant by wire transfer to the account designated in writing by Merchant for all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

3.4    Security.  To secure payment of the balance of any unpaid portion of the Guaranteed Amount, Sharing Amount (if any), Expenses and other amounts due to Merchant hereunder, Agent shall deliver to Ableco (provided the Revolving Credit Obligations are paid in full, otherwise PNC), as

Merchant's designee, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.4 attached hereto, in an original stated amount equal to the aggregate of (x) fifteen percent (15%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date, but excluding for purposes hereof the On Order Merchandise), and (y) three (3) weeks' estimated Expenses (the "Letter of Credit"). The Letter of Credit shall name Merchant and the applicable Lender, as Merchant's designee, as co-beneficiaries. The Letter of Credit shall be delivered to applicable Lender, as Merchant's designee, no later than the second business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and applicable Lender. In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, Sharing Amount (if any), Additional Agent Goods Fee (if any) and/or Expenses as required under this Agreement, Merchant and the applicable Lender shall be entitled to draw on the Letter of Credit to fund such undisputed amount or obligation after five (5) business days' written notice to Agent. The applicable Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than two (2) weeks' Expenses (and Merchant and the applicable Lender shall cooperate with respect to each such request). The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount, Sharing Amount, and/or Expenses Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant, Lender, and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount, Sharing Amount, and/or Expenses have been paid to Merchant. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10)) business days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant and the applicable Lender shall have the right to make a drawing under the Letter of Credit in an amount equal to the amount(s) Merchant asserts are then owing to Merchant. After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including but not limited to the Guaranteed Amount, the Sharing Amount, and Expenses), Merchant and the applicable Lender shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated. Upon the applicable Lender(s') receipt of payment in full of its claims against the Merchant, such Lender shall promptly deliver the Letter of Credit to Merchant and take all reasonable steps necessary to remove itself as a named co-beneficiary thereunder.

Section 4.  Expenses of the Sale.

4.1    Expenses.    Agent shall be unconditionally responsible for all "Expenses", which expenses shall be paid by Agent in accordance with Section 4.2 below. Agent and/or Merchant and/or Lender may review or audit the Expenses at any time. Agent shall be obligated to pre-fund any payroll-related expenses consistent with Merchant's customary payroll funding practices and timing. In addition, Agent agrees that (I) on the Payment Date, Agent shall pre-fund an amount equal to the number of days between the Sale Commencement Date and the first anticipated Weekly Sale Reconciliation (inclusive) of per diem Occupancy Expenses based on Exhibit 4.1(a) and (II) on the actual date of the first Weekly Sale Reconciliation and continuing on the dates of successive Weekly Sale Reconciliations during the Sale Term, an amount equal to seven (7) days of per diem Occupancy Expenses, which amounts Merchant and the Lenders agree shall be applied to and credited against any per diem Occupancy Expense obligations payable by Agent hereunder. As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

7