Deb Shops
Exhibit 4.1 (c)
Occupancy per Diem

| | | Occupancy | | | | | | | | | | | | | % Rent | | | Breakpoint Rent | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Per Diem | | | | | | | | | | | | | | | | | | | | | | | |
| Store # | Store Name | Rnt,Cam,Ins,Fees | Utilities | Repairs/Maint | Taxes | 5311-000 Loss Prevention | 5315-000 Store POS Expense | 5380-000 Refuse | 5390-000 Exterminator | 5410-000 Telephone | 7410-150 Data Collection | 7510 Data Services | 8009-000 Loss Prevention Recovery | Total | Lease Commencement | Lease Expiration | % Rent Rate | Lease Commencement | Lease Expiration | BreakPoint 1 | PercRate | BreakPoint 2 | PercRate | BreakPoint 3 | PercRate |
| 290 | Rotterdam Sq | 274 | 77 | 19 | 0 | 5 | 0 | 7 | - | 5 | - | - | - | 387 | | | | 9/1/2011 | 1/31/2015 | 760,000 | 10.0% | - | 0.0% | - | 0.0% |
| 291 | Fayette | 546 | - | 24 | 0 | 5 | 0 | - | - | 3 | - | - | - | 579 | | | | 2/1/2014 | 1/31/2015 | 2,100,000 | 5.0% | - | 0.0% | - | 0.0% |
| 292 | Great Northern | 122 | 39 | 22 | 60 | 5 | 0 | - | - | 6 | - | - | - | 255 | | | | 2/1/2014 | 1/31/2016 | 533,400 | 6.0% | - | 0.0% | - | 0.0% |
| 293 | Festival at Jeff. Court | 351 | 41 | 119 | 33 | 5 | 0 | 13 | - | 6 | - | - | - | 567 | | | | 2/1/2013 | 1/31/2018 | 2,365,245 | 4.0% | - | 0.0% | - | 0.0% |
| 294 | Centerpointe | 367 | 80 | 11 | 29 | 5 | 0 | 9 | - | 5 | - | - | - | 505 | | | | 2/1/2014 | 1/31/2019 | 1,480,000 | 5.0% | - | 0.0% | - | 0.0% |
| 295 | Rivertown Crossing | 614 | 43 | 35 | 97 | 5 | 0 | 14 | - | 6 | - | - | - | 815 | | | | 2/1/2012 | 1/31/2017 | 1,871,000 | 10.0% | - | 0.0% | - | 0.0% |
| 296 | Berkshire | 135 | - | 20 | 0 | 5 | 0 | - | - | 4 | - | - | - | 165 | 10/1/2013 | 9/30/2014 | 10.0% | 10/1/2014 | 1/31/2016 | 1,100,000 | 5.0% | - | 0.0% | - | 0.0% |
| 299 | Newtowne | 146 | 33 | 8 | 20 | 5 | 0 | 11 | - | 5 | - | - | - | 229 | | | | 2/1/2014 | 1/31/2016 | 700,000 | 8.0% | - | 0.0% | - | 0.0% |
| 301 | West Ridge | 122 | 104 | 24 | 110 | 5 | 0 | 3 | - | 4 | - | - | - | 372 | | | | 2/1/2013 | 1/31/2015 | 1,426,000 | 5.0% | - | 0.0% | - | 0.0% |
| 302 | Genesee Valley Ctr | 378 | 41 | 11 | 2 | 5 | 0 | - | - | 5 | - | - | - | 443 | | | | 2/1/2011 | 1/31/2016 | 1,450,000 | 10.0% | 1,800,000 | 5.0% | - | 0.0% |
| 303 | Burlington Sq | 382 | 78 | 55 | 61 | 5 | 0 | 8 | - | 5 | - | - | - | 594 | | | | 2/1/2014 | 1/31/2019 | 2,887,500 | 4.0% | - | 0.0% | - | 0.0% |
| 305 | Concord | 40 | 24 | 20 | 0 | 5 | 0 | 4 | - | 5 | - | - | - | 99 | 2/1/2010 | MTM | 3.0% | | | | | | | | |
| 307 | Sunshine Sq | 219 | 75 | 45 | 52 | 5 | - | 6 | - | 5 | - | - | - | 406 | | | | 2/1/2014 | 1/31/2019 | 1,250,000 | 5.0% | - | 0.0% | - | 0.0% |
| 310 | Richland | 334 | 50 | 32 | 10 | 5 | 0 | 18 | - | 5 | 43 | 66 | - | 564 | | | | 2/1/2014 | 1/31/2015 | 1,100,000 | 5.0% | - | 0.0% | - | 0.0% |
| 312 | East Hills | 94 | 33 | 11 | 1 | 5 | 0 | - | - | 4 | - | - | - | 148 | 2/1/2011 | MTM | 8.0% | | | | | | | | |
| 313 | West Town | 397 | 58 | 48 | 9 | 5 | - | 7 | - | 7 | - | - | - | 530 | | | | 7/30/2010 | 1/31/2016 | 1,875,000 | 5.0% | - | 0.0% | - | 0.0% |
| 315 | Rogue Valley | 209 | 27 | 37 | 0 | 5 | 0 | 7 | - | 4 | - | - | - | 289 | | | | 9/1/2012 | 8/31/2015 | 727,272 | 11.0% | - | 0.0% | - | 0.0% |
| 317 | West Ridge | 262 | 29 | 15 | 0 | 5 | 0 | - | - | 4 | - | - | - | 315 | | | | | | | | | | | |
| 321 | Metropolis | 443 | 53 | 22 | 0 | 5 | 0 | 8 | - | 8 | - | - | - | 539 | | | | 10/1/2013 | 1/31/2017 | 1,700,000 | 10.0% | - | 0.0% | - | 0.0% |
| 322 | Salem Centre | 349 | 29 | 35 | 53 | 5 | - | 15 | - | 4 | - | - | - | 489 | | | | 3/10/2012 | 2/28/2015 | 1,055,006 | 5.0% | - | 0.0% | - | 0.0% |
| 323 | Tippecanoe | 385 | - | 37 | 0 | 5 | 0 | 7 | - | 5 | - | - | - | 439 | | | | 2/1/2014 | 1/31/2019 | 1,450,000 | 10.0% | 1,700,000 | 5.0% | - | 0.0% |
| 326 | Richmond Sq | 144 | 19 | 9 | 0 | 5 | 0 | 5 | - | 5 | - | - | - | 187 | | | | 1/0/1900 | MTM | 552,000 | 10.0% | - | 0.0% | - | 0.0% |
| 327 | Bay Park Sq | 476 | 49 | 45 | 45 | 5 | 0 | 9 | - | 4 | - | - | - | 633 | | | | | | | | | | | |
| 329 | Gurnee Mills | 421 | 52 | 23 | 2 | 5 | 0 | - | - | 5 | - | - | - | 508 | | | | 2/1/2014 | 1/31/2019 | 1,400,000 | 10.0% | 1,800,000 | 5.0% | - | 0.0% |
| 332 | Northtown | 327 | 20 | 8 | 10 | 5 | 0 | - | - | 4 | - | - | - | 374 | | | | | | | | | | | |
| 333 | Spokane Valley | 289 | 29 | 17 | 9 | 5 | 0 | 10 | - | 4 | - | - | - | 363 | 2/1/2012 | 1/31/2015 | 10.0% | | | | | | | | |
| 334 | Robinson Town Centre | 298 | 38 | 21 | 45 | 5 | 0 | 5 | - | 5 | - | - | - | 416 | | | | | | | | | | | |
| 335 | Rockvale Outlets | 127 | 73 | 25 | 0 | 5 | 0 | - | - | 6 | - | - | - | 236 | 2/1/2014 | 1/31/2015 | 7.0% | | | | | | | | |
| 336 | York Galleria | 365 | 35 | 27 | 38 | 5 | 0 | 5 | - | 6 | - | - | - | 481 | | | | 2/1/2010 | 1/31/2015 | 1,500,000 | 5.0% | - | 0.0% | - | 0.0% |
| 337 | Green Ridge Sq | 318 | 49 | 16 | 29 | 5 | 0 | 4 | - | 4 | - | - | - | 424 | | | | 2/1/2012 | 1/31/2015 | 1,573,000 | 4.0% | - | 0.0% | - | 0.0% |
| 347 | St. Lawrence Centre | 56 | - | 7 | 0 | 5 | 0 | - | - | 4 | - | - | - | 73 | 2/1/2014 | 1/31/2017 | 5.0% | | | | | | | | |
| 349 | Castleton Sq | 551 | 57 | 35 | 141 | 5 | 0 | - | - | 5 | - | - | - | 793 | | | | 2/1/2013 | 1/31/2018 | 1,950,000 | 5.0% | - | 0.0% | - | 0.0% |
| 350 | Greenwood Park | 443 | 68 | 30 | 0 | 5 | 0 | - | - | 5 | - | - | - | 550 | | | | 2/1/2014 | 1/31/2019 | 1,500,000 | 10.0% | 1,600,000 | 5.0% | - | 0.0% |
| 351 | Westroads | 430 | - | 13 | 0 | 5 | 0 | 3 | - | 5 | - | - | - | 456 | | | | 2/1/2013 | 1/31/2018 | 1,650,000 | 5.0% | - | 0.0% | - | 0.0% |
| 352 | Oak View | 141 | - | 25 | 0 | 5 | 0 | 17 | - | 4 | - | - | - | 192 | | | | 1/1/2015 | 1/31/2018 | 900,329 | 10.0% | 1,600,000 | 5.0% | - | 0.0% |
| 353 | Outlet Collection Seattle | 391 | 26 | 12 | 14 | 5 | 0 | 12 | - | 4 | - | - | - | 463 | | | | 8/1/2013 | 1/31/2017 | 3,003,980 | 5.0% | - | 0.0% | - | 0.0% |
| 354 | Northwoods | 420 | 23 | 14 | 0 | 5 | 0 | 7 | - | 5 | - | - | - | 474 | | | | 2/1/2013 | 1/31/2018 | 1,500,000 | 5.0% | - | 0.0% | - | 0.0% |
| 356 | Carousel Ctr | 593 | 41 | 51 | 186 | 5 | 0 | - | - | 7 | - | - | - | 883 | | | | 2/1/2011 | 1/31/2016 | 1,300,000 | 5.0% | - | 0.0% | - | 0.0% |
| 357 | Green Tree | 358 | - | 30 | 0 | 5 | 0 | - | - | 5 | - | - | - | 399 | | | | 2/1/2014 | 1/31/2015 | 1,372,729 | 5.0% | - | 0.0% | - | 0.0% |
| 358 | Birchwood | 418 | 37 | 44 | 2 | 5 | 0 | 14 | - | 5 | - | - | - | 525 | | | | 2/1/2014 | 1/31/2019 | 2,000,429 | 5.0% | - | 0.0% | - | 0.0% |
| 359 | Kingsport Town Ctr | 167 | 45 | 18 | 1 | 5 | 0 | - | - | 5 | - | - | - | 241 | | | | 2/1/2013 | 1/31/2015 | 800,000 | 8.0% | - | 0.0% | - | 0.0% |
| 360 | Bradley Sq | 96 | 30 | 4 | 1 | 5 | 0 | 4 | 2 | 6 | - | - | - | 147 | 2/1/2014 | 1/31/2015 | 5.0% | | | | | | | | |
| 361 | Oakland | 417 | 53 | 71 | 8 | 5 | 0 | 6 | - | 5 | - | - | - | 564 | | | | 2/1/2011 | 1/31/2016 | 1,500,000 | 10.0% | 1,800,000 | 5.0% | - | 0.0% |
| 362 | The Mall of Monroe | 59 | 43 | 12 | 2 | 5 | 0 | 12 | - | 3 | - | - | - | 137 | 2/1/2013 | 1/31/2015 | 5.0% | | | | | | | | |
| 363 | Waterside Marketplace | 372 | 51 | 32 | 51 | 5 | 0 | 16 | - | 4 | - | - | - | 530 | | | | 2/1/2013 | 1/31/2018 | 2,232,000 | 5.0% | - | 0.0% | - | 0.0% |
| 364 | Bay City | 192 | 42 | 64 | 1 | 5 | 0 | 8 | - | 4 | - | - | - | 316 | 7/1/2014 | 6/30/2015 | 10.0% | 7/1/2014 | 1/31/2018 | 1,532,784 | 5.0% | - | 0.0% | - | 0.0% |
