IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| —————————————————————— ) | |
| | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| DEB STORES HOLDING | ) Case No. 14-12676 (KG) |
| LLC, *et al.*, | ) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| | ) Re:  Docket Nos. 11, 45 |
| | ) |
| | ) Obj. Deadline: 12/31/14, 4:00 p.m. |
| | ) Hearing Date: 1/7/15, 11:00 a.m. |
| —————————————————————— ) | |

OBJECTION OF CERTAIN UTILITY COMPANIES TO THE
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE
OF PAYMENT FOR FUTURE UTILITY SERVICES, (B) PROHIBITING UTILITY
COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES,
(C) APPROVING THE DEBTORS' PROPOSED PROCEDURES FOR RESOLVING
ADEQUATE ASSURANCE REQUESTS, AND (D) GRANTING RELATED RELIEF

Ameren Illinois Company ("Ameren"), American Electric Power
("AEP"), Baltimore Gas and Electric Company ("BGE"), Central
Maine Power Company ("CMP"), Commonwealth Edison Company
("ComEd"), Duke Energy Carolinas, LLC ("DEC"), Duke Energy
Indiana, Inc. ("DEI"), Duke Energy Florida, Inc. ("DEF"), New
York State Electric and Gas Corporation ("NYSEG") and PECO
Energy Company ("PECO") (collectively, the "Utilities"), by
counsel, hereby object to the *Debtors' Motion For Entry of
Interim and Final Orders (A) Approving the Debtors' Proposed
Adequate Assurance of Payment For Future Utility Services, (B)
Prohibiting Utility Companies From Altering, Refusing, or
Discontinuing Services, (C) Approving the Debtors' Proposed
Procedures For Resolving Adequate Assurance Requests, and (D)*

*Granting Related Relief* (the "Utility Motion"), and set forth the following:

## Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

With respect to Section 366(c) of the Bankruptcy Code, it specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account. Despite the foregoing, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account that purportedly contains one-half of the Debtors' average monthly utility charges from July 2014 through November 2014 (the "Bank Account"). Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment, the Court should reject it as an insufficient form of adequate assurance of payment for the following reasons:

(i) Unlike all of the identified and permissible forms of adequate assurance of payment listed in Section 366(c)(1)(A), the Bank Account is not something held by the Utilities, so the Utilities have no control over: (A) when

2

the Bank Account will be terminated; or (B) If the Bank Account will remain in place if there is an event of a default by the Debtors on their use of DIP financing (this is in complete contrast to the $250,000 Carve Out received by the Debtors' professionals in the DIP Financing pleadings, which remains in place even if there is an event of default);

(ii) The Bank Account, unlike the Professionals Carve Out, may be subject to the DIP lenders' liens;

(iii) It is underfunded from the outset because the Utilities issue monthly bills; and

(iv) The Debtors are not required to replenish the Bank Account following pay-outs.

The post-petition deposits sought by the Utilities in these jointly-administered cases are the following two-month deposits that the Utilities are authorized to obtain from all of the customers in their service territories pursuant to applicable state law:  (A) AEP - $29,256; (B) Ameren - $8,492; (C) BGE - $7,383; (D) CMP - $8,734; (E) ComEd - $13,940; (F) DEC - $1,840; (G) DEI - $4,125; (H) DEF - $2,010; (I) NYSEG - $6,665; and (J) PECO - $53,710.  Based on all the foregoing, this Court should deny the Utility Motion because the amounts of the post-petition deposit requests of the Utilities are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.    On December 4, 2014 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.    The Debtors' chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    Proper notice of the Utility Motion was not provided to the Utilities prior to the Court entering the *Interim Order (A) Approving the Debtors' Proposed Adequate Assurance of Payment For Future Utility Services, (B) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (C) Approving the Debtors' Proposed Procedures For Resolving Adequate Assurance Requests, and (D) Granting Related Relief* (the "Interim Utility Order") on December 5, 2014.

5.    Because the Utilities were not properly or timely served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, the Utilities had no opportunity to respond to the Utility Motion or

4

otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on December 5, 2014, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" to the Utilities.

6.    In the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is the Bank Account containing $282,659.25 that is supposedly equal to approximately one-half of the Debtors' average monthly utility charges from July 2014 through November 2014 (the "Bank Account"). Utility Motion at ¶ 11.  As set forth in this Objection, the foregoing proposal is unacceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

7.    The Debtors claim that they pay approximately $565,318.50 each month for utility services.  However, the Debtors also claim that their estimated utility charges for the first 30 days of their bankruptcy cases will be approximately $282,659.25, which does not make sense.  Utility Motion at ¶ 9.