| 365 | Premium Outlets | 324 | 65 | 27 | 4 | 5 | 0 | 12 | - | 6 | - | - | - | 442 | | | | 2/1/2013 | 1/31/2018 | 1,500,000 | 8.0% | 1,700,000 | 5.0% | - | 0.0% |
| 368 | McKinley | 574 | 57 | 22 | 0 | 5 | 0 | - | - | 6 | - | - | - | 665 | | | | 10/1/2013 | 1/31/2018 | 1,500,000 | 5.0% | - | 0.0% | - | 0.0% |
| 369 | Central | 195 | - | 33 | 0 | 5 | 0 | - | - | 4 | - | - | - | 237 | | | | 10/1/2012 | 1/30/2018 | 1,071,429 | 7.0% | - | 0.0% | - | 0.0% |
| 370 | Magic Valley | 395 | 29 | 22 | 0 | 5 | 0 | - | - | 4 | - | - | - | 454 | | | | 2/1/2014 | 1/31/2015 | 1,885,416 | 5.0% | - | 0.0% | - | 0.0% |
| 371 | Boise Town Sq | 298 | 17 | 15 | 42 | 5 | 0 | 9 | - | 4 | - | - | - | 389 | | | | 2/1/2012 | 1/31/2017 | 1,020,950 | 5.0% | - | 0.0% | - | 0.0% |
| 372 | Rushmore | 516 | 57 | 40 | 29 | 5 | 0 | 11 | - | 4 | - | - | - | 662 | | | | 1/1/2015 | 12/31/2015 | 1,551,137 | 5.0% | - | 0.0% | - | 0.0% |
| 373 | Canton Ctr | 256 | 71 | 57 | 4 | 5 | 0 | 10 | - | 5 | - | - | - | 418 | | | | 1/31/2009 | 1/31/2019 | 1,600,000 | 3.0% | - | 0.0% | - | 0.0% |
| 374 | Kirkwood | 314 | 28 | 34 | 0 | 5 | 0 | 8 | - | 4 | - | - | - | 393 | | | | 2/1/2014 | 1/31/2017 | 1,000,000 | 12.0% | - | 0.0% | - | 0.0% |
| 377 | Tulsa Hills | 492 | 30 | 36 | 67 | 5 | 0 | 9 | - | 5 | - | - | - | 644 | | | | 2/1/2014 | 1/31/2019 | 2,550,000 | 5.0% | - | 0.0% | - | 0.0% |
| 378 | Martinsburg | 130 | 33 | 2 | 67 | 5 | 0 | - | - | 5 | - | - | - | 242 | | | | 2/1/2014 | 1/31/2017 | 1,000,000 | 7.0% | - | 0.0% | - | 0.0% |
| 379 | Tulsa Promenade | 261 | - | 27 | 42 | 5 | 0 | - | - | 5 | - | - | - | 339 | | | | 2/1/2013 | 1/31/2018 | 1,600,000 | 5.0% | - | 0.0% | - | 0.0% |
| 380 | The Centre at Salisbury | 358 | 33 | 15 | 0 | 5 | 0 | - | - | 4 | - | - | - | 415 | | | | 2/1/2013 | 1/31/2016 | 1,250,000 | 12.5% | - | 0.0% | - | 0.0% |
| 382 | Illinois Ctr | 127 | 28 | 19 | 0 | 5 | 0 | - | 1 | 5 | - | - | - | 185 | | | | | | | | | | | |
| 383 | Hulen | 477 | 21 | 30 | 47 | 5 | 0 | 20 | - | 7 | - | - | - | 607 | | | | 2/1/2014 | 1/31/2019 | 1,750,000 | 5.0% | - | 0.0% | - | 0.0% |
| 384 | Ridgmar | 241 | 34 | 11 | 47 | 5 | - | - | - | 4 | - | - | - | 342 | | | | 2/1/2014 | 1/31/2015 | 796,022 | 10.0% | 1,342,045 | 5.0% | - | 0.0% |
| 385 | Santa Fe Place | 162 | 44 | 23 | 0 | 5 | 0 | - | - | 4 | - | - | - | 238 | 8/1/2013 | 7/31/2015 | 8.0% | | | | | | | | |
| 386 | Killeen | 217 | 30 | 13 | 11 | 5 | 0 | 4 | - | 3 | - | - | - | 283 | | | | 2/1/2014 | 1/31/2015 | 700,000 | 10.0% | - | 0.0% | - | 0.0% |
| 388 | South Towne | 314 | 32 | 23 | 3 | 5 | 0 | - | - | 4 | - | - | - | 381 | | | | 2/1/2014 | 1/31/2015 | 1,202,788 | 10.0% | 1,905,058 | 5.0% | - | 0.0% |
| 389 | Red Cliffs | 292 | 29 | 27 | 50 | 5 | 0 | 11 | 1 | 7 | - | - | - | 421 | | | | 2/1/2014 | 1/31/2015 | 900,000 | 12.0% | - | 0.0% | - | 0.0% |
| 390 | Animas Valley | 340 | 48 | 20 | 19 | 5 | 0 | 14 | 1 | 4 | - | - | - | 451 | | | | 2/1/2010 | 1/31/2015 | 1,100,000 | 5.0% | - | 0.0% | - | 0.0% |
| 391 | Laurel | 222 | 86 | 13 | 0 | 5 | 0 | 5 | - | 4 | - | - | - | 337 | | | | 2/1/2014 | 1/31/2015 | 1,100,000 | 5.0% | - | 0.0% | - | 0.0% |
| 392 | Newgate | 261 | 40 | 13 | 64 | 5 | 0 | 9 | - | 4 | - | - | - | 395 | | | | 2/1/2014 | 1/31/2015 | 700,000 | 15.0% | - | 0.0% | - | 0.0% |
| 394 | Millcreek | 461 | 62 | 52 | 19 | 5 | 0 | 14 | - | 6 | - | - | - | 618 | | | | 2/1/2013 | 1/31/2018 | 1,700,000 | 5.0% | - | 0.0% | - | 0.0% |
| 396 | Valley Mall | 211 | 30 | 15 | 20 | 5 | 0 | 21 | - | 4 | - | - | - | 305 | | | | 2/1/2013 | 1/31/2015 | 912,500 | 8.0% | - | 0.0% | - | 0.0% |
| 397 | Mall of America | 2,444 | 34 | 21 | 571 | 5 | 0 | - | 0 | 7 | - | - | - | 3,081 | | | | 2/1/2013 | 1/31/2018 | 8,216,520 | 5.0% | - | 0.0% | - | 0.0% |
| 399 | Branson Landing | 391 | 38 | 33 | 4 | 5 | 0 | 9 | - | 3 | - | - | - | 483 | | | | 6/1/2012 | 1/31/2017 | 1,500,000 | 5.0% | - | 0.0% | - | 0.0% |
| 400 | Upper Valley | 198 | 20 | 57 | 0 | 5 | 0 | 11 | - | 5 | - | - | - | 295 | 2/1/2014 | 1/31/2016 | 9.0% | | | | | | | | |
| 402 | Rivergate | 192 | 58 | 40 | 10 | 5 | 0 | 8 | - | 8 | - | - | - | 321 | | | | 2/1/2013 | 1/31/2015 | 686,900 | 10.0% | - | 0.0% | - | 0.0% |
| 407 | Aroostook Centre | 75 | - | 37 | 0 | 5 | 0 | - | - | 4 | - | - | - | 122 | 2/1/2014 | 1/31/2015 | 7.0% | | | | | | | | |
| 408 | Deerbrook | 314 | 28 | 35 | 35 | 5 | 0 | 9 | 1 | 5 | - | - | - | 432 | | | | 2/1/2007 | 1/31/2017 | 1,700,000 | 5.0% | - | 0.0% | - | 0.0% |
| 410 | Lloyd Ctr | 456 | 69 | 26 | 123 | 5 | 0 | 17 | - | 4 | - | - | - | 703 | | | | 2/1/2012 | 1/31/2017 | 1,460,000 | 5.0% | - | 0.0% | - | 0.0% |
| 411 | Lodi Outlets | 197 | 47 | 11 | 0 | 5 | 0 | - | - | 4 | - | - | - | 265 | 12/1/2013 | 11/30/2014 | 8.0% | 12/1/2014 | 1/31/2018 | 1,375,000 | 8.0% | 1,700,000 | 5.0% | - | 0.0% |
| 413 | Ashtabula | 68 | 66 | 18 | 0 | 5 | 0 | 8 | - | 4 | - | - | - | 169 | 2/1/2014 | 1/31/2015 | 4.0% | | | | | | | | |
| 414 | Eastgate | 389 | 48 | 112 | 6 | 5 | 0 | - | - | 3 | - | - | - | 563 | | | | 2/1/2013 | 1/31/2016 | 1,300,000 | 5.0% | - | 0.0% | - | 0.0% |
| 415 | Northgate | 246 | - | 80 | 0 | 5 | 0 | - | - | 15 | - | - | - | 347 | | | | 4/1/2014 | 3/31/2015 | 940,000 | 10.0% | - | 0.0% | - | 0.0% |
| 416 | Saint Clair Sq | 426 | 17 | 13 | 1 | 5 | - | 10 | - | 5 | - | - | - | 476 | | | | 7/30/2010 | 1/31/2016 | 2,000,000 | 5.0% | - | 0.0% | - | 0.0% |
| 417 | Independence Ctr | 633 | 38 | 20 | 13 | 5 | - | 8 | - | 4 | - | - | - | 715 | | | | 2/1/2011 | 1/31/2016 | 3,000,000 | 5.0% | - | 0.0% | - | 0.0% |
| 418 | Crabtree Valley | 730 | 32 | 48 | 3 | 5 | - | - | - | 5 | - | - | - | 823 | | | | 3/15/2012 | 1/31/2016 | 2,800,000 | 5.0% | - | 0.0% | - | 0.0% |
| 419 | Four Seasons Town Ctr | 411 | 50 | 25 | 74 | 5 | - | - | - | 4 | - | - | - | 569 | | | | 3/1/2013 | 1/31/2018 | 1,500,000 | 5.0% | - | 0.0% | - | 0.0% |
| 420 | Carolina Place | 492 | 57 | 17 | 94 | 5 | - | 11 | - | 3 | - | - | - | 679 | | | | 3/1/2013 | 1/31/2018 | 1,765,200 | 5.0% | - | 0.0% | - | 0.0% |
| 421 | White Marsh | 630 | 73 | 26 | 118 | 5 | 0 | 9 | - | 5 | - | - | - | 866 | | | | 8/29/2012 | 1/31/2018 | 2,150,000 | 5.0% | - | 0.0% | - | 0.0% |
| 422 | Galleria at White Plains | 519 | 58 | 22 | 0 | 5 | - | 21 | - | 7 | - | - | - | 633 | | | | 10/25/2012 | 1/31/2018 | 1,950,000 | 5.0% | - | 0.0% | - | 0.0% |
| 423 | TUTTLE CROSSING | 584 | - | 15 | 0 | 5 | - | 11 | - | 2 | - | - | - | 618 | | | | 4/26/2013 | 1/31/2019 | 2,750,000 | 5.0% | - | 0.0% | - | 0.0% |
| 424 | WESTGATE | 377 | 27 | 46 | 29 | 5 | - | - | - | 14 | - | - | - | 497 | | | | 7/12/2013 | 7/31/2018 | 2,413,400 | 5.0% | - | 0.0% | - | 0.0% |
| 798 | Total | 100,396 | 12,552 | 8,350 | 8,554 | 1,322 | 71 | 1,890 | 24 | 1,441 | 43 | 113 | - | 134,756 | | | | | | | | | | | |
| | Per Week | 702,771 | 87,863 | 58,452 | 59,875 | 9,256 | 494 | 13,229 | 165 | 10,089 | 304 | 791 | - | 943,291 | | | | | | | | | | | |
| | Per Store Week | 2,440 | 305 | 203 | 208 | 32 | 2 | 46 | 1 | 35 | 1 | 3 | - | 3,275 | | | | | | | | | | | |

### [_] SALE GUIDELINES

A.    The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.    On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.    At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.    . The Merchant and the Agent may advertise the Sale as a "going out of business," "store closing" "sale on everything", "everything must go", or similar themed sale.