8.    Both the Interim Utility Order and the proposed Final Utility Order provide that any payment to be made therein would be subject to the orders approving DIP financing and authorizing use of cash collateral.    Interim Utility Order at ¶ 15; proposed Final Utility Order at ¶ 14.    It is not clear if the Debtors and their secured lenders are trying to subordinate all of the post-petition payments made to the Utilities to the secured lenders' liens or just the proposed amount contained in the Bank Account. At a minimum, all post-petition payments made by the Debtors to the Utilities, including any post-petition security, should not be subordinated to the lenders' liens or subject to subsequent disgorgement by the secured lenders. If the Debtors want the Utilities to provide post-petition utility goods/services, any and all post-petition payments made to the Utilities should be free and clear of any and all liens, otherwise all of the relief sought in the Utility Motion is nothing more than a subterfuge.

9.    The Utility Motion does not address why the Bank Account would be undercapitalized at only a two-week deposit amount, especially when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contract to bill the Debtors monthly.

10.    Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).    Rather, without providing any specifics, the Utility Motion merely states that the Bank Account "in conjunction with

6

the Debtors' ability to pay for future utility services in accordance with prepetition practice . . . constitutes sufficient adequate assurance to the Utility Companies . . .." Utility Motion at ¶ 11.

### Facts Regarding the Debtors

11.   The Debtors are a mall-based retailer in the juniors "fast-fashion" specialty sector that operate under the name "DEB" and offers women's sportswear, dresses, coats, lingerie, accessories and shoes for junior and plus sizes. *Declaration of Dawn Robertson In Support of First Day Motions* ("First Day Declaration"), ¶ 6.

12.   On June 26, 2011, parent company DSI Holdings, Inc. and its subsidiaries ("Predecessor DEB") filed chapter 11 petition for relief with this Court (Case NO. 11-11941 (KJC)). First Day Declaration at ¶ 11.

13.   On October 11, 2011, Predecessor DEB's and the Debtors closed a sale transaction whereby the Debtors acquired substantially all of Predecessor DEB's assets and assumed liabilities, including the assumption of $60 million of Predecessor DEB's debt pursuant to the Term Loan described below. First Day Declaration at ¶ 12.

### The Debtors' Recent Financial Information

14.   As of December 31, 2013, the Debtors' most recent audited consolidated financial statements reflected assets totaling approximately $90.5 million and liabilities totaling approximately $120.1 million.  As of that date, the Debtors'

7

assets included cash or cash equivalents of approximately $1.5 million, inventory of $45.4 million and accounts receivable of approximately $2.6 million.  First Day Declaration at ¶ 21.

### Events Leading To the Filing of the Debtors' Chapter 11 Cases

15.   The Debtors' recent performance has been strained due to a combination of factors including the historic lack of capital invested in their business resulting from old tired stores with unfavorable mall traffic and a general weakness in the competitive Junior Space.  First Day Declaration at ¶ 27.

16.   In October 2014, potential interested parties were contacted regarding a potential investment or sale transaction. At the commencement of that process, the Debtors' liquidity position was forecasted to be sufficient to run a 60 to 90 day marketing process under reasonably stable business conditions. First Day Declaration at ¶ 30.

17.   At the end of October to early November 2014, given softer than expected performance trends, the Debtors' liquidity position began to weaken substantially and a forecasted potential liquidity shortfall developed in early November.  The Debtors approached their lenders and sponsors seeking additional liquidity support to cover the foregoing shortfall and fund operations.  When it became apparent that the requested liquidity support was not available, the Debtors began exploring numerous self-help liquidity initiatives, including expense reductions and the deferral of rent payments, which measures provided temporary deferral of the forecasted liquidity

8

shortfall.  It was also determined that the marketing process should be augmented to solicit investor interest in (i) consummating a financing or sale transaction through a near-term bankruptcy process and (ii) serving as a potential stalking horse purchaser or plan sponsor in a bankruptcy process.  First Day Declaration at ¶ 31.

18.  The augmented marketing process did not yield a going-concern bid from a stalking horse investor/purchaser.  First Day Declaration at ¶ 32.

19.  Having not received any going-concern stalking horse bids, the Debtor and their advisors began working with a joint venture comprised of Gordon Brothers Retail Partners and Hilco Merchant Resources (the "Potential Stalking Horse") to finalize a form of agency agreement, pursuant to which the Potential Stalking Horse would be designated as the Debtors' agent to conduct store closing sales and liquidate the Debtors' inventory. First Day Declaration at ¶ 35.