F.    Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.    Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.    Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.    The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

1

I.      The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s). The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.      The Agent shall be entitled to include Additional Agent Goods in the Sale in accordance with the terms of the Approval Order and the Agency Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to the Merchant:

If to the Agent:

**Exhibit 11.1 (o)**
**Deb Shop**
**Merchandise Mix**

| Dept. Code | Dept | % Total |
|---|---|---|
| 1020 | Jewelry | 5.5% |
| 1021 | Legwear | 0.5% |
| 1022 | Intimate | 2.7% |
| 1023 | Accessories | 2.3% |
| 1024 | Dresses | 9.9% |
| 1025 | Outerwear | 2.1% |
| 1026 | Bottoms | 5.3% |
| 1027 | Denim | 8.7% |
| 1028 | Shoes | 5.5% |
| 1029 | Swimwear | 0.2% |
| 1030 | Knit Tops | 12.3% |
| 1031 | Sweaters | 2.7% |
| 1032 | Wovens | 2.1% |
| 1033 | Daytime Dress | 2.4% |
| 1034 | Hanging Footwear | 2.0% |
| 1035 | Perfume | 0.9% |
| 1085 | eCommerce Promo Items Non-Sale | 0.0% |
| 1088 | Deb Promo Items Sale | 0.0% |
| 1089 | Deb Promo Non-Sale | 0.0% |
| 2040 | Pl Jewelry | 0.2% |
| 2042 | Pl Intimate | 0.8% |
| 2043 | Pl Access | 0.0% |
| 2044 | Pl Dresses | 4.4% |
| 2045 | Pl Outerwear | 1.8% |
| 2046 | Pl Bottoms | 5.6% |
| 2047 | Pl Denim | 7.5% |
| 2048 | Pl Shoes | 0.0% |
| 2049 | PL Swimwear | 0.1% |
| 2050 | Pl Knit Tops | 10.1% |
| 2051 | Pl Sweaters | 2.0% |
| 2052 | Pl Wovens | 1.4% |
| 2053 | Daytime Dress | 1.1% |
| **Total** | | **100.0%** |

deb

## Marketing Strategic Plan: November 2014 (Week 1/2)

| | S | M | T | W | T | F | S | Weekly Totals | S | M | T | W | T | F | S | Weekly Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| wk/day | 40 - 2 | 3 | 4 - Election Day | 5 | 6 | 7 | 8 | | 41 - 9 | 10 | 11 - Veteran's Day | 12 | 13 | 14 | 15 | |
| LY Sales *(rounded) | $551,809 | $338,177 | $364,411 | $411,280 | $476,426 | $320,862 | $1,345,817 | $4,309,182 | $523,922 | $525,281 | $333,029 | $375,710 | $414,217 | $804,183 | $1,321,516 | $4,403,566 |
| TY Plan *(rounded) | $520,000 | $330,000 | $375,000 | $380,000 | $475,000 | $820,000 | $1,386,000 | $4,286,809 | $600,000 | $375,000 | $495,000 | $355,000 | $440,000 | $860,000 | $1,327,000 | $4,452,000 |
| RETAIL | | | | | | | | | | | | | | | | |
| Floorset | | | | Holiday Gift FS sent in dedicated mailpack | Visual team to set Deptford for November Accessory Floor Set | Dawn to approve Nov Accessory Floor Set | | | Holiday Gift & Accessories Floor Set | | | | | | | |
| Fashion Big Idea | Embellished Tops, Lace tops, French terry/Fleece tops, Branded Denim, Jeggings, Sweaters, jogger pants | | | | | | | | Embellished Tops, Lace tops, French terry/Fleece tops, Branded Denim, Jeggings, Sweaters, jogger pants | | | | | | | |
| Notes | Mall Marketing Offer: 15% off your order (in-store only) | | | | | | | | Mall Marketing Offer: 15% off your order (in-store only) | | | | | | | |
| Big Idea/Event | BOGO Free Tops & Bottoms | | | | | BOGO 50% Entire Store<br>BOGO Free Clearance | | | BOGO 50% Entire Store<br>BOGO Free Clearance | $5/$10/$15 Price Point Event (holiday trim in window & in-store)<br>$4 Fashion Tops & Sneakers, $10 Leggings & Joggers, $15 Jeans & Fleece Tops | | | | | Up to 50% off Weekend Bash / 30% off Tops, Denim, Coats & Leggings | |
| Big Product Ideas | | | | | | | | | | | | | | | | |
| Window | *Window 1(Plus) - Outerwear Lifestyle w/ Plus Mannequins & Plus New Arrivals messaging<br>*Window 2 - BOGO Free Tops & Bottoms w/ Cabin Fever lifestyle<br>*Easel - BOGO Free Clearance / Boots BOGO $10 | | | | | *Window 1(Plus) -Outerwear Lifestyle w/ Plus Mannequins & Plus New Arrivals messaging<br>*Window 2 - BOGO 50% Entire Stores w/ Cabin Fever lifestyle<br>*Easel - BOGO Free Clearance /Coats 40% off | | | *Window 1(Plus) -Outerwear Lifestyle w/ Plus Mannequins & Plus New Arrivals messaging<br>*Window 2 - BOGO 50% Entire Stores w/ Cabin Fever lifestyle<br>*Easel - BOGO Free Clearance /Coats 40% off | *Window 1 - Plus Dressy Lifestyle / Mannequins / Holiday Trim/ Now Hiring Cling<br>*Window 2 - $5/$10/$15 Price Point / Dressy Lifestyle / Holiday Trim<br>*Easel - Up to 75% off Clearance | | | | | *Window 1 - Plus Dressy Lifestyle / Mannequins / Holiday Trim/ Now Hiring Cling<br>*Window 2 - Up to 50% off Weekend Bash / 30% off Tops, Denim, Coats & Leggings / Dressy Lifestyle / Holiday Trim<br>*Easel - Clearance Dogs Free & Shoes $10 | |
| Photoshoots | | | | | | | | | | | | | | | | |
| Steal of the Week: Apparel | | | | | | | | | | | | | | | | |
| Steal of the Week: Accessories | | | | | | | | | | | | | | | | |
| Steal of the Week: Footwear | | | | | | | | | | | | | | | | |
| ECOMMERCE | | | | | | | | | | | | | | | | |
| LY Demand | $93,914 | $62,312 | $80,465 | $71,174 | $67,664 | $69,742 | $62,997 | $508,268 | $83,821 | $101,729 | $69,543 | $61,114 | $62,872 | $67,242 | $59,107 | $615,578 |
| TY Plan | $132,419 | $87,560 | $113,456 | $100,355 | $95,408 | $98,336 | $88,826 | $716,854 | $118,272 | $85,831 | $142,494 | $89,299 | $91,778 | $97,939 | $100,482 | $726,895 |
| TY Email | 1 Day Only! 40% off Everything! | OMG FREE! Because Monday! | And the Winner Is... - Score Up to 75% off | Love FREE? BOGO Tops, Bottoms and more! | BOGO $10 Boots! Yes Please! | BOGO 50% Off entire Store? Happy Friday! | BOGO 50% off Entire <3. Time to shop! | | | | | | | | | |
| TY Big Idea/Event | 40% off Birthday Sitewide Sale, Clearance up to 70% off | 50% off Tops and Bottoms, Clearance up to 70% off | 50% off Tops and Bottoms, Clearance up to 70% off | 50% off Tops and Bottoms, Clearance up to 70% off | 50% off Tops and Bottoms, Clearance up to 70% off | 50% off Tops and Bottoms, Clearance up to 70% off | 50% off Tops and Bottoms, Clearance up to 70% off | | 40% off entire site, Clearance up to 70% off | | | | | | | |
| LY Big Idea/Event | Launched new Category and PDP, All boots $29.99, all jewelry 30% off, select jeans $14.99, all coats 30% off | 10% off Birthday Additional 10% off sitewide, All boots $29.99, all jewelry 30% off, select jeans $14.99, all coats 30% off | All boots $29.99, all jewelry 30% off, select jeans $14.99, all coats 30% off | All boots $29.99, all jewelry 30% off, select jeans $14.99, all coats 30% off | 25% off sitewide, clearance up to 80% off | 25% off sitewide, clearance up to 80% off | 25% off sitewide, clearance up to 85% off | | 20% off sitewide, clearance up to 80% off | 25% off sitewide, clearance up to 80% off | 25% off Veterans' Day Sale sitewide, clearance up to 80% off | 30% off Friends and Family sale sitewide, clearance up to 80% off | 30% off Friends and Family sale sitewide, clearance up to 85% off | 30% off Friends and Family sale sitewide, clearance up to 85% off | 30% off Friends and Family sale sitewide, clearance up to 85% off | |
| LAST YEAR | | | | | | | | | | | | | | | | |
| LY Date | 40 - 3 | 4 | 5 | 6 | 7 | 8 | 9 | Weekly Totals | 41 - 10 | 11 | 12 | 13 | 14 | 15 | 16 | Weekly Totals |
| LY IMU % | 52.3% | 51.9% | 54.0% | 52.9% | 54.1% | 54.1% | 54.3% | 53.5% | 52.7% | 35.7% | 40.7% | 47.2% | 47.5% | 54.6% | 55.1% | 58.5% |
| LY Comp % | -5.2% | -10.1% | -11.5% | 8.9% | -0.3% | -1.0% | 2.3% | -1.5% | 5.1% | 10.6% | -6.4% | -12.4% | -15.8% | 0.4% | 0 | -0.8% |
| LY Floorset | Holiday Floorset | | | | | | | | | | | | | | | |
| LY Big Idea/Event | Outerwear, Cold Weather Accessories, Denim, Sweaters, Loungewear (French Terry), Select Knits & Leggings 30% off, Boots $29.99, Jewelry BOGO 50%, Denim Wall $14.99/19.99, Basics 4/$20/25 | | | | BOGO 50% off Entire Store Bounceback $1 Distributed | | | | BOGO 50% off Entire Store Bounceback $1 Distributed | Entire Store 30% off, Clearance 50% off | | | Friends & Family 30% off 11/12-11/15<br>BOGO 50% off 11/15-11/20<br>Basics 4/$20/25 | | | |
| LY Email | Surprise! A Gift for you on our Birthday... additional 15% off 30% off all coats | 175 New Items | All Boots $29.99 Online and In Stores | Everything is On Sale/ Online 25% off entire site/ BOGO 50 In-Store | | TGIF Everything is On Sale | Save on Everything In-Stores – Online | | Final Hours - Everything is On Sale In-Stores and Online | #GetShopping - 30% off Everything In-Store and Online | Save 30% In-Store and Online | 30% Off Everything | 30% Off All Denim | All Dresses on Sale – RSVP Now | In-Store BOGO 50%/ Online 30% off | |