## The Debtors' Post-Petition Financing

20.  On the Petition Date, the Debtors filed the *Debtors' Motion For Entry of Interim and Final Orders Authorizing Borrowing and the Use of Cash Collateral, Granting Liens and Providing Super-Priority Administrative Expense Status and Granting Adequate Protection Pursuant To Sections 363 and 364 of the Bankruptcy Code* (the "Financing Motion").

21.  As of the Petition Date, the Debtors were parties to a Revolving Credit and Security Agreement dated as of October 11,

2011 (as amended, modified, and/or supplemented, the "Prepetition Revolving Credit Agreement") pursuant to which (i) the Debtors were indebted to the Prepetition Revolving Credit Secured Parties in the approximate non-contingent liquidated amount of $25,147,305.22 as of December 1, 2014, plus prepetition interest, fees, expenses, and other amounts arising under the Prepetition Revolving Credit Agreement, and (ii) the Prepetition Revolving Credit Obligations were secured by unavoidable liens on and security interests encumbering substantially all assets of the Debtors.  Financing Motion at p. 7.

22.  As of the Petition Date, the Debtors were parties to a Financing Agreement dated as of October 11, 2011 (as amended, modified, and/or supplemented, the "Term Loan Agreement") to which (i) the Debtors were indebted to the Term Loan Secured Parties in the approximate amount of $74,511,020.97, plus prepetition interest, and unpaid fees, expenses, and other amounts arising under the Term Loan Agreement, and (ii) the Term Loan Obligations were secured by unavoidable liens on and security interests encumbering the Prepetition Collateral. Financing Motion at ¶ 8.

23.  As of the Petition Date, the Debtors, the Prepetition Revolving Credit Agent, and the Term Loan Agent were parties to an Intercreditor Agreement dated as of October 11, 2011 (as amended, modified, and/or supplemented, the "Intercreditor Agreement") which provides the Prepetition Revolving Credit

10

Agent with a priority over the Term Loan Agent in the Revolving Credit Collateral and the Term Loan Agent having priority over the Prepetition Revolving Credit Agent in the Term Loan Priority Collateral.  Financing Motion at ¶ 9.

24.  Through the Financing Motion, the Debtors are seeking authority to obtain a senior debtor-in-possession revolving credit facility in the amount up to $25 million, with $23 million available on an interim basis.  Financing Motion at ¶ 15.

25.  Through the Financing Motion, the Debtors also seek a $250,000 carve-out for the payment of fees and expenses of the Debtors' professionals.  Financing Motion at pp. 10-11.

26.  On December 5, 2014, the Court entered the *Interim Financing Order Authorizing Borrowing and the Use of Cash Collateral, Granting Liens and Providing Super-Priority Administrative Expense Status and Granting Adequate Protection Pursuant To Sections 363 and 364 of the Bankruptcy Code* (the "Interim Financing Order"). The Interim Financing Order authorized the Debtors to borrow $23 million on an interim basis. Interim Financing Order at p. 7.

27.  The Interim Financing Order also approved the $250,000 Carve-Out.  Interim Financing Order at p. 15.

## The Sale Motion

28.  On December 5, 2014, the Debtors filed the *Debtors' Motion For Orders (I)(A) Authorizing Entry Into Agency Agreement, (B) Authorizing Bidding Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing*

11

*and Approving Notice Thereof; (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* (the "Sale Motion").

29.    Through the Sale Motion, the Debtors are seeking authority to conduct an auction for the sale of the Debtors' (i) inventory, (ii) furniture, fixtures and equipment, (iii) intellectual property, (iv) accounts receivable and cash on hand in the stores or other closing locations, (v) real property leases and (vi) customer lists (the "Assets"), either on a going-concern basis or via chain-wide store closing sales (the "Store Closing Sales") and liquidation.  It is also anticipated that the Debtors would seek to separately sell certain intellectual property assets to the extent the Debtors are not sold on a going-concern basis at auction.  Sale Motion at ¶ 5.

30.    The Debtors are also seeking authority to enter into an Agency Agreement for a Store Closure Process that would serve as the stalking horse bid, which would be subject to higher and/or better bids at an auction.  Sale Motion at ¶ 6.

31.    Pursuant to their post-petition financing agreement, the Debtors have agreed to commence, at a minimum, the Store Closing Sales no later than January 9, 2015.  The Agency Agreement provides that the Store Closing Sales commence on or prior to January 9, 2015.  Sale Motion at ¶ 9.

32.    The Debtors' propose that the Stalking Horse will commence the Store Closing Sale on or prior to January 9, 2015, and expects to end the Store Closing Sales on or about April 30,

12

2015.  Sale Motion at p. 10.

33.  The Debtors have proposed the following timeline:  (i) Bid Procedures Hearing – 12/19/14; (ii) Submission Deadline For Qualified Bids – 12/31/14; (iii) Auction – 1/6/15; (iv) Store Closing/Transaction Approval Hearing – 1/7/15; (v) Consummation of Transaction – 1/9/15.  Sale Motion at ¶ 15.  At this time, numerous objections to the Sale Motion have been filed, several of which, including the Objection filed by the Unsecured Creditors' Committee, question the Debtors administrative solvency.