deb

Marketing Strategic Plan: November 2014 (Week 3/4)

| | S | M | T | W | T | F | S | Weekly Totals | S | M | T | W | T | F | S | Weekly Totals | Monthly Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| wk/day | 42 - 16 | 17 | 18 | 19 | 20 | 21 | 22 | | 43 - 23 | 24 | 25 | 26 | 27 - Thanksgiving | 28 - Black Friday | 29 | | |
| LY Sales *(rounded) | $560,162 | $393,594 | $373,720 | $411,660 | $393,639 | $572,753 | $970,325 | $3,675,857 | $435,278 | $331,642 | $430,784 | $779,361 | $1,072,734 | $4,202,067 | $1,400,728 | $8,656,594 | $21,847,499 |
| TY Plan *(rounded) | $535,000 | $370,000 | $350,000 | $335,000 | $400,000 | $615,000 | $1,035,000 | $3,709,000 | $430,000 | $340,000 | $430,000 | $775,000 | $1,110,000 | $4,170,000 | $1,295,000 | $8,550,000 | $21,068,000 |
| RETAIL | | | | | | | | | | | | | | | | | |
| Floorset | | | | | Thanksgiving Floor Set | | | | | | | | | Samples needed in Ops/Mkt for Snow Daze & Shine Thing FS | | | |
| Fashion Big Idea | | | | | | | | | | | | | | | | | |
| Notes | Mall Marketing Offer: 15% off your order (in-store only) | | | | | | | | | | | | | | | | |
| Big Idea/Event | Up to 50% off Weekend Bash / 50% off Tops, Denim, Coats & Leggings | | | BOGO Free Tops & Bottoms | | | | | BOGO Free Tops & Bottoms | | Pre Party Bash: 40% off Entire Store | | Black Friday Bash [illegible] | | After Party: 40% off Entire Store | | |
| Big Product Ideas | | | | | | | | | | | | | | | | | |
| Window | *Window 1 - Plus Dressy Lifestyle / Mannequins / Holiday Trim / Now Hiring Cling *Window 2 - Up to 50% off Weekend Bash / 50% off Tops, Denim, Coats & Leggings / Dressy Lifestyle / Holiday Trim *Easel - Clearance Bogo Free & Shoes $10 | | | *Window 1 - Plus Holiday Lifestyle / Mannequins / Holiday Trim / Now Hiring Cling *Window 2 - Junior Holiday Lifestyle / BOGO Free Tops & Bottoms / Holiday Trim *Easel - Clearance BOGO Free / Coats 50% off | | | | | *Window 1 - Plus Holiday Lifestyle / Mannequins / Holiday Trim / Now Hiring Cling *Window 2 - Junior Holiday Lifestyle / BOGO Free Tops & Bottoms / Holiday Trim *Easel - Clearance BOGO Free / Coats 50% off | | *Window 1 - Plus Holiday Lifestyle / Pre Party 40% off Entire Store / Holiday Trim / Now Hiring Cling *Window 2 - Junior Holiday Lifestyle / Pre Party 40% off Entire Store / Holiday Trim *Easel - Pre Party 40% off Entire Store | | *Window 1 - Plus Holiday Lifestyle / 40% off Entire Store / Holiday Trim / Now Hiring Cling *Window 2 - Junior Holiday Lifestyle / 40% off Entire Store / Holiday Trim *Easel - GWP Easels | | *Window 1 - Plus Holiday Lifestyle / 40% off Entire Store / Holiday Trim *Window 2 - Junior Holiday Lifestyle / 40% off Entire Store / Holiday Trim *Easel - Entire Store 40% off / Gift Cards | | |
| Photoshoots | | | | | | | | | | | | | | | | | |
| Steal of the Week: Apparel | | | | | | | | | | | | | | | | | |
| Steal of the Week: Accessories | | | | | | | | | | | | | | | | | |
| Steal of the Week: Footwear | | | | | | | | | | | | | | | | | |
| ECOMMERCE | | | | | | | | | | | | | | | | | |
| LY Demand | $79,128 | $56,657 | $53,853 | $57,477 | $55,393 | $53,714 | $52,968 | $419,190 | $62,134 | $46,978 | $95,238 | $104,902 | $383,847 | $523,839 | $138,783 | $1,355,721 | $3,792,697 |
| TY Plan/Demand | $111,570 | $93,986 | $75,933 | $91,043 | $78,090 | $75,557 | $74,685 | $590,864 | $87,609 | $66,239 | $134,286 | $147,160 | $540,447 | $737,020 | $184,604 | $1,907,365 | $3,941,762 |
| TY Email | | | | | | | | | | | | | | | | | |
| TY Big Idea/Event | | | | | | | | | | | | | | | | | |
| LY Big Idea/Event | 30% off Friends and Family sale sitewide, clearance up to 60% off | 30% off Friends and Family sale sitewide, clearance up to 60% off | 25% off sitewide sale, clearance up to 70% off | 25% off sitewide sale, clearance up to 70% off | 25% off sitewide sale, clearance up to 70% off | Text and Save up to 40% off sitewide, Clearance up to 70% | Text and Save up to 40% off sitewide, Clearance up to 70% | | Text and Save up to 40% off sitewide, Clearance up to 70% | Text and Save up to 40% off sitewide, Clearance up to 70% | Text and Save up to 40% off sitewide, Clearance up to 70% | 40% off sitewide sale, clearance up to 70% off | 40% off sitewide sale, clearance up to 70% off | 50% off sitewide sale, clearance up to 70% off, free earbuds for first 5000 orders over $25 | 50% off until 1PM, 40% off after 1PM sitewide | | |
| LAST YEAR | | | | | | | | | | | | | | | | | |
| LY Date | 42 - 17 | 18 | 19 | 20 | 21 | 22 | 23 | Weekly Totals | 43 - 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weekly Totals | Monthly Totals |
| LY MMU % | 54.4% | 52.0% | 53.7% | 54.0% | 50.4% | 45.8% | 47.0% | 50.8% | 47.9% | 47.7% | 41.9% | 42.5% | 25.0% | 30.3% | 40.6% | 34.5% | 44.5% |
| LY Comp % | -2.0% | -2.8% | -15.3% | -48.8% | – | -80.6% | -21.9% | -52.8% | -25.8% | -22.7% | 3.0% | 75.4% | 112.0% | 309.7% | 1.7% | 86.0% | -8.7% |
| LY Floorset | | | | | | | | | | | | | | | | | |
| LY Big Idea/Event | BOGO 50% off 11/15-11/20 Bounceback #1 - $10 off $40 Redeemed 11/20-11/26 Basics 4/$20/$25 Employee Discount 50% off 11/18-11/21 | | | | Text & Save Surprise Sale Promotion 25/30/40% off Jewelry BOGO 50%, Clearance 2/$5 Basics 4/$20/25 Bounceback #1 - $10 off $40 Redeemed 11/20-11/26 Employee Discount 50% off 11/18-11/21 | | | | Text & Save Surprise Sale Promotion 25/30/40% off Pre-Party Bash 40% off (11/26) Jewelry BOGO 50%, Clearance 2/$5 Basics 4/$20/25 Bounceback #1 - $10 off $40 Redeemed 11/20-11/26 | | | Pre-Party Bash 40% off Bounceback #2 - Distributed 11/27-11/30 | Closed [illegible] 50% off Entire Store Bounceback #2 - Distributed 11/27-11/30 | Black Friday Bash [illegible] Bounceback #2 - Distributed 11/27-11/30 | Black Friday Bash [illegible] BOGO 50% off Entire Store [illegible] *Excludes Deals Bounceback #2 - Redeemed [illegible] | | |
| LY Email | Relax All Loungewear on Sale In-Stores and Online | 157 New Styles | #Shoesday Steal All Shoes on Sale | Most Missed This Week + Shop Our Sale | Shh, it's a Surprise Sale | How Much Will You Save? Find Out Now! Scratch & Save In-Store/ Text & Save Online: Save up to 40%! | Party Perfect Looks + A Surprise Sale! Scratch & Save In-Store/ Text & Save Online Save up to 40% | | Your Black Friday Shopping List + Hours! Scratch & Save In-Store/ Text & Save Online Save up to 40% | 40% Off Storewide | 40% Off Storewide | Get Ready! Sale & Just Hours Away Black Friday Bash starts online at 12:01AM ET on Thanksgiving Day - 50% Off Everything | (1st) Free Earbuds [illegible] 50% Off Everything Online - 50% Off Entire Store + Free Giveaways [illegible] Open at 6PM - 50% Off Entire Site + FREE Earbuds | 40% Off Storewide + Free Infinity Scarf - Storewide 50% Off + Free Giveaways All Day | Hourly Deals Storewide Sale - BOGO 60% Off Entire Store | | |