## Facts Concerning the Utilities

34.  Each of the Utilities provided the Debtors with prepetition utility goods and/or services and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

35.  Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill. If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or its service will be disconnected.  Accordingly, under the Utilities'

13

billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

36.    In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to the tariffs and/or state laws, regulations and/or ordinances set forth in Exhibit "A" below.

37.    Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---------|---------------|-------------------|--------------|
| AEP | 15 | n/a | $29,256 (2-month) |
| Ameren | 6 | $4,276.84 | $8,492 (2-month) |
| BGE | 2 | $3,850 | $7,383 (2-month) |
| CMP | 3 | n/a | $8,734 (2-month) |
| ComEd | 10 | $9,933 | $13,940 (2-month) |
| DEC | 1 | $1,105 | $1,840 (2-month) |
| DEI | 2 | $4,689.72 | $4,125 (2-month) |
| DEF | 1 | $63.62 | $2,010 (2-month) |
| NYSEG | 4 | $345.89 | $6,665 (2-month) |
| PECO | 2 | $38,157.74 | $53,710 (2-month) |

38.    AEP held prepetition deposits totaling $8,157 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any deposit credit after recoupment can be applied to AEP's post-petition deposit request.

39.    CMP held prepetition deposits that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code resulting in a deposit credit of $64.58 that can be applied to CMP's post-petition deposit request.

40.    NYSEG held prepetition deposits that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit credit remains after recoupment.

41.    PECO held a prepetition deposit of $670 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit credit remains after recoupment.

## Discussion

**A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

15

> (3)(A) On request of a party in interest and after notice
> and a hearing, the court may order modification of the
> amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.*, 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the

16

Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

1. **The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

(i)   Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over access to the Bank Account or how long the Bank Account will remain in place.

(ii)  In addition, in order to access the Bank Account, Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a Disbursement Request.

(iii) It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have used at least 45 to 60 days of commodity and/or service.

(iv)  The Bank Account, unlike the Professionals Carve Out, may be subject to the DIP lenders' liens.

(v)   The Debtors are not required to replenish the Bank Account following pay-outs.

17

Accordingly, the Court should not approve the Bank Account as adequate assurance to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

**2.    The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain why the amount of the Utilities' adequate assurance requests should be modified.  Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

18

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed."  *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

Although the billing cycles for each of the Utilities are slightly different, they all bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior

19

month.  Each Utility then provides the Debtors with a certain period of time to pay the bill, the timing of which is set forth in applicable state laws, tariffs, regulations and/or contracts.

Based on the foregoing state-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of 45 to 60 days based on their billing cycles.  Furthermore, the amounts of the Utilities' deposit requests are the amounts that the applicable public service commission, which is a neutral third-party entity, or applicable contract, permits the Utilities to request from their customers. The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law are binding on this Court, but, instead are introducing those amounts as evidence of amounts that their regulatory entities permit them to request from their customers.

Debtors' counsel has ensured that they and other post-petition professionals are favored creditors over the Utilities by ensuring that their post-petition bills/expenses are paid, even in the event of a post-petition DIP Financing default, by seeking a $250,000 carve-out for the payment of their fees/expenses.  Therefore, despite the fact that the Utilities continue to provide the Debtors with crucial post-petition

20

utility goods/services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of adequate security for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security they are seeking.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.   Denying the Utility Motion as to the Utilities;

2.   Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities, which are the form and amounts requested herein; and

3.   Providing such other and further relief as the Court deems just and appropriate.


Dated:    December 18, 2014    STEVENS & LEE, P.C.

                              /s/ John D. Demmy_____
                              John D. Demmy (Bar No. 2802)
                              1105 North Market Street, 7th Floor
                              Wilmington, Delaware 19801
                              Telephone:  (302) 425-3308
                              E-mail:   jdd@stevenslee.com

                              and

Russell R. Johnson III
John M. Craig
Law Firm of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862
E-mail:  russj4478@aol.com

*Counsel for Ameren Illinois
Company, American Electric Power,
Baltimore Gas and Electric
Company, Central Maine Power
Company, Commonwealth Edison
Company, Duke Energy Carolinas,
LLC, Duke Energy Indiana, Inc.,
Duke Energy Florida, Inc. d/b/a
Progress Energy Florida, New York
State Electric and Gas
Corporation, and PECO Energy
Company*