Updated November 26, 2014

deb

## Marketing Strategic Plan: December 2014 (Week 1/2/3)

| | S | M | T | W | T | F | S | Weekly Totals | S | M | T | W | T | F | S | Weekly Totals | S | M | T | W | T | F | S | Weekly Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| wk/day | 44 - 30 | 1 - Cyber Monday | 2 | 3 | 4 | 5 | 6 | | 44 - 7 | 8 | 9 | 10 | 11 | 12 | 13 | | 45 - 14 | 15 | 16 - Hanukkah Begins | 17 | 18 | 19 | 20 | |
| LY Sales *(rounded) | $718,885 | $493,030 | $533,612 | $533,699 | $554,592 | $874,612 | $1,437,220 | $5,145,651 | $734,891 | $552,827 | $464,442 | $476,857 | $567,147 | $1,020,847 | $1,406,853 | $5,223,875 | $922,850 | $564,427 | $637,001 | $790,887 | $880,445 | $1,317,015 | $2,011,332 | $7,224,426 |
| TY Plan *(rounded) | $710,000 | $525,000 | $545,000 | $565,000 | $630,000 | $900,000 | $1,525,000 | $5,400,000 | $810,000 | $600,000 | $595,900 | $565,000 | $670,000 | $1,095,000 | $1,675,000 | $6,000,000 | $1,040,000 | $695,000 | $700,000 | $830,000 | $935,000 | $1,450,000 | $2,350,000 | $8,000,000 |
| **RETAIL** | | | | | | | | | | | | | | | | | | | | | | | | |
| Floorset | | | | | | | | | December Floor Set | | | | | | | | | | | | | | | |
| Fashion Big Idea | | | | | | | | | | | | | | | | | | | | | | | | |
| Notes | | | | Mall Marketing Offer: 15% off your order (in-store only) | | | | | | | Mall Marketing Offer: 15% off your order (in-store only) | | | | | | Mall Marketing Offer: 15% off your order (in-store only) | | | | | | | |
| Big Idea/Event | After Party: 40% off Entire Store | [redacted] | Price Point Event: Gifts, Gift List & Gift Cards | | | | | | Price Point Event: Gifts, Gift List & Gift Cards | [illegible] | | | | | | | [illegible] | | [illegible] | | | | | |
| Big Product Ideas | | | | | | | | | | | | | | | | | | | | Gift Ideas for the Procrastinator, Gifts Under $10, Stocking Stuffers & Gift Cards | | | | |
| Window | *Window 1 - Plus Holiday Lifestyle / 40% off Entire Store / Holiday Trim *Window 2 - Junior Holiday Lifestyle / 40% off Entire Store / Holiday Trim *Easel - Entire Store 40% off / Gift Cards | *Window 1 - Plus Holiday Lifestyle / 50% off Entire Store / Holiday Trim *Window 2 - Junior Holiday Lifestyle / 50% off Entire Store / Holiday Trim *Easel - Entire Store 50% off / Gift Cards | *Window 1 - Plus Lifestyle Image /$5/$10/$15 Price Point Event / Holiday Trim *Window 2 - Junior Lifestyle Image /$5/$10/$15 Price Point Event / Holiday Trim *Easel - TBD | | | | | | *Window 1 - Plus Lifestyle Image /$5/$10/$15 Price Point Event / Holiday Trim *Window 2 - Junior Lifestyle Image /$5/$10/$15 Price Point Event / Holiday Trim *Easel - TBD | | | *Window 1 - Plus Lifestyle Image / Up to 40% off w/ Category Callouts / Holiday Trim *Window 2 - Junior Lifestyle Image / Up to 40% off w/ Category Callouts / Holiday Trim *Easel - TBD | | | | | *Window 1 - Plus Lifestyle Image / Up to 40% off w/ Category Callouts / Holiday Trim *Window 2 - Junior Lifestyle Image / Up to 40% off w/ Category Callouts / Holiday Trim *Easel - TBD | | | *Window 1 - Plus Lifestyle Image / Up to 50% off w/ Category Callouts / Holiday Trim *Window 2 - Junior Lifestyle Image / Up to 50% off w/ Category Callouts / Holiday Trim *Easel - TBD | | | | |
| Photoshoots | | | | | | | | | | | | | | | | | | | | | | | | |
| Steal of the Week: Apparel | | | | | | | | | | | | | | | | | | | | Rolled skinny tube $20 | | | | |
| Steal of the Week: Accessories | | | | Cold weather accessories $10 | | | | | Cold weather accessories $10 | | | | | | | | | | | | | | | |
| Steal of the Week: Footwear | | | | | | | | | | | | | | Shoes 30% off | | | Shoes 30% off | | | | | | | |
| **ECOMMERCE** | | | | | | | | | | | | | | | | | | | | | | | | |
| LY Demand | $95,864 | $893,531 | $123,304 | $63,706 | $54,171 | $69,838 | $81,746 | $1,182,268 | $74,753 | $132,471 | $60,772 | $65,684 | $64,511 | $81,325 | $78,342 | $557,859 | $82,139 | $67,732 | $64,775 | $50,230 | $52,138 | $43,734 | $39,697 | $409,445 |
| TY Plan/Demand | $105,256 | $978,501 | $173,944 | $56,870 | $78,419 | $96,520 | $87,106 | $1,639,534 | $105,454 | $186,876 | $85,731 | $92,560 | $91,005 | $114,726 | $110,517 | $738,969 | $115,872 | $95,549 | $91,378 | $63,555 | $73,551 | $61,514 | $56,000 | $577,420 |
| TY Email | | | | | | | | | | | | | | | | | | | | | | | | |
| TY Big Idea/Event | | | | | | | | | | | | | | | | | | | | | | | | |
| LY Big Idea/Event | 30% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | 50% off sitewide, clearance up to 70% off | 20% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | | 30% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | 40% off sitewide Green Monday sale, clearance up to 73% off | 25% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, jeans 14.99/19.99/24.99, clearance up to 70% off | 30% off sitewide sale, jeans 14.99/19.99/24.99, clearance up to 70% off | | 30% off sitewide sale, jeans 14.99/19.99/24.99, clearance up to 70% off | 30% off sitewide sale, jeans 14.99/19.99/24.99, clearance up to 70% off | 30% off sitewide sale, jeans 14.99/19.99/24.99, clearance up to 70% off | 30% off sitewide sale, jeans 14.99/19.99/24.99, clearance up to 70% off | 30% off sitewide sale, jeans 14.99/19.99/24.99, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | 30% off sitewide sale, clearance up to 70% off | |
| **LAST YEAR** | | | | | | | | | | | | | | | | | | | | | | | | |
| LY Date | 44 - 1 | 2 | 3 | 4 | 5 | 6 | 7 | Weekly Totals | 45 - 8 | 9 | 10 | 11 | 12 | 13 | 14 | Weekly Totals | 46 - 15 | 16 | 17 | 18 | 19 | 20 | 21 | Weekly Totals |
| LY MMU % | 39.8% | 49.4% | 50.8% | 50.8% | 50.4% | 48.7% | 50.5% | 48.6% | 51.1% | 52.0% | 53.2% | 50.3% | 50.1% | 48.9% | 51.1% | 50.8% | 51.5% | 43.7% | 43.7% | 44.2% | 43.8% | 43.0% | 43.9% | 44.9% |
| LY Comp % | 13.7% | 10.3% | 13.8% | 4.7% | -7.8% | -6.5% | -11.2% | -1.3% | -5.2% | 3.6% | -16.1% | -25.3% | -22.4% | -12.0% | -25.0% | -16.8% | -8.1% | -6.7% | -16.0% | -9.5% | -14.8% | -17.7% | -13.1% | -13.0% |
| LY Floorset | | | | | | | | | Holiday II Floorset | | | | | | | | | | | | | | | |
| LY Big Idea/Event | Black Friday Bash 40% off Entire Store | After Party Bash BOGO 60% off Entire Store | BOGO 60% off Entire Store | | | BOGO 70% off Entire Store | | | BOGO 70% off Entire Store Reg 1 BOGO 50% off Entire Store (12/9-12/10) | | | 30% off Entire Store Bounceback #2 Redeemed | | Reg 1 48% off Entire Store, Reg 2 BOGO 50%, Reg 3 BOGO 70% Bounceback #2 Redeemed Bag Free on Friday 13th with a purchase of $75 | BOGO 70% off Entire Store Bounceback #2 Redeemed | | BOGO 70% off Entire Store Bounceback #2 Redeemed | Fill the Bag Sale - 40% off Bounceback #2 Redeemed (12/16-17) | | | | | | |
| LY Email | Cyber Monday is Coming - BOGO 60% Off Entire Store | Save 50% Off - Cyber Monday Almost Over | 30% off All Shoes + Win Free Boots | 30% Off + Neon Crush | Store on Sale + The Perfect Gift In-Stores and Online | You're Invited - All Party Attire on Sale | #GetGiving + Shop Our Sale | | Neon Knee + Shop the Sale | 40% Off Everything | The Coziest Slippers Ever | Most Pinned + Win a Scarf In-Store and Online - 30% off Entire Store | 20% Off Everything In-Stores and Online | Free Bag with any In-Store Purchase of $25 or more - 30% Off Entire Site Online Only | Entire Store BOGO 70 | | Win a Pair of Heels + Entire Store BOGO 70 | Fill the Bag Sale + New Arrivals In-Stores and Online | Fill the Bag Sale + Shoes That Sparkle In-Stores and Online | Fill the Bag Sale + Win Leggings! | Everything On Sale + New Denim | Fill the Bag Sale + NYE Dresses | Entire Store on Sale and Most Pinned Gifts | |

Marketing Strategic Plan: December 2014 (Week 48)

11/19 - 11/24    BOGO Free Tops & Bottoms



11/25 - 11/26    Pre Party Bash: 40% off Entire Store





11/27 - 11/28 AT 4PM    50% off Entire Store



11/28 AT 4PM    40% off Entire Store



11/29 - 11/30    After Party Bash: 40% off Entire Store



12/1 Cyber Monday: 50% off Entire Store

12/2 - 12/7    $8 / $10 / $15 Price Point Event



12/8 - 12/15    Up to 40% off Entire Store w/ Category Callouts







12/16 - 12/23  Up to 50% off with Category Call Outs



12/24 - 1/3    Entire Store Up to 60% off - After Christmas Sale



December Sign Kit

# EXHIBIT B

## Sale Guidelines

DOCS_LA:283700.9 17794-001

## [_] SALE GUIDELINES

A.     The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.     The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.     On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.     At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.     . The Merchant and the Agent may advertise the Sale as a "going out of business," "store closing" "sale on everything", "everything must go", or similar themed sale.

F.     Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.     Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.     Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.     The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

1

I.      The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s). The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.      The Agent shall be entitled to include Additional Agent Goods in the Sale in accordance with the terms of the Approval Order and the Agency Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

<u>If to the Merchant:</u>

<u>If to the Agent:</u>

2

# EXHIBIT C

## Pitts Declaration

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DEB STORES HOLDING LLC, et al.[1] | ) Case No.: 14-12676 (MFW) |
| | ) (Joint Administration Requested) |
| Debtors. | ) |

**DECLARATION OF DEREK PITTS IN SUPPORT OF DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO AGENCY AGREEMENT, (B) AUTHORIZING BIDDING PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF; (II) AUTHORIZING (A) SALE OF ASSETS AND (B) STORE CLOSING SALES AND (III) GRANTING RELATED RELIEF**

I, Derek Pitts, declare under penalty of perjury that:

1.       I am a Managing Director with Houlihan Lokey Capital, Inc. (together with employees of its affiliates, its wholly-owned subsidiaries, and independent contractors, "**Houlihan Lokey**"). I am authorized to execute this declaration (this "**Declaration**") on behalf of Houlihan Lokey. I am an individual over the age of 18. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all of the facts set forth herein.[2]

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: Deb Stores Holding LLC (4407), Deb Stores Holding II LLC (4455), Deb Shops SDP Inc. (4120), Deb Shops SDIH Inc. (4113), Deb Shops SD Inc. (8806), Deb Shops SDE LLC (4077), Deb Shops SDW LLC (4065), Deb Shops SDE-Commerce LLC (0926), and Deb Shops SDFMC LLC (8842). The location of the Debtors' headquarters and the service address for each of the Debtors is 9401 Blue Grass Road, Philadelphia, PA 19114.

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Houlihan Lokey and are based on information provided by them.

2.    This Declaration is being submitted in connection with the *Debtors'*

*Motion for Orders (i)(a) Authorizing Entry into Agency Agreement, (b) Authorizing Bidding*

*Protections, (c) Authorizing Bidding Procedures and Auction and (d) Scheduling Sale Hearing*

*and Approving Notice Thereof, (ii) Authorizing (a) Sale of Assets and (b) Store Closing Sales*

*and (iii) Granting Related Relief* (the "**Motion**") filed on the date hereof.

### Background & Qualifications

3.    Houlihan Lokey is a nationally recognized investment banking and

financial advisory firm, with seventeen offices worldwide and more than 800 professionals.

Houlihan Lokey's Financial Restructuring Group, which has more than 160 professionals, is one

of the leading advisors and investment bankers to debtors, secured and unsecured creditors,

acquirers, and other parties-in-interest involved with financially troubled companies in a variety

of industries, both in and outside of bankruptcy.

4.    I am a Managing Director at Houlihan Lokey, and in such capacity, I have

worked on numerous financial restructuring, corporate finance and valuation engagements across

several industries, including retail, consumer products, textiles, restaurants, energy and

industrials since 2000. Prior to my employment with Houlihan Lokey, I worked for eight years in

corporate financial management and business development in the financial services and software

development industries. During my career, I have advised on more than 40 restructuring

transactions, including approximately 19 in the retail sector.

5.    I received my B.S. from Northeastern University and my M.B.A. from the

Darden School of Business at the University of Virginia.  I am registered with FINRA as a

DOCS_LA:283879.1 17794/001

General Securities Representative (Series 7 and 63) and a Limited Representative – Investment

Banking (Series 79).

6.    In September 2014, Deb Stores Holding LLC, on behalf of itself and its

affiliated debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors"), first engaged Houlihan Lokey to provide general financial advisory services to

explore strategic alternatives.  Such alternatives included, among others, a potential sale of the

Debtors, a potential debt and/or equity investment, as well as a potential refinancing of the

Debtors' existing capital structure in order to provide additional liquidity to fund the ongoing

strategic turnaround.

### Investment/Sale Marketing Process

7.    In connection with exploring the Debtors' strategic alternatives, beginning

in October 2014, Houlihan Lokey contacted 79 potentially interested parties, including 61

financial sponsors/investment funds and 18 strategic buyers, regarding a potential investment or

sale transaction. At the commencement of this process the Company's liquidity position was

forecasted to be sufficient to run a 60 to 90 day marketing process under reasonably stable

business conditions. Parties that expressed an interest in a potential transaction were asked to

execute a confidentiality agreement with the Debtors. Houlihan Lokey assisted the Debtors in

establishing a virtual data room (the "**Dataroom**") to enable those interested parties who

executed confidentiality agreements with the opportunity to conduct diligence on the Debtors'

financial and operational information, including management's business plan forecast. Houlihan

3

Lokey also facilitated this process by providing additional information when requested by interested parties.

8.      At the end of October to early November, given softer than expected performance trends, the Debtors' liquidity position began to weaken substantially and a liquidity shortfall was forecasted to potentially occur as early as mid-November. The Debtors approached their lenders and sponsors seeking additional liquidity support to cover this shortfall and fund operations. When it became apparent that the requested liquidity support was not available, the Debtors began exploring numerous self-help liquidity initiatives, including expense reductions and the deferral of rent payments, which measures provided temporary deferral of the forecasted liquidity shortfall. It was also determined that the marketing process should be augmented to solicit investor interest in (i) consummating a financing or sale transaction through a near-term bankruptcy process and (ii) serving as a potential stalking horse purchaser or plan sponsor in a bankruptcy process.

9.      Houlihan Lokey augmented the marketing process as required given the revised liquidity circumstances. To date, none of the 32 parties that executed confidentiality agreements and accessed the Dataroom have yet submitted a preliminary indication of interest for a potential financing or acquisition of the Debtors on a going-concern basis either in or out of court. Additionally, none of these potential buyers expressed interest in serving as a potential stalking horse purchaser or investor as part of a bankruptcy process. We communicated to interested parties that to the extent there was a bankruptcy filing and if they were not the stalking horse investor/purchaser, there may still be the potential to bid on the assets on a going-concern

4

basis at a bankruptcy related auction.  There has been interest expressed by going concern

buyers.

### Liquidator Bid Solicitation Process

10.    In connection with contingency planning for a potential Chapter 11 filing,

beginning October 29, 2014 and through early November (concurrent with the going-concern

sale and financing processes), Houlihan Lokey contacted five nationally known liquidators

capable of handling a company-wide store closing process and requested proposals from each to

serve as a stalking horse purchaser of the Debtors' assets whose contract would be subject to

potential higher and/or better bids, including potential going-concern bids, at a bankruptcy

auction. Each of these parties executed a confidentiality agreement and received access to the

Dataroom, as well as additional confidential information about the Debtors' assets.  Several of

the parties explored the possibility of entering into joint ventures with each other.

11.    By November 13, 2014, the Debtors received two preliminary proposals

that are typical of such proposals in the liquidation industry for conducting store closing sales to

sell inventory and disposing of FF&E in the store locations, distribution center and the corporate

headquarters.  In particular, each of the proposals provided that the liquidator would pay the

Debtors a guaranteed amount of cash equal to a fixed percentage of the Debtors' cost value of

their inventory, subject to certain adjustments.  Both proposals provided for payment of certain

store-related expenses of the Debtors, including but not limited to occupancy and payroll

expenses, plus certain operating expenses up to certain capped amounts for the duration of store

closing sales. Notably, neither proposal contemplated the purchase of the Debtors' intellectual property assets.

12.    I reviewed the initial proposals and contacted the parties to discuss the key terms of each bid. I also engaged in negotiations with these parties regarding the terms of their respective proposals. I, together with the Debtors' representatives, also participated in discussions with the parties regarding the terms of their agency agreement.

13.    The Debtors, after consultation with PNC Bank National Association ("**PNC Bank**"), and lenders under the *Financing Agreement* dated as of October 11, 2011 with Ableco, L.L.C. as administrative and collateral agent (the "**Term Loan Secured Parties**"), and having not received any going-concern stalking horse bids, ultimately accepted a bid from a joint venture comprised of Gordon Brothers Retail Partners and Hilco Merchant Resources (the "**Stalking Horse**"), which they considered, in their business judgment, to be highest and best. The Debtors' advisors worked with the Stalking Horse, in consultation with PNC Bank and the Term Loan Secured Parties, to finalize the form of agency agreement which is attached to the Motion as Exhibit A (the "**Agency Agreement**").

14.    In my view, the process which the Debtors and their advisors pursued in order to identify an acceptable Stalking Horse agency agreement was fair, open, comprehensive and afforded all likely interested parties ample opportunity to conduct due diligence and formulate proposals if they chose to do so.

15.    The Agency Agreement has been extensively negotiated between the parties at arm's length and in good faith. In the course of these negotiations, the Debtors and

6

their advisors were successfully able to negotiate an Agency Agreement that includes a "break up" fee, which represents approximately 1.0% of the total consideration under the Agency Agreement. This, together with the absence of any "no shop" or non-solicitation period under the Agency Agreement, is designed to (a) encourage participation by other prospective buyers, including going-concern buyers, evaluating a potential overbid for the Debtors' assets and (b) establish an open and fair auction process.

16.    I believe that the Agency Agreement is the best and most viable method currently available to the Debtors to maximize recoveries for all of the Debtors' stakeholders. First, I believe that it is generally more cost effective for the Stalking Horse, with its substantial experience in retail liquidations, to conduct the potential store closing sales, rather than the Debtors. Second, I believe that this arrangement will minimize the Debtors' risk, while motivating the Stalking Horse to maximize proceeds from the store closing sales. Third, I believe it provides an appropriate benchmark to conduct a bankruptcy auction and preserves the opportunity to obtain higher and/or better bids from other liquidators as well as potential going-concern buyers.

### The Need for Immediate Relief to Avoid Immediate and Irreparable Harm

17.    Under these circumstances, the milestones set forth in the Agency Agreement are reasonable and warranted. The entry of the Sale Approval Order on or prior to January 7, 2015 is critical to assure the commencement of the store closing sales by January 9, 2015, if not otherwise sold to a going-concern buyer, and to preserve the value of the Debtors' estates. I believe this timeframe also allows potential competing bidders, including going-

7

concern buyers, ample opportunity to formulate comprehensive, binding bids to compete at an auction.

18.    In light of the Debtors' pre-petition solicitation of offers from liquidators, as well as the competitive bidding process among the nation's most prominent liquidators to enter into the Agency Agreement, I believe that approval of the Agency Agreement with the Stalking Horse is the best alternative to any other form of liquidation. Accordingly, I believe it is necessary to avoid immediate and irreparable harm to the Debtors' estates that the Debtors be granted authority to enter into the Agency Agreement and be granted the relief requested in the Motion by January 7, 2015 to enable the store closing sales to begin no later than January 9, 2015.

19.    Indeed, it is also critical to commence the sales as soon as possible for several important reasons, including the following:

(a)    First, the guaranteed amount that potential liquidators are willing to pay to conduct the closing sales could drop if the sales cannot commence promptly.

(b)    Second, the Debtors continue to incur expenses in connection with operating the store locations. However, upon approval of the proposed Agency Agreement and commencement of the store closing sales, the Stalking Horse will assume virtually all expenses of the store closing sales thus saving the Debtors' estates from incurring future expenses in connection with operating the store locations.

20.    Because the Debtors' marketing efforts to date have drawn few potential alternative bidders a continued long and protracted marketing and sales process beyond the

8

proposed sale approval date of January 7, 2015 is unlikely to elicit additional offers and would, instead, threaten the value of the Debtors' estates. Nevertheless, Houlihan Lokey is still working with the Debtors to continue to market to potential alternate bidders and has continued its marketing efforts towards potential going-concern purchasers, equity investors, liquidators and third party financing sources.

        21.     Over and above the robust marketing process and negotiations that occurred prior to the petition date, and that will continue post-petition in these chapter 11 cases, the Debtors have proposed a post-petition process for the sale of the Debtors' assets that will allow for an auction to be conducted should any qualified bidder ultimately desire to propose a bid with respect to all of, or any class of, the Debtors' assets. The Debtors' proposed auction process will "market test" the value the Debtors will receive in the sale of their assets so that such received value is fair and reasonable. This process, in my opinion, will ensure that the Debtors receive the greatest value possible for their assets while preserving the value of the proposals received to date.

        22.     I believe that the Agency Agreement and the process negotiated with the Stalking Horse (including the timelines set forth in the Agency Agreement) are fair and reasonable under the necessarily accelerated circumstances of these chapter 11 cases, particularly in light of (a) the Debtors' and Houlihan Lokey's efforts to date; (b) the lack of alternative proposals received thus far in marketing the Debtors' assets; and (c) the opportunity for third-parties to make overbids as part of the sale process via the auction.

<div align="center">9</div>

23.    In summary, based on my experience, I believe that the Debtors' decision to move forward with the sale of assets on the timetable described in the Motion utilizing the Stalking Horse as the potential purchaser will significantly enhance recoveries.  This is because: (a) the most able, nationally- recognized liquidators have been directly involved in the stalking horse bidding process; (b) those parties have expertise in quickly formulating proposals and were provided all the necessary diligence; (c) the solicitation process was typical, although expedited, for such situations; (d) the form of Agency Agreement used is customary for such transactions; (e) the terms and conditions in the Agency Agreement are customary for such transactions; (f) the terms and conditions allow for higher and/or better bids at an auction; and (g) as described in the *Declaration of Dawn Robertson in Support of First Day Motions* (the "**Robertson Declaration**"), there is no alternative bid to-date to acquire the Debtors as a going-concern despite solicitation efforts.

*[Remainder of page intentionally blank; signature on next page]*

24.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  New York, NY                                    HOULIHAN LOKEY
        December 5, 2014

                                                 By: _____
                                                     Derek Pitts
                                                     Managing Director

# EXHIBIT D

## Proposed Bidding Procedures Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x

In re:                                                      :    Chapter 11
                                                            :
DEB STORES HOLDING LLC, et al.,[1]                          :    Case No. 14 –12676 (MFW)
                                                            :
Debtors.                                                    :    (Jointly Administered)
                                                            :
                                                            :    Ref. Docket No. ____
------------------------------------------------------------x

### ORDER (I)(A) AUTHORIZING ENTRY INTO AGENCY AGREEMENT, (B) AUTHORIZING BIDDING PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Deb Stores Holding LLC on behalf of itself and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), for an order (this "**Order**") (a) authorizing entry into Agency Agreement, (b) authorizing Break Up Fee and Expense Reimbursement for the Stalking Horse, (c) authorizing proposed auction procedures (the "**Bidding Procedures**") and setting the time, date and place of the auction (the "**Auction**") and (d) approving the form of notice of the Auction and notice of the Store Closing Sales (the "**Auction Notice**") and (ii) setting a hearing (the "**Sale Hearing**"), to be held on January [_], 2015, to consider the entry of the Approval Order all as more fully set forth in the Motion; and upon the *Declaration of Dawn Robertson in Support of First Day Motions* and the *Declaration of Derek Pitts in Support of the Debtors' Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bidding*

---

[1]    The Debtors, together with the last four digits of each Debtor's tax identification number, are: Deb Stores Holding LLC (4407), Deb Stores Holding II LLC (4755), Deb Shops SDP Inc. (4120), Deb Shops SDIH Inc. (4113), Deb Shops SD Inc. (8806), Deb Shops SDE LLC (4077), Deb Shops SDW LLC (4065), Deb Shops SDE-Commerce LLC (0926), and Deb Shops SDFMC LLC (8842). The location of the Debtors' headquarters and the service address for each of the Debtors is 9401 Blue Grass Road, Philadelphia, PA 19114.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Agency Agreement.

DOCS_LA:283854.8 17794-001

*Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief*; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and it appearing that venue of these chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.      Good and sufficient notice of the Bidding Procedures and other related relief sought pursuant to the Motion has been given to all interested persons and entities, including, without limitation, (a) all parties provided with notice of the Motion; (b) all parties identified by the Debtors or their advisors as potentially interested purchasers; (c) all potential assigned contract counterparties; (d) all parties known or reasonably believed to have expressed an interest in the Assets; (e) all parties who are known to possess or assert a secured claim against the Assets; and (f) the relevant taxing authorities having jurisdiction over any of the Assets.

---

[3]      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

DOCS_LA:283854.8 17794-001

B.      Any remaining objections to the Motion with respect to the relief granted in this Order, or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are overruled in all respects and denied.

C.      The form of the Agency Agreement is hereby approved and is appropriate and reasonably calculated under the circumstances to enable the Debtors and other parties-in-interest to easily compare and contrast the differing terms of the bids presented at the Auction.

D.      The Bidding Procedures, substantially in the form attached hereto as <u>Exhibit 1</u>, are fair, reasonable and appropriate under the circumstances and are designed to maximize the Debtors' recovery with respect to the sale of the Assets, including sale of the Merchandise and Owned FF&E through the Store Closing Sales or to a Successful Bidder proposing an Alternative Transaction, including a going concern sale.

E.      The Debtors' proposed Auction Notice, substantially in the form attached hereto as <u>Exhibit 2</u>, is appropriate and reasonably calculated under the circumstances to provide all interested parties with timely and proper notice of the Bidding Procedures, the related Auction (if necessary), the Sale Hearing, and any and all objection deadlines and no other or further notice is required.

F.      The proposed notice substantially in the form attached hereto as <u>Exhibit 3</u> to be served on counterparties to Assumed Contracts (**"Cure Notice"**) is reasonably calculated to provide adequate notice concerning the proposed sale of the Assets and any proposed assumption and assignment of Assumed Contracts and will provide due and adequate notice of the relief sought in the Motion.

G.      Under the circumstances, timing and procedures set forth herein, in the Motion and in the Agency Agreement, the Debtors have demonstrated compelling and sound business

3

justifications for entry into the Agency Agreement and its terms, including, without limitation, the Break-Up Fee and Expense Reimbursement and Stalking Horse's actual out-of-pocket costs of signage and freight as provided in the Agency Agreement (collectively, the "**Bidding Protections**").

      H.     The Bidding Protections were: (a) negotiated by the Debtors and the Stalking Horse in good faith and at arm's-length, (b) are reasonable and appropriate under the circumstances given, among other things, the size and nature of the transaction and the efforts that have been expended and will continue to be expended by the Stalking Horse and (c) are a reasonable inducement for, and a condition of, the Stalking Horse's offer to serve as the Debtors' exclusive agent to conduct the Transaction on the terms set forth in the Agency Agreement and compensation for the risks and lost opportunity costs incurred by the Stalking Horse. The Bidding Protections are commensurate with the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse and constitute actual and necessary costs and expenses incurred by the Debtors in preserving the value of their estates within the meaning of section 503(b) of the Bankruptcy Code.

      I.     Entry into the Agency Agreement with the Stalking Horse is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest and, based on the information set forth in the Motion and presented to the Court, is an appropriate exercise of the Debtors' business judgment. The Agency Agreement will enable the Debtors to secure an adequate consideration floor for the Auction and will provide a clear benefit to the Debtors' estates and all other parties-in-interest.

      J.     The Transaction does not require the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) of the Bankruptcy Code.

<div align="center">4</div>

K.      No other or further notice shall be required. No finding or ruling is made in this Bidding Procedures Order as to the adequacy of any proposed transaction, it being intended that such approval will be sought at the Sale Hearing.

L.      No person or entity, other than the Stalking Horse, shall be entitled to any expense reimbursement, break up fee, "topping," termination or other similar fee or payment.

**IT IS HEREBY ORDERED THAT:**

1.      The procedural relief requested in the Motion is GRANTED.

2.      The Debtors are authorized to enter into the Agency Agreement and all of its terms (including the Bidding Protections) and the Transaction with the Stalking Horse, the Bidding Procedures, Auction Notice, setting the time, date and place of Sale Hearing, are hereby APPROVED, and fully incorporated into this Order, and shall apply with respect to the proposed Transaction. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Agency Agreement.

3.      The Bidding Procedures attached hereto as <u>Exhibit 1</u> are approved. The Debtors are hereby authorized to conduct an auction of the Assets pursuant to the Bidding Procedures and this Order.

4.      The Stalking Horse shall be deemed a Qualified Bidder pursuant to the Bidding Procedures for all purposes with respect to the Merchandise and Owned FF&E and shall be permitted to participate and bid for the Merchandise and Owned FF&E at the Auction.

5.      The Bidding Procedures shall apply to the Qualified Bidders and the conduct of the sale of the Assets and the Auction.

6.      The Bidding Protections are approved in accordance with the Bidding Procedures and the Agency Agreement. In the event that the Agency Agreement is not consummated with

5

the Stalking Horse because the Debtors elect as a consequence of the Auction to terminate the

Agency Agreement and pursue an alternative higher or otherwise better transaction with respect

to the Merchandise and Owned FF&E or as a going concern sale, the Bidding Protections, where

applicable, shall be paid to the Stalking Horse from the proceeds of an Alternative Transaction as

set forth in Section 16 of the Agency Agreement; *provided, however*, that in such event, the

Successful Bidder shall reimburse the Stalking Horse up to the amount of the Signage Costs (as

such term is defined in the Agency Agreement; *provided further* that in no event shall the

Debtors have any liability for such Signage Costs.  Pursuant to sections 105, 363, 364, 503, 506

and 507 of the Bankruptcy Code, the Debtors are hereby authorized and directed to pay, without

further order of this Court, the Bidding Protections pursuant to the terms and conditions set forth

in the Agency Agreement and this Order.

   7.  The Auction Notice, substantially in the form attached hereto as <u>Exhibit 2</u>, shall

be deemed good and sufficient notice of the Bidding Procedures and any related Auction, the

Sale Hearing and the associated objection periods, and is reasonably calculated to provide notice

to any affected party and afford the affected party the opportunity to exercise any rights affected

by the Motion as it relates to the Auction and Sale Hearing.

   8.  The Cure Notice, substantially in the form attached hereto as <u>Exhibit 3</u> to be

served on counterparties to Assumed Contracts (**"Cure Notice"**) is reasonably calculated to

provide adequate notice concerning the proposed sale of the Assets and any proposed assumption

and assignment of Assumed Contracts and will provide due and adequate notice of the relief

sought in the Motion.

9.      Within three (3) business days after entry of this Order, to the extent the Debtors determine in their discretion that providing such notice is in the best interests of their estates, the Debtors (or their agent) shall serve the Auction Notice upon all Notice Parties.

10.     Within three (3) business days after entry of this Order, the Debtors shall file and serve the Cure Notice to the counterparties to any Assumed Contracts.  Counterparties to the Assumed Contracts[4] (each a "**Counterparty**," and together, the "**Counterparties**") must file and serve any objection to the assumption and assignment of any Assumed Contract, including objections to any Cure Cost, so that such objections are received by **January ___, 2015 at 5:00 p.m. (Eastern Standard Time)**.

11.     In the event that an objection to any Cure Cost is timely filed by a Counterparty, such Counterparty's objection must set forth (i) the basis for the objection, (ii) with specificity, the amount the party asserts as the Cure Cost, and (iii) appropriate documentation in support of the alleged alternative Cure Cost.  In the event that the Debtors and the Counterparty cannot consensually resolve the Counterparty's objection to the Cure Cost, the Successful Bidder or any other assignee will segregate any disputed cure amounts pending the resolution of any such disputes by this Court or mutual agreement of the parties.

12.     Any Counterparty failing to timely file an objection to the Cure Cost set forth in the Cure Notice shall be deemed to consent to the assumption and assignment of the applicable Assumed Contract and forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, and the Successful Bidder with respect to the Assumed Contract to which it is a Counterparty.  For the avoidance of doubt,

---

[4] The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Contract.

no executory contract or unexpired lease will be assumed or assumed and assigned pursuant to the Motion.

13.    All other objections to approval of the Transaction, including the Sale of the Assets free and clear of liens, claims and encumbrances and the Approval Order must be in writing, state the basis of such objection with specificity and be filed with this Court in compliance with the Bankruptcy Rules and the Local Rules and served so as to be received by the Bid and Objection Notice Parties on or before 5:00 p.m. (Eastern Standard Time) on January __, 2015.

14.    Except as otherwise provided in the Agency Agreement, the Bidding Procedures or this Order, the Debtors may, as they may reasonably determine to be in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest:  (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the Successful Bid; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors or their estates; (d) remove any material Assets from the Auction; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) adjourn or cancel the Auction and/or Sale Hearing in open Court without further notice; (i) modify the Bidding Procedures or (j) withdraw the Motion at any time with or without prejudice.

15.    If no Qualified Bid other than the Qualified Bid submitted by the Stalking Horse is received by the Bid Deadline, then the Auction will not be held and the Debtors shall promptly seek this Court's approval of the Agency Agreement with the Stalking Horse.

8

16.    Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Store Closing Sales.

17.    Bidding at the Auction shall be transcribed.

18.    Only Qualified Bidders will be permitted to submit bids at the Auction.

19.    The Sale Hearing will be held in this Court on **January __, 2015 at __:00 _.m. (Eastern Standard Time)**. The Sale Hearing may be adjourned or rescheduled by the Debtors, with the consent of the Stalking Horse, without further notice by an announcement of the adjourned date at the Sale Hearing or by the filing of a hearing agenda.

20.    All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of this Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Transaction and the construction and enforcement of the Agency Agreement.

21.    In the event there is a conflict between this Order and the Motion or the Agency Agreement, this Order shall govern and control.

22.    The Debtors are hereby authorized to take such steps and incur such expenses as may be reasonably necessary or appropriate to effectuate the terms of this Order.

23.    This Order is binding on any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors' cases are proceeding under Chapter 7 or Chapter 11 of the Bankruptcy Code.

24.    Notwithstanding any applicability of Bankruptcy Rules 6004 and 6006 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

25.     The Stalking Horse's right to receive payment of the Bid Protections and reimbursement of the Signage Costs from the proceeds of an Alternative Transaction as provided in Section 16 of the Agency Agreement shall be the sole and exclusive remedy of the Stalking Horse in the event of termination of the Agency Agreement

26.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Bidding Protections or the Agency Agreement.

Dated:  Wilmington, Delaware
          December __, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

10

DOCS_LA:283854.8 17794-001

**EXHIBIT 1**

**Bidding Procedures**

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the sale (the "**Sale**") of the following classes of assets (each, an "**Asset Class**" and collectively, the "**Assets**") of Deb Stores Holding LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in connection with their jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), lead case number 14-12676 (MFW): (i) inventory, (ii) furniture, fixtures and equipment ("**Owned FF&E**"), (iii) intellectual property, (iv) accounts receivable and cash on hand in the stores or other closing locations, (v) real property leases and (vi) customer lists.  For the avoidance of doubt, the Debtors may solicit, and shall be entitled to consider and accept, bids for all or a portion of the Assets as part of a going concern sale.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE DEBTORS' ADVISORS, AS FOLLOWS:**

Laura Davis Jones Esq. and David Bertenthal, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Phone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
        dbertenthal@pszjlaw.com

Derek Pitts and Surbhi Gupta
Houlihan Lokey Capital, Inc.
245 Park Avenue, 20th Floor
New York, New York  10167
Phone:  (212) 497-4100
Facsimile:  (212) 661-3070
Email:  dpitts@hl.com
        sgupta@hl.com

**A.     Sale**

The Debtors seek to sell the Assets in all Asset Classes described above, pursuant to the Bidding Procedures as set forth herein.

**B.     Stalking Horse Agency Agreement**

With respect to the Debtors' inventory (the "**Merchandise**") and furniture, fixtures and equipment ("**Owned FF&E**"), the Debtors and a contractual joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the "**Stalking Horse**") have entered into that certain Agency Agreement, dated as of December 4, 2014 (the "**Stalking Horse Agency Agreement**"), attached hereto as Exhibit 1, pursuant to which the Stalking Horse will, among other things, acquire the Merchandise and

1

conduct chain-wide store closing sales (the "**Store Closing Sales**"), as well as act as the Debtors' exclusive agent to sell Owned FF&E at the Debtors' stores, distributions centers, corporate headquarters and other corporate offices owned by the Debtors.

Pursuant to the Stalking Horse Agency Agreement, the Debtors seek to sell the Merchandise and Owned FF&E from all of their retail locations and, at the Stalking Horse's option, e-commerce platforms and the Owned FF&E from the Debtors' warehouse, distribution facilities and corporate offices as described in the Stalking Horse Agency Agreement. The Sale is on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates, except to the extent set forth in the Stalking Horse Agency Agreement and as approved by the Bankruptcy Court.

Further, except as otherwise provided in the Stalking Horse Agency Agreement and as approved by the Bankruptcy Court, all of the Debtors' right, title and interest in and to the Assets will be sold free and clear of all liens, claims, interests and encumbrances thereon to the maximum extent permitted by section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), with such liens to attach to the net proceeds of the Sale with the same validity and priority as such liens had against the Assets.

The ability to undertake and consummate the Sale pursuant to the Stalking Horse Agency Agreement shall be subject to competitive bidding as set forth herein and approval by the Bankruptcy Court. The Debtors may consider bids for all or a portion of the Assets in a single bid from a single bidder, or multiple bids from multiple bidders, including bids on individual Asset Classes.

## C.    The Bidding Procedures

### 1.    *Provisions Governing Qualifications of Bidders*

Unless otherwise ordered by the Bankruptcy Court, prior to **4:00 p.m. prevailing Eastern time on December ___, 2014** (the "**Bid Deadline**"), each entity, other than the Stalking Horse, that wishes to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties (defined below):

(a)    a written disclosure of the identity of each entity, including involvement in any joint venture, that will be bidding (or participating in a bid) on the Assets or certain Asset Classes;

(b)    adequate assurance information, including (a) adequate information (in the Debtors' reasonable business judgment) about the financial condition of the Potential Bidder, such as federal tax returns for the previous two years, a current financial statement, and/or current bank account statements; and (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed transaction;

      (c)      an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

      (d)      a *bona fide* non-binding letter of intent or expression of interest with respect to a purchase of the Assets or certain Asset Classes which shall describe, among other things, the cash, financing commitments, or other sources of consideration that the Potential Bidder will use to consummate the proposed transaction, which of the Debtors' Assets or certain Asset Classes are proposed to be acquired in the proposed transaction, and any conditions to consummating the proposed transaction including any required internal approvals, syndication requirements, or other contingencies or approvals.

A Potential Bidder that the Debtors determine in their reasonable business judgment, after consultation with their advisors, counsel to any official committee of unsecured creditors appointed in these chapter 11 cases (the "**Committee**"), and counsel to PNC Bank, as lender under the Debtors' postpetition debtor in possession financing agreement (the "**DIP Lender**") and the prepetition term loan lenders (together with the DIP Lender, the "**Secured Lenders**") is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "**Qualified Bidder**." The Debtors will provide access to due diligence only to those parties they believe, in the exercise of their reasonable business judgment, are pursuing a proposed transaction in good faith.

As promptly as practicable after a Potential Bidder delivers the materials required above, the Debtors, in consultation with the Committee and the Secured Lenders, will make their determination and notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

### 2. *Due Diligence*

The Debtors will afford any Qualified Bidder such due diligence access or additional information as the Debtors deem appropriate, in their reasonable discretion. Any due diligence materials requested by any bidder shall be made available to bidders and the Stalking Horse in the data room, subject to such protections as the Debtors determine in their reasonable business judgment.

The due diligence period will extend through and including the Bid Deadline; *provided, however*, that any Qualified Bid (defined below) submitted will be irrevocable until the selection of the Successful Bidder (defined below) and the Back-Up Bidder (defined below) as described herein.

### 3. *Provisions Governing Qualified Bids*

A bid will be considered a qualified bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "**Qualified Bid**") as determined by the Debtors in their business judgment:

      (a)      states with specificity the Asset Classes such Qualified Bidder offers to purchase, in cash, (which shall consist of at least the Asset Classes

3

described in the non-binding letter of intent submitted by such Qualified Bidder) and the liabilities and obligations to be assumed by the Qualified Bidder upon the terms and conditions set forth in an agency agreement based on the form of Stalking Horse Agency Agreement submitted by the Stalking Horse, as modified to reflect such Qualified Bidder's proposed transaction (an "**Alternative Transaction Agreement**");

(b)     discloses any connection or agreements with the Debtors, the Stalking Horse, any other known Potential Bidder and/or any officer, director or equity security holder of Deb Stores Holding LLC;

(c)     includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder; *provided that* if such Qualified Bidder is selected as the Successful Bidder or Back-Up Bidder, its offer will remain irrevocable until the date that is three business days after the commencement of the Store Closing Sales or, if a going-concern bid is the Successful Bid, until the closing of the Sale;

(d)     contains written confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement, including, but not limited to, any additional due diligence, inventory evaluation or financing conditions, and that all necessary approvals have been obtained prior to the date of submission of the bid;

(e)     includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Stalking Horse Agency Agreement or Alternative Transaction Agreement;

(f)     includes a duly authorized and executed copy of the Stalking Horse Agency Agreement or Alternative Transaction Agreement (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications to (a) the Stalking Horse Agency Agreement and (b) the proposed Approval Order;

(g)     includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the Sale, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale;

(h)     includes an acknowledgement and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties

4

whatsoever, whether express or implied, regarding the Assets or the completeness of any information provided except as expressly stated in the Stalking Horse Agency Agreement or Alternative Transaction Agreement; and (d) is not entitled to any expense reimbursement, break-up fee or similar type of payment in connection with its bid;

(i)     is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, in an amount equal to ten percent of the value of such Qualified Bidder's Qualified Bid (as quantified by the Debtors) (the "**Deposit**");

(j)     is accompanied by a letter (a) stating with specificity the Assets or Asset Classes such Qualified Bidder wishes to bid on and the liabilities and obligations to be assumed by such Qualified Bidder, (b) specifying all material terms of the bid that are substantially the same as or better than those of the Stalking Horse bid, to the extent the bid is on the same Asset Class as the Stalking Horse bid, (c) stating that its offer is a *bona fide* offer that it intends to consummate if it is selected as the Successful Bidder and (d) stating that such Qualified Bidder has not engaged in any collusion with respect to the bidding process;

(k)     contains such other information as is requested by the Debtors in their sole business judgment; and

(l)     is received prior to the Bid Deadline.

The Debtors will notify all Qualified Bidders by not later than two business days after the Bid Deadline as to whether or not *any* bids constitute Qualified Bids with respect to any Asset Class and whether *such* Qualified Bidder's bid constitutes a Qualified Bid. The Debtors retain the right, upon consultation with the Secured Lenders and the Committee, to waive or modify the terms of the Bidding Procedures when determining which bids (other than the Stalking Horse Agency Agreement, which shall constitute a Qualified Bid) may be deemed Qualified Bids, *provided, however*, that waiver by the Debtors of the requirement of a Deposit set forth in clause subparagraph C.3(i) above is subject to the prior consent of the Secured Lenders. As soon as reasonably practicable after the Debtors determine that a bid is a Qualified Bid, the Debtors shall distribute a copy of such bid to counsel to the Stalking Horse by e-mail.

The Stalking Horse shall be deemed a Qualified Bidder for all purposes with respect to any Asset Class proposed to be acquired by the Stalking Horse bid and shall not be required to comply with the requirements in Section B.3 hereof, *provided* that such bid by the Stalking Horse with respect to additional Asset Classes not otherwise contemplated by the Stalking Horse Agency Agreement is delivered to the Notice Parties by the Bid Deadline.

**4. *Bid Deadline***

A Qualified Bidder that desires to make a bid must deliver written copies of its bid to the following parties (collectively, the "**Notice Parties**") so as to be received not later than the Bid Deadline of **4:00 p.m. prevailing Eastern time on December ___, 2014**:

**INSERT NOTICE PARTIES**

Laura Davis Jones Esq. and David Bertenthal, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19801

Derek Pitts and Surbhi Gupta
Houlihan Lokey Capital, Inc.
245 Park Avenue, 20th Floor
New York, New York 10167

The Bid Deadline may be extended by the Debtors with the consent of the Stalking Horse and each of the Notice Parties (which consent shall not be unreasonably withheld).

### 5. *Evaluation of Competing Bids*

A Qualified Bid will be valued based upon several factors as determined by the Debtors in their business judgment including, without limitation: (a) the amount of such bid; (b) the Asset Classes included in such bid, (c) the risks and timing associated with consummating such bid; (d) any proposed revisions from the Stalking Horse Agency Agreement and/or the Approval Order; and (e) any other factors deemed relevant by the Debtors in their reasonable business judgment, upon consultation with the Secured Lenders.

### 6. *No Auction if No Qualified Bids*

If the Debtors receive no more than one Qualified Bid (including the Stalking Horse bid) on each Asset Class, the Debtors will not hold the Auction and instead shall request at the Sale Hearing (defined below) that the Bankruptcy Court approve the Stalking Horse Agency Agreement with the Stalking Horse.

### 7. *Auction Process*

If the Debtors receive more than one Qualified Bid for the Assets or any Asset Class (including the Stalking Horse bid), the Debtors will conduct an auction, which will be transcribed, at **10:00 a.m. prevailing Eastern Time on January ___, 2014** (the "**Auction**") at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, or such other location as will be timely communicated to all entities entitled to attend the Auction. The Auction will be conducted in accordance with the following procedures:

(a)     Only the Debtors, the Committee, the Secured Lenders, any Qualified Bidder that submitted a Qualified Bid, and the advisors to each of the foregoing, will be entitled to attend the Auction, and only the Qualified Bidders will be entitled to make any bids at the Auction.

(b)     Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding at the Auction.